KATHY A.F. DAVIS (4022)
RACHELLE SHUMWAY (8177)
K. TESS DAVIS (15831)
Assistant Attorneys General
Utah Attorney General's Office
MARK BOSHELL (16002)
CLAY CROZIER (17192)
Special Assistant Attorneys General
DEREK BROWN (UT 10476)
UTAH ATTORNEY GENERAL
1594 West North Temple, Suite 300
Salt Lake City, Utah 84116
kathydavis@agutah.gov
rashumway@agutah.gov
mboshell@utah.gov
claycrozier@utah.gov

*Attorneys for Plaintiffs*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| STATE OF UTAH, including the UTAH SCHOOL AND INSTITUTIONAL TRUST LANDS ADMINISTRATION (SITLA), an agency of the State of Utah; and EMERY COUNTY, a Utah political subdivision, SEVIER COUNTY, a Utah political subdivision<br><br>Plaintiffs,<br><br>vs.<br><br>Doug Burgum, in his official capacity as SECRETARY OF THE INTERIOR; the DEPARTMENT OF THE INTERIOR, an agency of the United States of America; BILL GROFFY, in his official capacity as PRINCIPAL DEPUTY DIRECTOR OF THE BUREAU OF LAND MANAGEMENT; and the BUREAU OF LAND MANAGEMENT, an agency of the United States of America,<br><br>Defendants, | Case No.<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br><br>Judge<br>Magistrate Judge |

Plaintiffs, State of Utah ('State"), including the Utah School and Institutional Trust Lands Administration ("SITLA", also called Trust Lands Administration or "TLA"), Emery County and Sevier County (sometimes also collectively referred to as the "Counties"), by and through counsel, file this Complaint for Declaratory and Injunctive Relief against Defendants, Doug Burgum, in his official capacity as Secretary of the U.S. Department of the Interior (DOI), the DOI, Bill Groffy, in his official capacity as acting Principal Deputy Director of the U.S. Bureau of Land Management (BLM), and  BLM, and allege as follows:

## INTRODUCTION AND BACKGROUND

1.    The San Rafael Swell TMA encompasses roughly 1,314,325 acres of lands managed by BLM located in both Emery County and Sevier County in Utah.  Plaintiffs bring this action for declaratory and injunctive relief to challenge BLM's December 31, 2024, Decision Record ("DR" or "2024 Decision Record") on the San Rafael Swell Travel Management Plan ("TMP") as invalid and ask this Court set aside the Decision. Decision Record, December 31, 2024. Record Decision. https://eplanning.blm.gov/public_projects/1500146/200323703/20125831/251025811/SanRafael SwellTMP_DR_Final_Signed.pdf  (last visited August 25, 2025).

2.    The San Rafael Swell TMA is well-known for its spectacular landscapes which include canyons, arches, and mesas.  Due to this rare scenery, it is the region's "most well-known and popular scenic attraction" that draws in "high levels of recreation visitation."[1]  The DR resulted in the closure of approximately 665 miles of roads and road segments and restrictions placed on another 141 roads relating to Off-Highway Vehicles ("OHV's") or

---

[1] 1 See Bureau of Land Management, San Rafael Swell Travel Management Plan Environmental Assessment, DOI-BLM-UT-G020-2019-0019-EA at 4 (Dec. 2024).

seasonal use within the TMA. *See* Exhibit 1 - San Rafael TMA Map.

3.    Prior to the December 2024 DR, in 2008, the BLM released its Resource

Management Plans ("RMPs") for six field offices in Utah, with associated Travel Management

Plans, including the Price Field Office ("PFO"), which encompasses the San Rafael Swell.  The

2008 PFO RMP incorporated specific designations for OHV routes which were more restrictive

than the historic routes that had been used for decades, significantly reducing the number of

routes open to OHV vehicle use.  Due to confusion regarding both the content and incomplete

implementation of the 2008 RMP, in the years following its release, both BLM and Emery

County each created its own OHV maps and eventually joined in a collaborative effort to

develop new maps. DR at 2.

4.    Eventually, the Travel Management Plans for the six field offices were litigated

by various environmental special interest groups or non-governmental organizations ("NGOs")

including the Southern Utah Wilderness Alliance ("SUWA").  In 2017, a settlement agreement

("Settlement Agreement") was reached between the NGOs and BLM, in the United States

District Court for the District of Utah, which required BLM to create all new travel management

plants for Utah TMAs, including the San Rafael Swell. DOI-BLM-UT-G020-2019-0019-EA

https://eplanning.blm.gov/public_projects/1500146/200323705/20125833/251025813/SanRafael

SwellTMP_EA_MAPS.pdf (last visited July 15, 2025).   The Settlement Agreement was

negotiated without any inclusion or involvement of the State and certain  intervenors, and the

court dismissed the case. *S. Utah Wilderness All. v. U.S. Bureau of Land Mgmt, et. al.*, Case No.

2:21-cv-0091-DAK-JCB, Dkt 60 (the "RMP Case").

5.    The DR challenged in this case is the outcome of the Settlement Agreement in the

RMP Case. *See* DR, Section 2.4.

6.      In the RMP Case, SUWA sought to force BLM to reconsider and close additional routes that are within a vast area in within Utah that SUWA has been pushing to be congressionally designated as "Red Rock Wilderness."

7.      Every year for the past thirty years, SUWA and a few members of Congress sponsor a bill known as the *Red Rock Wilderness Bill*, aimed at creating millions of additional acres of congressionally designated wilderness throughout Utah.  However, that bill has never passed.  SUWA, by filing the RMP Case, attempted to accomplish that designation exclusively delegated to Congress, through litigation.

8.      In 2019, Congress passed, and President Donald J. Trump signed the John D. Dingell Jr. Conservation, Management, and Recreation Act ("Dingell Act"). Public Law No. 116-9.  The Dingell Act specifically has a section known as the "Emery County Public Land Management" provision to resolve certain issues such as the one articulated in this complaint. Dingell Act Subtitle C Part II.

9.      The Dingell Act was intended to be a compromise between the State, Emery County, and SUWA to maintain access and existing uses within Emery County's boundaries while giving wilderness advocates certain congressionally designated wilderness areas located in Emery County. 165 Cong. Rec., 116th Cong. S5571, 2019.  Ultimately, the Dingell Act designated certain areas as Wilderness, other areas as Recreation Area, and directed a land swap between SITLA and the BLM, among other things. *See* Dingell Act at § 1221 (establishing the San Rafael Swell Recreation Area), § 1231 (establishing additions to the National Wilderness Preservation System within Emery County), and § 1255 (authorizing a land swap between SITLA and the BLM).

10.     The Dingell Act's Senate Sponsor, Senator Mitt Romney, put into the

Congressional Record the statement that, "Fundamental to this process was the effort to avoid any action that would end a current ongoing use." And the Dingell Act's House Sponsor, Representative John R. Curtis, put into the Congressional Record the statement that, "our founding principle was to never take any action that would end a current ongoing use. For example, **we were immensely careful to not close a road, trail, air strip**." (emphasis added). *See* Exhibit 2 – Senator Mitt Romney and Representative John R. Curtis Congressional Intent Records.

11.    The State contends that a "principal major use" in the San Rafael Swell TMA is public motorized travel, and the BLM violated Congress' intent by ending the use on a large host of routes. *See* FLPMA §103(l) (describing recreation as a principal major use).

12.    Further, Section 1222(j) of the Dingell Act the State was to be considered for a cooperative agreement, which further show this was meant to be a compromise with the counties and the State. John D. Dingell Jr. Conservation, Management, and Recreation Act ("Dingell Act"). Public Law No. 116-9, § 1222(j).

13.    The 665 miles of roads and road segments that were closed, and the limitations placed on another 141 miles by BLM in the 2024 San Rafael Decision Record, are within the area that SUWA has proposed to Congress for designation as Red Rock Wilderness.

14.    The BLM released the preliminary alternatives, the scoping reports, the baseline monitoring report, and the preliminary route reports to the public February 22, 2024. DR at 141. BLM received over 6,000 comments, where 245 of the comments were considered "substantive", and of those considered substantive, only 139 led to changes to the DR or reroute reports. *Id.*

15.    The State and Emery County and Sevier County each submitted comment letters in each of the respective comment periods for both the 2008 and the 2024 Environmental

Assessment and DR. *See* State's Exhibit 3 - State Comment Letters; State's Exhibit 4 - County

Comment Letters.

16.     SITLA also submitted relevant comments during each of the respective comment

periods. *See* State's Exhibit 5 – SITLA Comment Letters.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal

question); 28 U.S.C. § 2201 (declaratory judgment); the Federal Land Policy Management Act

("FLPMA"), 43 U.S.C. §§ 1701-1784; the National Environmental Policy Act ("NEPA"), 42

U.S.C. §§ 4321-35; and the federal Administrative Procedure Act ("APA"), 5 U.S.C. § 706.

18.     Judicial review of Defendants' actions is also available under the doctrine of non-

statutory judicial review of agency action because Defendants have acted without statutory

authority and the challenged actions are unlawful and *ultra vires.*

19.     The APA also authorizes judicial review of Defendants' actions because

Defendants have acted contrary to law and without lawful authority, 5 U.S.C. § 706(2)(C)

(2024), as well as arbitrarily, capriciously, and not in accordance with law. 5 U.S.C. § 706(2)(A)

(2024).

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) (2024) because the

San Rafael Swell TMA is situated within the State.

## PARTIES

21.     The State is one of fifty sovereign states forming the United States of America,

having been admitted to the Union on January 4, 1896, on an equal footing with the original

states.  The executive power of the State is vested in the Governor, who is responsible for seeing

that the laws of the State are faithfully executed. Utah Const. art. VII, § 5; UTAH CODE ANN. §

67-1-1 (2024).

22.     SITLA, as an agency of the State, administers and manages lands owned by the State for the benefit of Utah's public-school systems.  Approximately 127 sections of land managed by SITLA are located within the San Rafael Swell TMA, 109 of those sections are located in Emery County and 18 are located in Sevier County.

23.     Emery County and Sevier County are each political subdivisions of the State, located in the central part of Utah.  The San Rafael Swell TMA lies mostly within the boundaries of Emery County, with a small portion in Sevier County.  The Emery County and Sevier County Commissioners exercise governmental authority for, and on behalf of, their respective counties pursuant to state law.  As political subdivisions of the State , Emery County and Sevier County, acting through their County Commissioners, are duly vested with governmental power and authority to provide for and protect the public health, safety, and welfare of its citizens and those who travel county roads within its boundaries.

24.     Defendant Doug Burgum is the Secretary of the DOI.  In his official capacity, the Secretary is responsible for upholding the Constitution of the United States and for setting public land policy in accordance with the provisions and requirements of federal law, including FLPMA and the Dingell Act.

25.     Defendant DOI is the department of the federal government to which Congress delegated the authority to administer the public lands in accordance with the Constitution of the United States and federal law.

26.     Defendant Bill Groffy is the Principal Deputy Director of the BLM.  In his official capacity, Principal Deputy Director Bill Groffy is responsible for managing the public lands in accordance with the U.S. Constitution and federal law.

27.     Defendant BLM is the federal agency within DOI responsible for the management of public lands and minerals in Utah. The BLM manages approximately 22.9 million acres of federal surface and 23 million acres of mineral estate in Utah, including the San Rafael Swell Transportation Management Area.

## PLAINTIFFS' INTERESTS AND STANDING

### A.     Plaintiffs are Participating Cooperating Agencies

28.     The Plaintiffs participated in the process leading up to the BLM decisions that are the subject of this action, by submitting comments. 43 C.F.R. 4.410(b) (2024). *See* Comment Letters cited above as State's Exhibits 3,4 and 5.

29.     The State, Emery County and Sevier County, as well as SITLA have been actively involved as cooperating agencies in the TMP planning process since the beginning of the process and has significant interests that will be adversely affected by the BLM's Decision Record and Reconsidered Travel Management Plan challenged here.

30.     In July of 2018, the State and the BLM executed a Memorandum of Understanding ("MOU"), specifically for the purpose of establishing and defining a cooperating agency relationship between them for the purpose of preparing a TMP for the San Rafael Swell. *See* State's Exhibit 6.

31.     The MOU expressly acknowledges that the State, through the Governor's Public Lands Policy Coordinating Office ("PLPCO"), as a cooperating agency, has special expertise applicable to transportation management planning efforts as defined in 40 CFR 1508.15 and 1508.26. *Id.* The MOU details the responsibilities and procedures agreed to by the BLM and PLPCO.

32.     PLPCO actively participated in the planning process for the Original TMP and

submitted several comment letters on behalf of the State dated July 26, 2023, March 15, 2024, and August 20, 2024.  The letters articulated the State's and County's interests and position on matters relating to the TMP. *See* States Exhibit 3.

33.    Emery County and Sevier County have both also been actively involved as cooperating agencies in the TMP planning process since the beginning and has significant interests that will be adversely affected by the BLM's DR and Reconsidered Travel Management Plan challenged here.  See States Exhibit 4.

**B.    Access to State-Owned Lands Managed by SITLA**

34.    Pursuant to the Utah Constitution, the State  owns all property interests acquired from the United States at or after the time of statehood. Utah Const. art. XX, §§ 1–2.  The State holds fee title to approximately 127 sections of land within the San Rafael Swell TMA that are administered and managed by SITLA, in trust, for the benefit of the public-school systems in the state ("Trust Lands").  Many of the roads within the TMA provide transportation and access to these Trust Lands and contribute to the economic vitality of the school systems in the state.

35.    The State challenges the action by the BLM's Decision Record which closes approximately 665 miles of roads and road segments and limits another 141 miles because it closes and/or restricts access to multiple sections of Trust Lands owned by the State and managed by SITLA and will result in an adverse economic impact on these lands.  *See* State's Exhibit 8 and 9.

36.    The marketability and value of the affected Trust Lands will be significantly reduced with these road closures/restrictions.  The closure of access roads severely limits the potential uses of these Trust Lands and their accessibility, thereby reducing their attractiveness to potential buyers or lessees.  Continued access to these Trust Lands is paramount for fulfilling the

intent of the original land grant from the United States.

37.     Specifically, the closure of the closure of 665 miles of roads and road segments, as well as limitations on another 141 miles by BLM has resulted in loss of access or restriction of access to hundreds of acres of Trust Lands owned by the State  and managed by SITLA, which in turn will result in reduced marketability and diminished per acre value by as much as fifty percent.  The collective loss of the value of these Trust Lands will be in the hundreds of thousands of dollars.

38.     Throughout the State , the Trust Lands generally have several access points for administrative and lessee access for proper management and use, including the Trust Lands included in this complaint, due to each parcel's unique topography, landscape, and terrain. These unique land characteristics must be considered before the closure of roads.  The closure of just one road leading to a certain parcel would cause the State and SITLA to immediately lose their congressionally mandated ability to fully take advantage of economic benefits of these Trust Lands due to limited or no access and run afoul of the Utah Constitution.  Utah Enabling Act of 1894; Utah State Const., art. X, § 5.

39.     In addition to the valuation loss, SITLA has very limited budgets for road maintenance.  It is that way by design to maximize disbursements of revenue.  Therefore, it is imperative for the State and SITLA that their roads leading to SITLA Trust Lands be public and have public access.  This allows SITLA to partner with the Emery County and Sevier County Road Departments and other entities to improve or maintain the roads as needed.  *See* State's Exhibit 5.

40.     The United States, in specific circumstances and subject to prior existing rights, may regulate the manner access to state school trust lands; however, that regulation cannot

prevent the State or its lessee from gaining access to its land, nor may it be so prohibitively restrictive as to render the land incapable of full economic development. *Utah v. Andrus*, 486 F. Supp. 995 (D. Utah 1979) (commonly referred to as the *Cotter* Decision).

41.     BLM's Decision Record violates the *Cotter* Decision by cutting off access to at least at least nine sections State-owned SITLA Trust Land.  *See* State's Exhibit 8.  All Trust Land parcels had motorized access prior to the Decision Record and many of them had multiple routes of motorized access.  The Decision Record effectively eliminates access to many sections and prohibitively restricts many others, which will deprive the State and SITLA of the full economic value of the land, in violation of the law.

42.     The lack of available roads, even if they are only "paper routes" (routes that are only visible on maps but are reclaimed on the ground), will substantially impair actual access to the Trust Lands and increase the amount of time and financial capital necessary for prospective lessees to access those lands.  This will render those parcels incapable of "full economic development".  *Id. at 1009.*

**C.     Transportation System Management and R.S. 2477**

43.     The State , Emery County and Sevier County each have regulatory authority over all motorized vehicle travel within their borders, including travel by All Terrain Vehicles ("ATVs") and OHVs, which constitutes a significant amount of the travel in the San Rafael Swell Transportation Management Area.  Utah Off-Highway Vehicle Act, UTAH CODE ANN. § 41-22-1 *et seq*.(2024).

44.     The State and the Counties are joint owners of R.S. 2477 rights-of-way within their respective Counties, Utah. UTAH CODE ANN. §§ 72-5-302(2) (2023) and 103(2)(b) (2025).

45.     Approximately 665 miles of roads and road segments closed by the BLM in its

Decision Record, and limitations/restrictions on another 141 miles, as alleged above in previous paragraphs are subject to R.S. 2477 rights-of-way jointly owned by the State, Emery County and Sevier County.  Specifically, 806 miles of roads closed or restricted by the BLM are an integral part of the State's transportation network.  Further, there is a quiet title action based upon R.S. 2477 currently pending before Judge Waddoups of this Court with three of the plaintiffs in this action, Emery County, Sevier County and the State.  See, *Emery Cnty, et.al. v. U.S.,* Case No. 2:12-cv-00429-CW (D. Utah 2012), Amended Complaint Dkt 6; *Sevier Cnty. et.al. v. U.S.,* Case No. 2:12-cv-00452-CW (D. Utah 2012), Complaint Dkt 2.

**D.    Motorized Recreation and Access**

46.    It is also in the interest of the State and the Counties to promote outdoor recreation on federal land, including motorized recreation.  Off-highway vehicle use is one of the top 5 ranked outdoor activities in Utah according to the 2024 Utah State Comprehensive Outdoor Recreation Plan ("SCORP") at 45.  https://recreation.utah.gov/wp-content/uploads/TP_HOLDING_Utah-SCORP-Final-09262024-Web-Single-Page.pdf (last visited July 10, 2025).   Daily outdoor recreation is a pathway to health and community well-being. *Id*. at 50.  Across all demographics, the primary personal benefits of outdoor recreation include connection to nature, improved mental health, and quality time with family and friends. *Id*.

47.    Roughly 38% of respondents to the SCORP travel more than 25 miles to engage in outdoor activities, with personal vehicles being the primary mode of transportation. *Id*. at 48. The SCORP identifies a need for improved access to motorized recreation areas and highlights the community's interest in expanding opportunities for diverse outdoor activities. *Id.* at 51. Improved access includes improving aging or insufficient infrastructure.  *Id.* at 52.

48.    The BLM is required under FLPMA to coordinate land use planning with statewide outdoor recreation plans such as the SCORP. 43 U.S.C. § 1712 (9) (2024).

49.    The 2025 State Resource Management Plan at 125 ("State RMP") (https://rmp.utah.gov/state-of-utah-resource-management-plan/) see PDF, which shows that outdoor recreation generates more than $6.1 billion to Utah's economy and accounts for 67,000 jobs.  Recreation also generates hundreds of millions in state and local tax revenue and billions of dollars in wages and salaries. *Id*.  Outdoor recreation is a key contributor to Utah's economy, experiencing an average of 8.4% yearly growth rate, the highest of any state, Utah Department of Natural Resources, citing Outdoor Recreation Roundtable Association, https://naturalresources.utah.gov/dnr-newsfeed/utahs-outdoor-recreation-economy-breaks-records-reaching-9-5-billion/  (last visited July 10, 2025).

50.    In 2013, Utah set a national precedent by becoming the first state to establish an Office of Outdoor Recreation (now called the Division of Outdoor Recreation).  *State RMP* at 125*.  Utah's pioneering efforts have inspired 24 other states to establish offices or divisions dedicated to outdoor recreation, further emphasizing the state's role as a leader in the industry. *Id.*

51.    More recent economic estimates show that in 2023, in the Utah, including Emery County and Sevier County, outdoor recreation economy grew to 9.5 billion in value-added, which contributes 3.4% of Utah's GDP and supports 71,898 jobs, Utah Dep't Nat. Res., https://naturalresources.utah.gov/dnr-newsfeed/utahs-outdoor-recreation-economy-breaks-records-reaching-9-5-billion/, citing to the U.S. Bureau of Economic Analysis, *Outdoor Recreation Satellite Account*, 2023, U.S. Dep't of Com (Nov. 28, 2023), https://www.bea.gov/data/special-topics/outdoor-recreation , Utah (last visited July 10, 2025).

52.    In Emery County, travel and tourism constitute 14 percent of all jobs in the
county, and in Sevier County, travel and tourism constitute 16 percent of all jobs. Headwaters
Economics 2019 Economic Profile System, *Emery, County, UT: Tourism,*
https://headwaterseconomics.org/apps/economic-profile-system/49015 (last visited July 10,
2025).

53.    The closure of roads by the Decision Record in the San Rafael Swell will directly
impact all activities in a large area of Emery and, to a smaller extent, Sevier County and
adversely affect economic and tax revenue for the Counties and the State.

54.    Local businesses that rent ATVs or offer guided tours to visitors provide
employment to local residents and tax revenue to both the State and the Counties.

55.    The State and the Counties have an interest in the economic well-being of their
citizens.  Motorized vehicle travel on the roads in the San Rafael Swell TMA provides access not
only to federal public lands, but to private lands and state Trust Lands.  This access is important
to the economy of the Counties and the State.

56.    The roads in the TMA provide access for multiple uses including rangeland
management and monitoring (including wildland firefighting), infrastructure maintenance, access
and preservation of water resources, public safety, wildlife management and recreation, and
especially livestock operations.  Access for activities such as the placement of salt licks,
livestock gathering, and range improvement maintenance is important to the livestock business
in the Counties and the State.  Access near wilderness areas, wilderness study areas, and lands
with wilderness characteristics is of particular concern since these lands are by their very nature
difficult to access.  It is critical that existing roads in these areas remain open to preserve existing
rangeland uses.  The DR directly affects livestock grazing allotments.

E.    **Livestock Grazing, Agriculture and Water Resources**

57.    The State, as a sovereign, has an interest in seeing its laws applied with respect to grazing on federal public lands, including grazing in the San Rafael Swell TMA.

58.    State policy, codified in state law, directs that public lands should be managed for domestic sources of food, and provide habitat for domestic animals. UTAH CODE ANN. § 63L-8-104(1)(d) (2017).

59.    State law further declares "livestock grazing on public lands is important for the proper management, maintenance, and health of public lands in the state." UTAH CODE ANN. § 4-18-101(4) (2024).  State law therefore supports the Plaintiffs' interest and standing to challenge the BLM's DR by this action.

60.    Livestock has been commercially grazed on lands in Utah for at least 185 years. The State derives an economic benefit from the continuation of livestock grazing on federal public lands including cattle grazing in the San Rafael Swell TMA.

61.    Agriculture is of prime importance to the State, and it benefits the natural, cultural, social and economic welfare of the State.  Agriculture successfully balances multiple needs between different stakeholders while providing a valuable source of local jobs and income. Utah's animal industry is the largest within its agricultural sector and is thus a key piece of the overall economy of the State.  For example, in Utah, agricultural employment constitutes 1 percent of all jobs in the State (compared to 1.3 percent nationwide) and produces 1.4 billion in cash receipts per year.  U.S. Dep't of Agric. Nat'l Agric. Statistic Service, as cited by the State RMP (see link above in paragraph 50, https://www.nass.usda.gov/ , Utah (last visited July 8, 2025);

62.    These dollar amounts underscore the importance that agriculture, and particularly

livestock grazing, plays in the Utah economy. More specifically, public land grazing plays a large role in ensuring the vitality of Utah's livestock grazing industry.

63.    Emery County and Sevier County also benefit economically from livestock grazing on federal grazing allotments within the San Rafael Swell TMA.

64.    Livestock grazing is critical to the economy of Emery County and Sevier County, including the communities of the Counties.

65.    In Emery County, agricultural employment constitutes 11.2 percent of all jobs and produces approximately 37.1 million in cash receipts per year. Headwaters Economics. *Economic Profile System: Agriculture Report for Emery County, Utah* (2022), https://headwaterseconomics.org/apps/economic-profile-system , Emery County, Utah, under Tools (last visited July 8, 2025).

66.    In Emery County, the total agricultural cash receipts show the sale of cattle and calves accounts for $9,036,000. Nat'l Agric. Stat. Serv., U.S. Dep't of Agric, 2017 Census of Agriculture. County Profile: Emery County, Utah, https://www.nass.usda.gov/Publications/AgCensus/2017/Online_Resources/County_Profiles/Utah , Emery County (last visited July 10, 2025).

67.    The median household income for Emery County is $67,056 per year, which is lower than the State's median household average of $86,833, and underscores the importance that agriculture, and particularly livestock grazing, plays in that local economy. U.S Census Bureau, 2020 Decennial Census, as complied in Utah Dep't of Workforce Servs., Utah Demographic and Economic Profile at 5 (2024), https://jobs.utah.gov/wi/data/library/wages/annualprofilewages.html (last visited July 10, 2025).

68.    In Sevier County, agricultural employment constitutes 5.4 percent of all jobs and produces approximately 165.5 million in cash receipts per year.  Headwaters Economics. *Economic Profile System: Agriculture Report for Emery County*, Utah (2022). https://headwaterseconomics.org/apps/economic-profile-system  Sevier County, Utah (last visited July 8, 2025).

69.    In Sevier County, the total agricultural cash receipts, show the sale of cattle and calves accounts for $48,512,000.  Nat'l Agric. Stat. Serv., U.S. Dep't of Agric, 2017 Census of Agriculture. County Profile: Sevier County, Utah, https://www.nass.usda.gov/Publications/AgCensus/2017/Online_Resources/County_Profiles/Utah , Sevier County, Utah (last visited July 10, 2025).

70.    The median household income for Sevier County is $66,972 per year, which is lower than the State's median household average of $86,833, and underscores the importance that agriculture, and particularly livestock grazing, plays in that local economy. U.S Census Bureau, 2020 Decennial Census, as complied in Utah Dep't of Workforce Servs., Utah Demographic and Economic Profile at 5 (2024), https://jobs.utah.gov/wi/data/library/wages/annualprofilewages.html (last visited July 10, 2025).

71.    As set forth above, livestock grazing plays a key role in the economies of not only Emery and Sevier Counties, but the as a whole.  Further, with urbanization continually swallowing available agricultural land within the State, livestock grazing on federally administered lands becomes even more important to agriculture in the State, as well as Emery and Sevier County.

72.    The BLM and the U.S. Forest Service (Forest Service) are primarily responsible for administering rangelands in Utah.  Of the 45 million acres of grazing land within the State ,

73 percent is federally owned, 9 percent is state owned, and 18 percent is privately owned. *See* State RMP at 22, *https://rmp.utah.gov.*

73.    Of the federal land on which grazing is permitted, 67 percent is managed by the BLM." *Id.* Because of this, the BLM plays an oversized role in ensuring the continued success of livestock grazing in Utah.

74.    In Utah, "grazing has declined on BLM lands by more than 66 percent" over the course of the past century. *Id.* at 23. The   DR and closure of roads in the San Rafael Swell TMA challenged in this action will further diminish access and contribute to the decline of grazing on public land to the economic detriment of plaintiffs.

**F.    Wildlife and Vegetation Management and Control**

75.    The United States Supreme Court has long recognized that states as sovereign entities have the power and right to control and manage wildlife within their borders.  *Greer v. Connecticut*, 161 U.S. 519 (1896).  This state ownership doctrine is still a legitimate basis for the exercise of state authority.

76.    Pursuant to the Utah Code, all wildlife within the State  . . . is the property of the State. UTAH CODE ANN. § 21A-1-102.  The State has primary responsibility for the management of wildlife within its borders and receives economic benefits from the issuance of hunting and fishing licenses and permits to outdoor sportsmen. *See generally* UDWR, Fiscal Year 2024 Financial Information, Utah Division of Wildlife Resources, *available at:* https://wildlife.utah.gov/dwr-financial-overview.html (2024), (last visited May 30, 2025).

77.    In addition, the various State agencies and counties are tasked with management of endangered or threatened plants as well as control of noxious weeds. Utah Noxious Weed Act, UTAH CODE ANN. §§4-17-101-113 (2024).

18

78.    The decreased access to the San Rafael Swell TMA caused by BLM's Decision Record and closure/limitations of roads challenged by this action diminishes and negatively affects the State's interest in and ability to manage wildlife and vegetation.

**G.    Law Enforcement and Public Safety**

79.    The Tenth Amendment to the U.S. Constitution, U.S. Const. amend. X, reserves general police powers to the states, affirming their inherent right to ensure public safety and enforce laws within their borders.  This affirmative inherent state authority was recognized by the Supreme Court in *Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905), which held that a state was entitled to the implementation of certain public safety laws relating to an epidemic.  Be it quarantine laws as in *Jacobson* or general public safety concerns, the state's power to ensure health and wellbeing, extends to all lands within a state's geographical boundaries, including federal lands, where states retain crucial responsibilities for public safety and law enforcement.

80.    The area encompassing the San Rafael Swell TMP is home for a large number of recreation enthusiasts.  The area is shared by hikers, rafters, climbers, off-road enthusiasts, and campers alike.  Many of these activities pose risks to health and human safety.  However, roads are essential for the area, offering the most effective and secure transportation network for law enforcement and public safety.  Law enforcement and responding medical personnel rely on many of these roads to access critical areas in the TMA.

81.    Although not specifically set forth in the federal code, pursuant to 43 CFR § 8341.2 and Section 1222(d) of the Dingell Act carve out exceptions for emergency response in the San Rafael Swell area.  The BLM can and does authorize exceptions to closures or restrictions for emergency operations and law enforcement functions through cooperative agreements.  However, BLM's road closures in the TMA significantly impact the State's ability

to exercise these fundamental police powers and effectively provide essential public safety and

law enforcement services across its territory.

82.     When roads are closed, the counties or State are not able to maintain the roads

that it has traditionally maintained by grading, installing culverts and berms etc., and other roads

that are only maintained through use become reclaimed and go back to their natural state,

severely limiting law enforcement or firefighting crews from going into many areas.  It later

becomes a large expense for the counties and State, with limited budgets, to rebuild roads instead

of maintaining them.

**H.     Scientific Study, Anthropology and Archeology**

83.     The State has a profound interest in the scientific, anthropological, and

archaeological resources located within its borders, including those on federal lands.  These

irreplaceable resources provide invaluable opportunities for research, education, and

understanding of human history and natural environments.  Federal land management agencies,

such as the BLM, are mandated by statutes like FLPMA to manage public lands for multiple use

and sustained yield, including the protection of historical and archaeological values.

84.     The National Historic Preservation Act ("NHPA"), requires federal agencies to

consider the effects of their undertakings on historic properties and, as implemented by the

Section 106 Process (formerly found at 36 C.F.R. §800 Subpart B) and to consult with the

Advisory Council on Historic Preservation, State and Tribal Historic Preservation Officers,

Indian tribes and Native Hawaiian organizations, representatives of local governments,

applicants for Federal assistance, permits, licenses and other approvals, and additional consulting

parties. 54 U.S.C. §§ 300101- 3006108

85.    The goal of consultation is to "is to identify historic properties potentially affected

by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse

effects on historic properties". *Id.*

86.    Road closures that restrict access to these areas can severely impede the ability of

state-affiliated researchers, universities, and cultural resource management entities to conduct

necessary surveys, studies, mitigation, and monitoring projects, thereby hindering the discovery,

preservation, and interpretation of irreplaceable cultural and scientific heritage.  The area

contained within the TMA has rough and difficult terrain without effective access mechanisms.

Cultural resources survey, mitigation, preservation, and monitoring equipment and materials are

often heavy and cumbersome.  In addition, people are needed to operate and install this

equipment, which is also expensive.

87.    Road access is of upmost importance for the continued protection, preservation,

and analysis of cultural, archeological, and other scientific resources located within the San

Rafael Travel Management Area. The TMA also includes many historical roads that were closed

without the benefit of Section 106 evaluation. The TMP (i.e., "undertaking") was approved

without BLM making a reasonable and good-faith effort to identify these roads as historic

properties and applying the criteria of adverse effect required by NHPA, such as  considering

whether closing a National Register-eligible road "may alter, directly or indirectly, any of the

characteristics of a historic property that qualify the property for inclusion in the National

Register in a manner that would diminish the integrity of the property's location, design, setting,

materials, workmanship, feeling, or association." *Id.*  Closing such roads may result in neglect,

changing the character of the property's use, and changing the physical features within the

property's setting that contribute to its historic significance. 36 C.F.R. § 800.5(a)(2)(iv) and (vi).

## STATUTORY AND REGULATORY FRAMEWORK

**A.  The Wilderness Act**

88.    The Wilderness Act of 1964 was enacted "to secure for the American people of
present and future generations the benefits of an enduring resource of wilderness." Management
of these wilderness areas was to be done in "such manner as will leave them unimpaired for
future use and enjoyment as wilderness." 16 U.S.C. § 1131(a) (2024).

89.    The Wilderness Act process for adding lands to the National Wilderness
Preservation System ("NWPS") begins with recommendations to the President from the
secretary of either the Departments of Agriculture or Interior.  The President then makes a
recommendation to Congress, which reserved to itself the power to designate wilderness.
Specifically, the Wilderness Act states that "no Federal lands shall be designated as 'wilderness
areas' except as provided for in this chapter or by a subsequent Act." *Id*.

90.    The Act defines "wilderness" as "an area where the earth and its community of
life are untrammeled by man, where man himself is a visitor who does not remain" and "an area
of undeveloped Federal land retaining its primeval character and influence, without permanent
improvement or human habitation." A qualifying area is defined as an area that:

> (1) generally appears to have been affected primarily by the forces of nature, with the
> imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for
> solitude or a primitive and unconfined type of recreation; (3) has at least five thousand
> acres of land or is of sufficient size as to make practicable its preservation and use in an
> unimpaired condition; and (4) may also contain ecological, geological, or other features of
> scientific, education, scenic, or historical value.
> *Id*. at § 1131(c).

**B.  The Federal Land Policy Management Act**

91.    Congress enacted FLPMA, 43 U.S.C. §§ 1701–1787, to establish uniform and
coherent administration of public lands.  This congressional mechanism includes the (1) creation

of resource inventories and land use plans, (2) implementation of "multiple use" management

plans, (3) management of lands recommended for inclusion in the NWPS as Wilderness Study

Areas ("WSAs"), and (4) designate and manage Areas of Critical Environmental Concern

("ACECs") according to land use plans.

### 1. Inventory and Land Use Plans

92.     Section 201 of FLPMA requires the Secretary of the Interior to "prepare and

maintain on a continuing basis an inventory of all public lands and their resources and other

values (including, but not limited to, outdoor recreation and scenic values), giving priority to

areas of critical environmental concern." 43 U.S.C. § 1711(a) (2024).  This inventory is to be

kept current in order to reflect any changed conditions and to "identify new and emerging

resources and other values." *Id.*

93.     In addition to the requirement to prepare an inventory, FLPMA requires that "[t]he

preparation and maintenance of [the] inventory or the identification of such areas shall not, of

itself, change or prevent change of management or use of public lands." *Id.* (emphasis added).

94.     Section 202 of FLPMA requires the Secretary of the Interior, with public

participation, to "develop, maintain, and when appropriate, revise land use plans which provide

by tracts or areas for the use of the public lands." *Id*. § 1712(a).  In developing or RMPs, the

BLM must rely "on the inventory of the public lands, their resources, and other values." *Id*. §

1712(c)(4).

95.     FLPMA also requires the Secretary of the Interior to "coordinate the land use

inventory, planning, and management activities of or for such lands with the land use planning

and management programs of . . . the State and local governments within which the lands are

located…" *Id*. § 1712(c)(9).

96.    Moreover, the Secretary of the Interior:

shall provide for meaningful public involvement of State and local government officials, both elected and appointed, in the development of land use programs, land use regulations, and land use decisions for public lands, including early public notice of proposed decisions which may have a significant impact on non- Federal lands. Such officials in each State are authorized to furnish advice to the Secretary [of the Interior] with respect to the development and revision of land use plans [and] land use guidelines. . . for the public lands within such State and with respect to such other land use matters as may be referred to [the Secretary of the Interior] by them.

*Id*.

## 2.  Multiple Use and Sustained Yield

97.    As set forth in FLPMA, the guiding principle in the management of public lands generally, and the RMPs specifically, is multiple use and sustained yield. 43 U.S.C. § 1732(a).

98.    "Multiple use" is defined as "management of public lands and their various resources so that they are utilized in the combination that will best meet the present and future needs of the American people." *Id*. § 1702(c).

99.    These resources include, but are not limited to, "recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values." *Id*.

100.    "Sustained yield" is defined as "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of various renewable resources of the public lands consistent with multiple use." *Id*. § 1702(h).

101.    As set forth in FLPMA, the "principal or major uses" of public lands include and are limited to "domestic livestock grazing, fish and wildlife development and utilization, mineral exploration and production, rights-of-way, outdoor recreation, and timber production." *Id*. § 1702(l).

## 3.  Wilderness Study Areas

102.    WSAs, are those lands inventoried and identified by BLM as suitable for

preservation as wilderness, subject to prior existing rights and uses. 43 U.S.C. § 1782(c).

103.    Because the Wilderness Act does not directly address BLM's authority to designate or manage public lands as wilderness, FLPMA § 603 provides for a two-step inventory and management process.

104.    First, within fifteen years of October 21, 1976, passage of FLPMA, the Secretary of the Interior was to use the section 201 Inventory to review "roadless areas of five thousand acres or more and roadless islands of the public lands."  During that fifteen-year period, the Secretary of the Interior was required "from time to time [to] report to the President his recommendation as to the suitability or nonsuitability of each area or island for preservation as wilderness." *Id*. § 1782(a).

105.    On October 21, 1991, BLM's authority to review, recommend, create, or manage lands as WSAs terminated. *Id*.

106.    Second, the President was to advise Congress within two years of each report by the Secretary of the Interior of "his recommendations with respect to designation as wilderness of each such area. . .." *Id*. § 1782(b).

107.    As stated above, only Congress has the discretion to either designate WSA lands as part of the NWPS or to release them for other uses.

108.    Prior to congressional determination, management of recommended WSAs must be done in "a manner so as not to impair the suitability of such areas for preservation as wilderness," subject to prior existing rights and uses (the non-impairment standard). *Id*. § 1782(c).

109.    Pursuant to FLPMA § 302(b), BLM is to manage all other lands to the lesser undue degradation standard.

110.     On December 12, 1979, BLM issued an Interim Management Policy for Lands Under Wilderness Review ("IMP") to provide management guidance to BLM staff for section 603 WSAs pending congressional action.

### 4.    Areas of Critical Environmental Concern

111.     FLPMA defines Areas of Critical Environmental Concern (ACEC) as "areas within the public lands where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and safety from natural hazards." 43 U.S.C. § 1702(a).

112.     Under FLPMA section 201, the Secretary of the Interior must give priority to ACECs in the inventory of public lands. *Id*. § 1711(a).

113.     Under FLPMA section 202, the designation and protection of ACECs are given priority in the development and revision of land use plans. *Id*. § 1712(c)(3).

114.     Prior to designating an ACEC, the BLM State director must provide a 60-day period for public comment on the proposed designation. 43 CFR § 1610.7-2(b).

### 5.    Rules and Regulations

115.     To carry out the purposes of FLPMA, the Secretary of the Interior is required to promulgate rules and regulations.  "The promulgation of such rules and regulations shall be governed by the provisions of chapter 5, title 5," 43 U.S.C. § 1740 (2024) (referring to the Administrative Procedure Act, 5 U.S.C. §§ 500–596 (2024)).

116.     In 1971, DOI promulgated a rule to follow rulemaking procedures, even if the subject matter would fall within APA exceptions.  Specifically, DOI stated that "[n]otice is

hereby given of the policy of the Department of the Interior to give notice of proposed rulemaking and to invite the public to participate in rulemaking in instances where not required by law." 36 Fed. Reg. 8336 (May 4, 1971).

**C.    The National Environmental Policy Act**

117.    Congress enacted NEPA to "encourage the enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate health and welfare of man; to enrich the understanding of the ecological and natural resources important to the Nation…" 42 U.S.C. § 4321 (2024).

118.    To achieve these goals, NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1501.4 and BLM NEPA Handbook, H-1790-1, 3.2.1 (Jan. 30, 2008) (discussing NEPA process).

119.    NEPA defines "major Federal actions" triggering NEPA analyses as "new or revised" agency "plans, policies, or procedures" including, as in the case of Order 3310, "formal documents establishing an agency's policies which will result in or substantially alter agency programs" and "which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based." 40 C.F.R. 1508.18(b)(1).

120.    The "human environment" is defined to "include the natural and physical environment and the relationship of people with that environment." 40 C.F.R. § 1508.14. Furthermore, when economic and social effects are interrelated with natural and environmental effects, "then the environmental impact statement will discuss all of these effects on the human environment." *Id*.

121.    The EIS must "provide full and fair discussion of significant environmental

impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.  This open process of evaluation allows all stakeholders to know the implications of federal actions and have the ability to participate and have their voices heard in the decision-making process.

## D.    Administrative Procedures Act

122.    Congress enacted the APA to standardize the way federal administrative agencies propose and establish rules and regulations.  The APA also establishes a process for judicial review of agency decisions.

### 1.  Rulemaking

123.    Rulemaking procedures are clearly laid out in the APA and require both notice and the opportunity to comment. 5 U.S.C. § 553 (2024).

124.    Notice of proposed rulemaking is to be published in the Federal Register and must include "(1) a statement of the time, place, and nature of the public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id*. § 553(b).

125.    After providing notice, an agency must "give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id*. § 553(b)(3)(A).

126.    Except as otherwise required by statute, the APA provides an exception to the notice and comment requirements for "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice."

127.    Courts will overturn a rule purporting to exist under this exception if it was

promulgated pursuant to a direct delegation of legislative power by Congress or "if it changes existing law, policy or practice." *Rocky Mountain Helicopters, Inc. v. F.A.A.*, 971 F.2d 544, 546 (10th Cir. 1992).

### 2.    Judicial Review

128.    The APA also establishes a procedure for judicial review for those who are suffering a legal wrong as the result of a final agency action and have no other adequate remedy. *Id*. § 704.

129.    The reviewing court may decide "all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Id*. § 706.

130.    The court shall, among other things "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . [or] without observance of procedure required by law." *Id*. § 706(2)(A) and (C)-(D).

131.    The reviewing court shall also "compel agency action unlawfully withheld or unreasonably delayed[.]" *Id*. § 706(1).

### E.    R.S. 2477

132.    R.S. 2477 provides as follows: "And be it further enacted [T]hat the right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253, codified at 43 U.S.C. § 932, repealed by FLPMA, Pub. L. No. 94-579 § 706(a), 90 Stat. 2743.

133.    R.S. 2477 was an open congressional grant *in praesenti* of public highway rights-

of-way for the benefit of miners, ranchers, homesteaders, and all other members of the public who had a need to travel across public lands.

134.    Acceptance and vesting of R.S. 2477 rights-of-way required no administrative formalities: no entry, no application, no license, no patent, and no deed on the federal side; no formal act of public acceptance on the part of the states or localities in whom the right was vested. *See S. Utah Wilderness All. v. U.S. Bureau of Land Mgmt.*, 425 F.3d 735, 741 (10th Cir. 2005) (hereinafter "*SUWA v. BLM*").  R.S. 2477 operated as a standing offer of a right-of-way over the public domain, and the grant may be accepted without formal action by public authorities. *Id.*

135.    The congressional grant of public highway rights-of-way embodied by R.S. 2477 operated on unreserved public lands for 110 years until it was repealed on October 21, 1976, by the FLPMA

136.    In repealing R.S. 2477, Congress preserved vested R.S. 2477 rights-of-way as valid existing rights and expressly directed the United States and its subordinate agencies (including the DOI and the BLM) to manage federal lands subject to these valid existing rights.

137.    Section 701(h) of FLPMA provides as follows: "All actions by the Secretary concerned under this Act shall be subject to valid existing rights." *Id*. § 1701, note; see also *Id*. § 1769(a) ("Nothing in this subchapter shall have the effect of terminating any right-of-way or right of use heretofore issued, granted or permitted.")

F.    **National Historic Preservation Act**

138.    The NHPA was enacted in 1966 by Congress to preserve the historical and cultural foundations of the United States by protecting historic buildings, districts, sites, structures and objects that are significant in American history, architecture, archaeology, and

culture. Pub. L. No. 89-665, 80 Stat. 915 (1966).

139.    The purposes of NHPA are fulfilled through a comprehensive framework that

includes federal, state, tribal, and local coordination, including facilitating Section 106

consultations between federal agencies, local governments, tribes, private developers, and the

public.  54 U.S.C. § 306108 (2018).

140.    The goal of consultation is to "is to identify historic properties potentially affected

by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse

effects on historic properties". *Id.*

**G.  John D. Dingell, Jr. Conservation, Management, and Recreation Act**

142.    The Dingell Act, as explained in Paragraph 10, designated 216,995 acres of land

within Emery County as the San Rafael Swell Recreation Area ("Recreation Area").  Dingell Act

§1221.  The purpose of the Recreation Area is to "provide for the protection, conservation, and

enhancement of the recreational, cultural, natural, scenic, wildlife, ecological, historical, and

educational resources of the Recreation Area." *Id*. at §1221(b).

143.    These purposes were supposed to be accomplished through a "comprehensive

management plan" which has yet to be enacted yet was supposed to be enacted prior to travel

management planning. *Id*. at §1222(c).  The Recreation Area is also to be managed in accordance

with FLPMA which requires the BLM to recognize prior existing rights. *Id*. at §1222(a)(2)(B).

144.    The Dingell Act also named 18 new Wilderness Areas that were to be added to

the National Wilderness Preservation System under 16 U.S.C. 1131 et seq. *Id*. at §1231. These

wilderness areas are to be administered "[s]ubject to valid existing rights." *Id*. at §1232(a).

Because such a large group of wilderness areas were designated in the Dingell Act, the

remaining WSAs were released in Emery County. *Id*. at §1234.

145.    Lastly, the Dingell Act authorized the exchange of lands and minerals between the SITLA and BLM. *Id*. at §1255. This exchange was also subject to valid existing rights that existed prior to the exchange. *Id*. at §1255(b)(5).

## FACTS AND ARGUMENT RELATING TO BLM DECISION TO CLOSE ROADS

146.    The APA authorizes the setting aside of agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations; without observance of procedures required by law, and unwarranted or unsupported by the facts. 5 U.S.C. 706(2).  There must be a "rational connection between the facts found and the choice made." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 56, 103 S. Ct. 2856, 2873, 77 L. Ed. 2d 443 (1983).

147.    There are several roads identified in the EA that were left open during BLM's reconsideration process, but they are in the same condition or even less traveled and defined than many of the routes considered "reclaimed or reclaiming" under the DR.

148.    There are several roads that are substantially similar to other roads that were initially open under the TMP but have been closed under the DR.  Those routes, like others, are listed as being appropriate for closure to minimize damage to resources documented in the area.

149.    There are several roads in areas that are prominently black brush and blow sand, that are all typically just one windy or rainy season away from having their track marks that reveal route usage reclaimed.

150.    There are roads identified that were left open under the original 2008 TMP but are now designated as OHV closed after being preliminarily designated as closed after the Settlement Agreement.

151.    There are roads that are closed to protect habitat for managed and special status

32

species, wilderness character, and native pollinators; however, several closed routes go through areas of invasive species such as tamarisk, Canadian thistle etc. that should be managed under various federal laws rather than protected through route closures. Invasive species are not beneficial for managed or special status in this area nor are they typically targets for native pollinators.

152.    Several roads or segments provide access to a scenic and unique area that overlooks the Green River.

153.    There are several roads that are far from reclaimed; the roads are actually in very good condition and provide access to remarkable views for a wide range of recreationalists, including basic four-wheel drive vehicles.

154.    The rationale for closing certain roads that are fully reclaimed and do not have segments or remnants still visible is nearly identical to the rationale used for closing roads that are good roads with easily identifiable tracks and evidence of use.

155.    Certain roads are identified as being closed primarily because they are redundant routes; however, the important difference between this and other roads is that the other "redundant" road provides a vastly different recreational experience to the roads it parallels. Certain roads are visible and easily identifiable on the ground, so they are much easier and a novice friendly experience, whereas other parallel roads offer a more rugged all terrain experience.

156.    Based on the inadequate record the BLM's DR failed to adhere to the BLM's own rules and regulations.

157.    BLM improperly reversed its previous NEPA process. The same NEPA process that supported keeping routes open, now, without any articulated changes to the record, supports

the full closure of 665 miles of roads and road segments and places limitations on another 141 miles of previously open routes.

158.    Absent justification within the Administrative Record, the decision to close or restrict these routes in the TMP that were previously designated as open is arbitrary and capricious, as well as illegal and *ultra vires*.

159.    The DR closes access to at least nine sections of Trust Lands owned by the State and managed by SITLA and closes other roads that are prohibitively restrictive as to render the land incapable of full economic development.  One example of a prohibitively restricted section is SITLA Section 36, Township 22 South, Range 7 East, Salt Lake Base and Meridian, Utah. *See* State's Exhibit 8.  This section is restricted to vehicles over 66", which would limit vehicles and equipment needed to access the section to make full economic use.  Continued access to these sections of Trust Lands is paramount for fulfilling the intent of the original land grant from the United States.

160.    On March 12, 2019, the United States Congress passed Public Law 116-9, otherwise known as the John D. Dingell, Jr. Conservation, Management, and Recreation Act (the "Dingell Act"). John D. Dingell, Jr. Conservation, Management, and Recreation Act, Pub. L. No. 116-9, 133 Stat 580. (2019).  Among other things, the Dingell Act designated 14 Wilderness Areas, and the Jurassic National Monument within the San Rafael Swell TMA and restricted some areas to motorized travel, overriding prior TMP route designations.  Therefore, all inventoried routes that were in the now designated wilderness areas, which were not cherry stemmed in the Dingell Act, were subsequently removed from San Rafael Swell TMP, to comply with the 1964 Wilderness Act. *Id.*

161.    A thorough analysis of the specific facts underlying BLM's decision reveals that

34

the BLM acted arbitrarily and capriciously in deciding which roads to close and which roads to keep open.

162.    FLPMA requires the BLM to manage public lands according to multiple use and sustained yield principles, in order to "meet the present and future needs of the American people." *See* 43 U.S.C. §§ 1701(a)(7); 1702(c) (2024). These uses include domestic livestock grazing, which is defined as a "principal or major use." *Id*. at (1).

163.    Under FLPMA, lands within the TMA must be managed to protect rangeland improvements and promote domestic livestock grazing. *Id.*

164.    Many of the routes that were closed in the TMP considered only conservation and failed to take into account grazing, recreation, and other multiple uses.

165.    Keeping existing routes open helps accomplish the goal of "minimization of conflicts among various uses of the public lands." 43 C.F.R. § 8342.1.  Transportation connectivity reduces in and out traffic and can spread out use.  Additionally, keeping roads open provides the traveling public access while reducing the need and desire to pioneer new and unauthorized routes.  Further, the Defendant failed to property analyze opportunities to reroute roads pursuant to Section 1221(d)(3)(B) of the Dingell Act.

166.    The DR violates FLPMA by failing to manage the public lands according to the standards set forth in the preceding paragraphs.

167.    Under FLPMA, when developing or creating RMPs, the BLM is required to coordinate state and local government plans. 43 U.S.C.A. § 1712 (2024).

168.    The BLM also is required in the development of land use plans to ensure that consideration is given to the applicable state, local, and tribal plans "and to resolve, to the extent practical, inconsistencies between Federal and non-Federal Government plans." *Id.*

169.    FLPMA further mandates that BLM land use plans "shall be consistent with state and local plans to the maximum extent [the Agency] finds consistent with federal law and the purposes of this Act." *Id.*

170.    In addition to the coordination and consistency requirements, the CEQ regulations that were in place prior to the DR, required federal agencies to discuss the conflicts between the proposed action and the objectives of state and local plans. 40 CFR § 1502.16.

171.    The State, Emery County, and Sevier County have each duly adopted State and County resource management plans. 2025 State RMP, Emery County Resource Management Plan. and Sevier County Resource Management Plan (the Emery County and Sevier County Resource Management Plans are collectively referred to as "County RMPs").

https://rmp.utah.gov/; https://tinyurl.com/Sevier-County-Utah-CRMP;

https://tinyurl.com/Emery-County-Utah-CRMP (last visited July 10, 2025).

172.    The County RMPs and State RMP include locally adopted objectives and policies for federal land management and include findings, provisions, and policies relating to natural resource development and environmental quality relevant to the current planning process.

173.    In addition to the County RMPs and State RMP, Title 63J of the Utah Code also establishes the State's position that BLM land-use plans should: support valid existing transportation . . . privileges on federal land at the highest reasonably sustainable levels, and keep open to motorized travel, any road in the subject lands that is part of the respective counties' duly adopted transportation plan.

174.    BLM has failed to follow the provisions of FLPMA and the Dingell Act; the DR is inconsistent with the County RMPs and the State RMP, and BLM completely failed to discuss these inconsistencies or make any attempt to resolve them.

175.    NEPA requires that BLM allow cooperating agencies a meaningful opportunity to participate in the reconsideration process as required in 40 C.F.R. 1501.8.  Specifically, NEPA requires cooperating agencies be allowed to participate in the NEPA process at the earliest practicable time. 40 C.F.R. 1501.8(b)(1).

176.    BLM is required to use the environmental analysis and proposals of cooperating agencies… to the "maximum extent practicable" and "shall develop a schedule, setting milestones for all environmental reviews and authorizations required for implementation of the action, in consultation with… cooperating agencies as soon as practicable". 40 C.F.R. 1501.7 (h)-(i).

177.    The BLM considers RMPs to be broad programmatic "land use plans" under FLPMA that set the overarching management framework for public lands, including identifying areas where recreation maybe appropriate and which areas may be considered as open or closed to certain uses, as well as possible Travel Management Areas ("TMAs").  RMPs do not designate specific routes, but they establish, the planning-level groundwork for further travel management.  43 CFR § 1610.3-2(e).

178.    TMAs are spatial designations (defined by physical boundaries and features). TMAs do not determine routes but simply carve out areas where a TMP may be selected. *Id.*

179.    Travel Management Plans should be treated as a "land use plan" developed after RMPs and not as an "implementation level plan" which allows BLM to conveniently ignore cooperating agency input.  Due to the characterization and treatment of the TMP as an implementation level plan, the State is denied rights such as a Governor's Consistency Review - an extremely important provision that allows a state governor to review the proposed federal plan and ensure it is consistent with state policies, plans and programs, further denying cooperating

agencies critical input required pursuant to FLPMA, NEPA and the Dingell Act.  Nonetheless, the State has submitted a Governors Consistency Review letter to the Acting BLM director expressing the State's concerns, and also sent a follow-up letter to the Acting BLM Director, that should have been considered by the BLM but were not.  *See* State's Exhibit 7.

180.    Further, under Section 1223 of the Dingell Act, Congress established a Recreation Advisory Council for the San Rafael Swell Recreation Area. This council was to "advise the secretary with respect to the preparation and implementation of the Management Plan[.]" The BLM sought the advice of the RAC on the TMP. Why would they seek the RAC's advise if they were merely preparing an implementation plan?

181.    The BLM has violated the APA by acting arbitrarily, in excess of statutory authority, and without observance of procedure required by law in proceeding to complete the San Rafael Swell TMP prior to completing the San Rafael Swell Recreation Area RMP as required by § 1222(c) of the Dingell Act.  Section 1222(c) requires the BLM to "develop a comprehensive management plan" for the Recreation Area "not later than 5 years" after the passage of the Dingell Act.

182.    A "comprehensive" plan would logically be a RMP level plan (i.e. a "land use plan" as defined in FLPMA), including more resource management provisions than just travel. Section 1222(d) states, "[e]xcept as needed for emergency response or administrative purposes, the use of motorized vehicles in the Recreation Area shall be permitted only on roads and motorized routes ***designated in the Management Plan*** (emphasis added) for the use of motorized vehicles.  Section 1211 defines "Management Plan" as "the management plan for the Recreation Area developed under section 1222(c)."

183.    Thus, due to the statutory framework of the Dingell Act, the "Management Plan,"

as defined in the Dingell Act, must be completed before any TMP can be performed and

implemented.  Again, the State wrote a letter to the BLM urging it to follow this provision of the

law, but to no avail.  *See* State's Exhibit 3.  Due to BLM's erroneous analysis of this provision of

the Dingell Act, the DR should be set aside, and the BLM should first complete the Management

Plan for the San Rafael Swell Recreation Area.

184.    Section 1232 of the Dingell Act provides:

(e) Adjacent Management.—

(1) In general.--Congress does not intend for the designation of the wilderness areas
to create protective perimeters or buffer zones around the wilderness areas.

(2) Nonwilderness activities.--The fact that nonwilderness activities or uses can be
seen or heard from areas within a wilderness area shall not preclude the conduct of
those activities or uses outside the boundary of the wilderness area.

Section 132(e)(2) of the Dingell Act prohibits the creation of "buffer zones" around

wilderness areas.  These "buffer zones" refer to the practice of closing or restricting

access to public lands outside the boundaries of designated wilderness characteristics of

the area, including "sight or sound" of motorized use from within the wilderness.  There

are several buffer zones created within the TMA, in violation of the Dingell Act.

Another violation of the Dingell Act is Section 1222(c)(1), which requires BLM

to develop a management plan for the recreation area within five years of enactment of

the Act.  The BLM has failed to develop this plan which is a violation of Section 706 of

the APA and *Forest Guardians v. Babbit.*  174 F.3d 1178 (10th Cir. 1999).

185.    Section 4001 of the Dingell Act Provides:

TITLE IV—SPORTSMEN'S ACCESS AND
RELATED MATTERS

Subtitle A—National Policy
SEC. 4001. CONGRESSIONAL DECLARATION OF NATIONAL POLICY.

(a) IN GENERAL. —Congress declares that it is the policy of the United States that Federal departments and agencies, in accordance with the missions of the departments and agencies, Executive Orders 12962 and 13443 (60 Fed. Reg. 30769 (June 7, 1995); 72 Fed. Reg. 46537 (August 16, 2007)), and applicable law, shall—

(1) facilitate the expansion and enhancement of hunting, fishing, and recreational shooting opportunities on Federal land, in consultation with the Wildlife and Hunting Heritage Conservation Council, the Sport Fishing and Boating Partnership Council, State and Tribal fish and wildlife agencies, and the public.

(2) conserve and enhance aquatic systems and the management of game species and the habitat of those species on Federal land, including through hunting and fishing, in a manner that respects—

    (A) State management authority over wildlife resources; and

    (B) private property rights; and

(3) consider hunting, fishing, and recreational shooting opportunities as part of all Federal plans for land, resource, and travel management (emphasis added).

The BLM did not adequately consider the hunting, fishing, and recreational shooting aspect of each route in their evaluation process.  Thus, the decision was arbitrary and capricious for failing to follow congressional intent and disregards multiple use.

189.    More recently, Congress passed Expanding Public Lands Outdoor Recreation Experiences Act (EXPLORE Act) Pub. L. No. 118-234, on January 4, 2025, with the primary goals to improve access and modernized infrastructure, streamline permitting, support gateway and underserved communities, enhance recreation for veterans, youth and people with disabilities through accessible trails, programs, and facilities, and enhance data and agency coordination and stays true to the multiple use mandate of . Pub. L. No. 118-234.

190.    The EXPLORE Act Section 111 establishes that it is the policy the United States to promote recreation on federal lands and waters as follows:

"the policy of the Federal Government to foster and encourage recreation on

Federal recreational lands and waters, to the extent consistent with the laws applicable to specific areas of Federal recreational lands and waters, including multiple-use mandates and land management planning requirements."

Section 127 provides:

regarding the use of motorized and nonmotorized vehicle, mandates that "Secretaries shall seek to create additional opportunities, as appropriate, and in accordance with existing law, for motorized and nonmotorized access and opportunities on Federal recreational lands and waters administered by the Chief of the Forest Service or the Director of the Bureau of Land Management."

The EXPLORE Act also repeats NEPA and FLPMA mandates of collaboration and cooperation with state and local partners on recreation and tourism and planning. *Id.* § 132, 138 State. 2836 (2025). Both Emery County and Sevier County have gateway communities[2] within their respective jurisdictions and closing access to roads or limiting motorized access, will have a major impact on visitation and tourism and ultimately be detrimental to their economies. Closing roads goes against Congress's intent to engage in communities that share significant recreation-based ties to Federal public land.

191.    Although the EXPLORE Act was passed after finalization of the San Rafael Swell TMP, Congress's recent enactment reflects a clear legislative intent of its priorities and vision for public lands like those in this TMP. This post-enactment legislative development is not retroactive, but it is interpretively relevant and should be considered in agency decisions when considering public land planning mandates and for administrative consistency with evolving congressional mandate. The Act elevates the importance of recreation, including motorized use, to a national priority, signaling that closure should not be the default tool in travel planning.

192.    BLM further violated the law by failing to consider the requirement that access be provided to State-owned Trust Lands managed by SITLA under the *Cotter* decision as well as

---

[2] A community that serves as an entry point or is adjacent to a recreation destination on Federal recreational lands and waters. 16 U.S.C. § 8401(3) (added by Pub. L. No. 118-234, § 2).

access to a road congressionally designated as open under the Dingell *Act.*

193.    The DR violates the Settlement Agreement reached in the RMP Case.  Paragraph two of the RMP Settlement Agreement required that BLM comply with applicable law, including OHV regulations at 43 C.F.R. Part 8340 and NEPA.  Paragraph five of the Settlement Agreement requires that BLM consult with interested user groups, federal, state, county and local agencies, local landowners, and other parties in a manner that provides an opportunity for the public to express itself and have its views given consideration, in accordance with 43 C.F.R. 8342.2(a).

194.    The BLM violated the Settlement Agreement and NEPA by failing to substantiate its compliance with the requirements 43 C.F.R. Park 8340, 43 C.F.R. 8342.2(a).  The OHV regulations are merely mentioned in passing in the DR, with no showing of compliance.

195.    The BLM's DR closes motorized access to 35.49 miles of roads where Plaintiffs have pre-1976 vested property rights, in violation of FLPMA§ 701(a).  43 U.S.C. 1701.

196.    Because acceptance and vesting of R.S. 2477 rights-of-way required no administrative formalities of formal act of public acceptance by the United States, the rights-of-way for the 35.49 miles of R.S. 2477 roads within BLM's TMA vested upon the roads receiving at least ten years of continuous public use.  *See SUWA v BLM.*

197.    In recent *Kane Cnty (2) v. U.S.,* 2:10-cv-1073 (August 25, 2024, D. Utah)  *("Kane (2) Decision")* Judge Waddoups of this Court ruled that, with regard to R.S. 2477 roads, the State and its Counties have done all that was required by Congress to accept the R.S. 2477 grant, and unless the United States disputes title, "it has an obligation to treat the State and Counties in the same manner as it did prior to October 21, 1976, for the roads at issue."  *Kane (2)* Decision, at 29.  The BLM's DR fails to take into consideration any R.S. 2477 claims or vested rights.

198.    In *Kane (2)*, this Cout considered BLM's closure and control of R.S. 2477 roads in the Monument Management Plan for the Grand Staircase-Escalante National Monument ("GSENM").  *Kane (2)* Decision, at 54.  Similar to BLM's DR here, BLM's GSENM Monument Management Plan disregarded the State's vested rights under R.S. 2477.  *Id*, at 55.

199.    In the GSENM Monument Management Plan, BLM altered the status of the State's and Kane County's existing rights by treating all  roads within the GSENM as subject to United States jurisdiction and authority and by controlling whether a road would be opened or closed.  *Id*, at 57.  Judge Waddoups, citing *Salazar*, found that "the BLM is not entitled 'to make unilateral changes in the status quo without first considering the legitimate interests of the other.'"  *Id.*, citing *Kane Cnty., Utah v. Salazar,* 562 F.3d. 1077, 1091 (10th Cir. 2009) (Henry, J., concurring).  Since BLM had failed to consider the legitimate vested property interests of the State and Kane County, this Court found that the BLM Monument Management Plan unlawfully regulated the valid, existing rights of the State and Kane County as holders of R.S. 2477 rights-of-way.  *Id*, at 57.

200.    In the present case, BLM has similarly failed to consider the legitimate vested property rights of the State and County in the San Rafael Swell TMA and TMP and seeks to unlawfully regulate the State's valid existing rights.

201.    In developing the TMP for the San Rafael Swell TMA, BLM did not consider any R.S. 2477-related evidence all in violation of the R.S. 2477 vested property rights of the State and County as holders of those vested rights.  The BLM must treat the State as a title holder and provide motorized access to all R.S. 2477 roads within the TMA.

202.    NEPA requires federal agencies to take a hard look at the environmental consequences of an action requiring NEPA review.  *Kleppe v. Sierra Club,* 427 U.S. 390 (1976).

During the route evaluation process, BLM used an electronic process where the decision maker picks out a photograph of a route and decides the "purpose and need" of a route from a drop-down menu. This does not allow for customized needs of an area and gives the appearance of an arbitrary process.

203.    During the development of the Environmental Assessment for the San Rafael Swell comment periods, the State and Counties repeatedly urged BLM to consider the State's vested rights to R.S. 2477 roads as a holder. The State's requests included requests to consider the impact of closing these vested rights on the community and local economy.

204.    Despite the State's repeated requests, the BLM failed to consider the State's vested rights under R.S. 2477. The State's entreaties to consider its vested rights were ignored throughout the planning process.

205.    In the *Kane (2)* decision, this Court recently held that BLM's failure to treat any road as being an R.S. 2477 right-of-way absent judicial adjudication constitutes "an implicit dispute of the State and Kane County's title because such unilateral decision making is contrary to the rights of a holder." *Kane (2)* at 58. In this case, BLM also failed to treat any road in the TMA as an R.S. 2477 road, despite the State's valid claims, while also refusing to dispute the State's title. The BLM is trying to have it both ways, failing to analyze the State's vested title claims while also refusing to dispute the title for jurisdictional reasons.

206.    This Court in the *Kane (2)* decision described this technique as "a course of action to shut the courthouse doors to Plaintiffs [i.e. the State and counties] seeking to perfect titles to roads that are key to Plaintiffs' transportation systems." *Id.* at 11. The BLM has failed to take a hard look at the significant consequence of its DR on the vested property rights of the State, despite clear requests by the State to do so, in order to satisfy BLM's own jurisdictional

purposes.  This abrogates the very purpose of performing NEPA analysis for a BLM TMP and taking a hard look at the consequences of the agency action.  The San Rafael Swell DR should be set aside until BLM takes a necessary hard look at the consequences closure of R.S. 2477 roads will cause to the State's vested property rights.

207.    In *SUWA v. BLM*, the Tenth Circuit Court of Appeals stated that because "FLPMA explicitly preserved and protected R.S. 2477 rights of way in existence as of October 21, 1976, and that those rights have the status of vested real property rights, any post-1976 changes in agency interpretation of the repealed statute have questionable applicability." *Id*. at 760.  The court further noted that "it is hard to square . . . law-changing discretion with the concept of property rights that vested, if at all, on or before a date almost 30 years ago." *Id*.

208.    In *Block v. North Dakota ex rel. Bd. of University and School Lands*, 461 U.S. 273 (1983), the United States Supreme Court stated that the Quiet Title Act ("QTA") "does not purport to effectuate a transfer of title."  The Court also noted that even in situations where the QTA statute of limitations has run, the QTA "does not purport to strip any State, or anyone else for that matter, of any property rights." *Id*. at 291.  The Court also opined that if Congress had done so by statute, it "would have constituted a taking of the State's property without just compensation, in violation of the Fifth Amendment. *Id.*

209.    The BLM DR's closure of roads in the San Rafael Swell TMP that are subject to R.S. 2477 rights of way held by the State and Emery County and Sevier Counties and have the status of vested real property rights, constitutes a taking of property of the State and Counties, in violation of the Fifth Amendment to the United States Constitution.

210.    This Court in the *Kane (2)* decision stated that "Until title is perfected under the Quiet Title Act, the United States retains that right to challenge a claim to vested title, but such

challenge must be done through the QTA and not through an informal policy of the United

States.  It also must be done as a good faith dispute, rather than as a means to circumvent R.S.

2477 rights.  *See Kane Cnty.*, *Utah v. Salazar*, 562 F.3d 1077, 1090 (10th Cir. 2009) (Henry, J.

concurring) (stating "[t]he federal agency is not entitled, under FLPMA and the APA, to close

existing county roads asserted to be R.S. 2477 rights-of-way without a reasoned and nonarbitrary

basis for doing so, such as . . .substantial evidence that the asserted right-of-way is invalid.")."

*Kane Cnty v. U.S.*, 2:10-cv-01073-CW, Dkt. 792, at 33 (Memorandum Decision and Order Re:

Motions to Dismiss and Definition of "Holder") (D. Utah Aug. 9, 2024).

## FIRST CAUSE OF ACTION
### *Violation of Federal Case Law: Diminished Access to State-owned Land managed by SITLA*

211.    Plaintiffs reallege and incorporate by reference the allegations contained in the

paragraphs above.

212.    As alleged above, BLM's DR closes access to at least nine sections of property

totaling approximately 6,416 acres owned by the State and administered by SITLA, and many

more sections and acres are restricted by vehicle width or other systems (for example, see limited

access Route SS5385), which will result in direct adverse economic impacts.  The DR also

restricts access to already developed roads going through several SITLA parcels.  Specifically,

BLM's DR will result in loss of access or restriction of access to thousands of acres of property,

which in turn will result in reduced marketability and diminished per acre value by as much as

fifty percent.  The collective loss of the value of these lands will be in the hundreds of thousands

of dollars.

213.    Continued access to these sections is paramount for fulfilling the intent of the

original land grant from the United States. The closure of access roads severely limits the

potential uses of these lands and their accessibility, thereby reducing their attractiveness to

potential buyers or lessees.

214.    BLM may consider that this decision does not impact the State-owned SITLA

parcels to the extent prohibited by the *Cotter* decision; however, the lack of available roads, even

if they are only "paper routes" (i.e. routes that are only visible on maps but are reclaimed on the

ground), will substantially impair actual access to those parcels and increase the amount of time

and financial capital necessary for prospective lessees to access those lands, which will

undoubtedly render those lands "incapable of full economic development." *Id*.

**SECOND CAUSE OF ACTION**
*Violation of the Dingell Act, FLPMA, NEPA and APA*

215.    Plaintiffs reallege and incorporate by reference the allegations contained in the

paragraphs above.

216.    On March 12, 2019, the United States Congress passed Public Law 116-9,

otherwise known as the John D. Dingell, Jr. Conservation, Management, and Recreation Act (the

"Dingell Act"). John D. Dingell, Jr. Conservation, Management, and Recreation Act, Pl 116-9,

March 12, 2019, 133 Stat 580.

217.    BLM has failed to follow the provisions of FLPMA and the Dingell Act; the DR

is inconsistent with the Sevier County and Emery County RMPs and the State RMP, and BLM

completely failed to discuss these inconsistencies or make any attempt to resolve them.

218.    BLM has also failed to follow the provisions of NEPA which requires that BLM

allow cooperating agencies a meaningful opportunity to participate in the reconsideration process

as required in 40 C.F.R. 1501.8.  Specifically, NEPA requires cooperating agencies be allowed to

participate in the NEPA process at the earliest practicable time. 40 C.F.R. 1501.8(b)(1).

219.    BLM is required to use the environmental analysis and proposals of cooperating

agencies… to the "maximum extent practicable" and "shall develop a schedule, setting milestones for all environmental reviews and authorizations required for implementation of the action, in consultation with… cooperating agencies as soon as practicable". 40 C.F.R. 1501.7 (h)-(i), which has not been done.

220.    Other provisions of the Dingell Act have been violated including Section 1222(c)(1), which requires BLM to develop a management plan for the recreation area within five years of enactment of the Act.  The BLM has failed to develop this plan which is a violation of Section 706 of the APA and *Forest Guardians v. Babbit.*

221.    The road closures, regardless of the condition or use of the road, are contrary to expressed congressional intent, an illegal overreach of power, a violation of federal law and is arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. § 706.  BLM cannot at the administrative level override congressional action.

### THIRD CAUSE OF ACTION
*Violation of the APA: Unlawful Arbitrary and Capricious Action*

222.    Plaintiffs reallege and incorporate by reference the allegations contained in in the paragraphs above.

223.    The APA authorizes the setting aside of agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations; without observance of procedures required by law, and unwarranted or unsupported by the facts. 5 U.S.C. 706(2). There must be a "rational connection between the facts found and the choice made." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 56, 103 S. Ct. 2856, 2873, 77 L. Ed. 2d 443 (1983).

224.    As set forth in detail above the above paragraphs, BLM's DR violates federal law and is arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. § 706.

## FOURTH CAUSE OF ACTION
### *Violation of FLPMA: Failure to comply with Multiple Use and Sustained Yield Mandate*

225.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs above.

226.    Under FLPMA, the guiding principle in the management of the public lands generally, and the RMPs specifically, is multiple use and sustained yield. 43 U.S.C. § 1732(a) (2024).

227.    "Multiple use" is defined as "management of public lands and their various resources so that they are utilized in the combination that will best meet the present and future needs of the American people" *Id*. § 1702(c).

228.    These resources include, but are not limited to, "recreation, range, timber, oil, gas, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values." *Id*.

229.    "Sustained yield" is defined as "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of various renewable resources of the public lands consistent with multiple use." *Id*. § 1702(h).

230.    FLPMA requires BLM to manage public lands according to multiple use and sustained yield principles, in order to "meet the present and future needs of the American people." *See* 43 U.S.C. 1701(a)(7), 1702(c).  These uses include domestic livestock grazing, which is defined as a "principal or major use." *Id*. at (1).

231.    The BLM's DR closed roads based upon a rationale that only considers conservation and fails to take into account livestock grazing, wildlife management, motorized recreation and travel and other uses.

232.    Keeping existing routes open helps accomplish the goal of "minimization of conflicts among various uses of the public lands." 43 C.F.R. § 8342.1.  Transportation

connectivity reduces in and out traffic and can spread out use.  Additionally, keeping roads open

provides the traveling public access while reducing the need and desire to pioneer new and

unauthorized routes.

233.    BLM's DR violates FLPMA by failing to manage the public lands of the San

Rafael Swell TMA in accordance with principles of multiple use and sustained yield and is

arbitrary, capricious, or otherwise not in accordance with law in violation of the APA. 5 U.S.C. §

706.

**FIFTH CAUSE OF ACTION**
***Violation of FLPMA, APA, other Federal Statutes and the Dingell Act: Unlawful De Facto
Wilderness Management on Non-WSA Lands***

234.    Plaintiffs reallege and incorporate by reference the allegations contained in the

paragraphs above.

235.    Constitutional authority to classify and manage public lands resides with

Congress. United States Constitution, Article IV, Section 3 cl. 2.  In various federal laws,

including but not limited to Taylor Grazing Act ("TGA"), 43 U.S.C. §§ 315-315q, FLPMA, 43

U.S.C. §§1701 *et seq.*, the 1872 Mining Law, as amended, 30 U.S.C. §§ 20, *et seq.*, and the

Mineral Leasing Laws ("MLA"), 30 U.S.C. §§181, *et seq.*, Congress has delegated its

constitutional authority to Defendants to manage public lands.  This delegated authority is

defined and limited by the terms of the respective federal statute.

236.    While BLM's reconsideration and DR closing of 665 miles of roads and

restrictions on another 141 miles in the San Rafael Swell Transportation Management Area does

not use the term "wilderness" to define its protective management of non-WSA lands, there is no

question that the on the ground effect is to create WSA-type management.

237.    As set forth above in paragraphs above, BLM's wilderness review authority under

§ 603 of FLPMA, 43 U.S.C. § 1782(c), has terminated, and as a result, BLM must "not manage or otherwise treat public lands, other than § 603 WSAs. . . as WSAs or as wilderness pursuant to the [FLPMA] § 202 process."

238.    BLM may not create § 202 WSAs and may not "treat" public lands as WSAs through its land use and transportation management planning process.  The BLM's DR unlawfully treats the non-WSA lands of the San Rafael Swell Transportation Management Atea as *de* facto WSA lands.

239.    Notably, FLPMA does not preclude individual protections associated with the concept of wilderness that may be afforded through the land use planning process, such as through the establishment of areas of critical environmental concern (ACECs). 43 U.S.C. § 1702(a) (2024).   In doing so, specific statutory and regulatory criteria must be met, including a finding that special management attention is required to prevent irreparable damage. *Id.* Proposed ACEC designations are not a substitute for a wilderness suitability determination, nor may they be offered as a means to manage non-WSA lands as wilderness.

240.    When appropriate, BLM may also limit OHV use or establish mitigation measures, stipulations, or conditions of use to be attached to permits, leases, and other authorizations to avoid or minimize impacts to individual resource values.  BLM, however, may not use the land or transportation management planning process to create *de facto* wilderness similar to the management of WSAs to the exclusion of multiple use.

241.    The BLM's reconsideration and DR treats the area of the newly closed roads as if they were WSAs and violates any sound and legally supported interpretation of FLPMA and other federal statutes.

242.    Defendants have acted arbitrarily and capriciously in issuing BLM's DR and have

closed numerous roads and road segments for the sole reason that they traverse lands considered by SUWA and other environmental groups to be Red Rock Wilderness.  A favorable decision from this Court will redress the legal injuries to Emery County, Sevier County, the State and SITLA, and remove immediate barriers to multiple use of the affected public lands, including access to lands owned by the State and managed by SITLA, wildlife management, historic and scientific resource, transportation management and livestock grazing and support key components of the State's and both County's land use and transportation plans. Such a determination and permanent injunction will leave the Utah wilderness debate where it belongs as provided by law, with the United States Congress.

243.    Similar to the FLPMA violations mentioned under this cause of action, the BLM's DR also amounts to illegal wilderness management under the Dingell Act.  In that law, Congress "released" all of the lands in Emery County which were not designated as Wilderness from their other respective wilderness designations such as WSAs and "lands with wilderness characteristics" ("LWC").  Dingell Act Section 1234(a).  In doing so, Congress made all released lands subject to multiple use and sustained yield management under FLPMA. *Id*. at 1234(b). However, the BLM still chose to prioritize and consider whether several routes should be opened or closed based on their effect on "wilderness character", which is a blatant violation of the Dingell Act, and the Court should set aside the BLM's DR accordingly.

244.    Furthermore, the APA allows this court to "hold unlawful and set aside" agency actions that are found to be "arbitrary and capricious, and abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C.A. § 706(2)(A). The same applies to agency actions found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" as well as agency decisions "without observance of procedure required by law[.]" *Id*. at (2)(C)-(D).

52

245.   Under Section 4001 of the Dingell Act,  the BLM was required to adequately consider each route's hunting, fishing, and recreational shooting value in the travel management planning process. The BLM failed to do this and thus acted arbitrary and capriciously and "without observance of procedure required by law."

246.   Under Section 1222 of the Dingell Act, BLM is and was required to complete a "comprehensive management plan" for the San Rafael Swell Recreation Area that was created in the Dingell Act "not later than 5 years" after the passage of the Dingell Act. This Section also states that "Necessary maintenance or repairs to existing roads ***designated in the Management Plan*** for the use of motorized vehicles, including necessary repairs to keep existing roads free of debris or other safety hazards, shall be permitted after the date of the enactment of this Act, consistent with the requirements of this Section." Congress defined "Management Plan" as "the management plan for the Recreation Area developed under Section 1222(c). This "comprehensive Management Plan" has yet to be developed nor finalized. The BLM failed to complete this critical task Congress assigned it and thus acted arbitrary and capriciously and "without observance of procedure required by law."

247. Under Section 1232 of the Dingell Act, and as discussed in the paragraphs above, BLM illegally created a "protective perimeter" and "buffer zone" around the designated Wilderness in the TMA to prevent "nonwilderness activities" from occurring near wilderness boundaries in violation of the APA and Dingell Act.

248.   Further, Congress created the National Wild and Scenic River System P.L. 90-542; U.S.C. 1271 et seq, which created a classification system deeming a river either "wild" or "scenic" based largely on its accessibility via roads. 16 U.S.C. 1273(b). 39. "Scenic River Areas" are "[t]hose rivers or sections of rivers that are free of impoundments, with shorelines or

watersheds still largely primitive and shorelines largely undeveloped, but accessible in places by roads." Id (emphasis added).  In contrast, Congress defined "Wild River Areas" as "[t]hose rivers or sections of rivers that are free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted." Id. 40.

249.    In 2019, in conjunction with the Dingell Act, Congress added segments of Utah's Green River to the Wild and Scenic River system. 43 C.F.R. §1241. Most of the Green River was designated "scenic", with a small northerly portion being designated "wild". Id. 41. The Dingell Act did not include any language regarding Utah's Price River.  Despite this, BLM has closed many routes "to encourage only non-motorized access along the Price River to help protect sensitive resources." DR at 8. This management approach has created a designated wild river in contradiction to what Congress intended. If it was Congress' intent to prioritize non-motorized recreation along the Price River, it would have done so explicitly.

## SIXTH CAUSE OF ACTION
### *Violation of FLPMA: Unlawful closure of roads to which the State holds vested rights-of-way*

250.    Plaintiffs reallege and incorporate by reference all allegations contained in the paragraphs above.

251.    As alleged above, R.S. 2477 provided for the construction of public highways across public land, while also providing for title to those public highways to vest with state and county governments.

252.    Upon fulfilling the public highway requirements of R.S. 2477, state and county governments became the "holders" of rights-of-way to those highways.

253.    Rights-of-way granted under R.S. 2477 were self-executing, requiring no action on the part of the federal government.

254.    Although FLPMA repealed R.S. 2477 upon its passage in 1976, FLPMA

preserved any valid lease, permit, patent, right-of-way, or other land use right or authorization existing upon the passage of FLPMA.

255.    The BLM's DR closes to motorized travel and limits OHV access on 806 miles of roads to which the State and Counties are the "holders" of pre-1976 vested rights-of-way under R.S. 2477.

256.    The BLM closure of rights-of-way within the TMA disturbs the State's and County's use of those vested rights-of-way.

257.    Although the State's and County's vested title in the rights-of-way within the TMA are not yet perfected and are in some cases still the subject of a pending lawsuit under the Quiet Title Act, the State and Counties are nevertheless holders of the rights-of-way within the TMA.

258.    The BLM has therefore violated FLPMA by closing public motorized access to roads to which the State and Counties hold vested title preserved by FLPMA.

## SEVENTH CAUSE OF ACTION
### *Violation of NEPA: Failure to consider rights-of-way for which State holds vested title*

259.    Plaintiffs reallege and incorporate by reference all allegations contained in the prior paragraphs.

260.    NEPA requires federal agencies such as BLM to take "hard look" at the environmental consequences of a federal action warranting NEPA analysis.

261.    During the development of the EA for BLM's TMP, the State and Counties asked BLM to consider the impacts of road closures on their vested rights under R.S. 2477.

262.    Despite these requests, BLM declined to even consider these impacts.

263.    BLM's failure to consider how its road closures would impact the vested rights of

the State and Counties violates NEPA's "hard look" standard.

## EIGHTH CAUSE OF ACTION
### *Violation of the Fifth Amendment to the Constitution: unlawful taking of property of the State and Counties*

264.    Plaintiffs reallege and incorporate by reference all allegations contained in the

paragraphs above.

265.    The BLM DR's closure of approximately 35.49 miles of roads that are subject to

R.S. 2477 rights of way held by the State, Emery County and Sevier County have the status of

vested real property rights, constitutes a taking of property, in violation of the Fifth Amendment

to the United States Constitution.

## NINTH CAUSE OF ACTION
### *Violation of the APA, the Dingell Act, and Forest Guardians v. Babbit*

266.    Plaintiffs reallege and incorporate by reference all allegations contained in the

paragraphs above.

267.    The President of the United States signed the Dingell Act into law on March 12,

2019. The Dingell Act, under Section 1222(c)(1) states that "Not later than 5 years after the date

of enactment of this Act, the Secretary shall develop a comprehensive management plan for the

long-term protection and management of the Recreation Area." The date that Congress gave the

BLM to complete this plan was thus no later than March 12, 2024, and yet this plan has to date,

failed to be developed. Section 706(1) of the APA states that the reviewing court "shall (1)

compel agency action unlawfully withheld or unreasonably delayed[.]" *Forest Guardians v.*

*Babbit.*

268.    The development of the management plan has been unlawfully withheld to the

detriment of the State and thus the court should set the DR aside as it has when a congressional

deadline has failed to be adhered to in the past. *Id.* Further, the unlawfully withheld agency action is also arbitrary and capricious, and without observance of procedure as required by law under the APA.

**TENTH CAUSE OF ACTION**
*Violation of NHPA: Failure to follow the Section 106*

269.    Plaintiffs reallege and incorporate by reference all allegations contained in the paragraphs above.

270.    NHPA, requires federal agencies to consider the effects of their undertakings on historic properties and, as implemented by the Section 106 Process and to consult with local governments and other groups with the goal to identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects on historic properties.

271.    By failing to comply with NHPA, BLM's road closures have restricted access to these areas which may impede the ability of state-affiliated researchers, universities, and cultural resource management entities to conduct necessary surveys, studies, mitigation, and monitoring projects, thereby hindering the discovery, preservation, and interpretation of irreplaceable cultural and scientific heritage.

272.    The road closures and restrictions has resulted in neglect, changing the character of the property's use, and changing the physical features within the property's setting that contribute to its historic significance and violates NHPA.

**ELEVENTH CAUSE OF ACTION**
*Violation of FLPMA and the Dingell Act*

273.    Plaintiffs reallege and incorporate by reference all allegations contained in the paragraphs above.

57

274.    Dingell Act Section 1255(b)(5) states: "The land exchange under paragraph (1) shall be subject to valid existing rights."  Section 1232 governs the administration of Wilderness areas that Congress designated in the legislation.  Section 1232(a) explicitly states that "Subject to valid existing rights, the wilderness areas shall be administered by the Secretary in accordance with the Wilderness Act[.]"  Thus, Emery County owns a valid existing right of way on the routes found in Exhibit 10 and the BLM had no authority to close them in its DR.

275.    The BLM in some instances failed to evaluate certain routes and in other instances closed routes of which Emery County holds "prior existing rights", without Emery County's consent, in violation of the Dingell Act and FLPMA.  In BLM's analysis and ultimate DR, the agency failed to consider these roads and closed many of them despite multiple comments from the State and Emery County. *See* Exhibit 3-5.

276.    Emery County acquired a right of way on the routes found in Exhibit 10, prior to SITLA exchanging the land with the BLM, as authorized in Section 1255 of the Dingell Act.  As part of the Trust Lands/BLM land swap, SITLA exchanged certain lands within the wilderness areas for lands outside the designated wilderness areas.  Before any of these swaps took place, SITLA granted Emery County access easements to three specific routes that would supersede and continue to exist despite any land exchange with the BLM.

277.    The BLM's road closures cause a significant concern for the State and Emery County because the County cannot access its land and resources and individuals may be subject to civil and/or criminal sanctions when they "trespass" on routes or roads BLM considers closed and no longer accessible, even though Emery County holds prior existing rights which is a violation of the FLMPA and the Dingell Act.

**TWELFTH CAUSE OF ACTION**
*Violation of the APA:  Arbitrary and Capricious*

278.    Plaintiffs reallege and incorporate by reference all allegations contained in the paragraphs above.

279.    During the TMP process, the State reviewed the proposed San Rafael Swell TMP draft Alternatives and wrote comment letters to BLM.  The State commented in part, that BLM was pursuing an arbitrary decision-making process by closing routes halfway through the given route that traversed both inside and outside of the TMA.  See Exhibit 3 - State's comments on March 15th, 2024.  The BLM disregarded Utah's comments and closed roads anyway with no rational basis for doing so.

280.    A federal agency action is "arbitrary" or "capricious" under the APA if it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U. S. 414, 423. Further, an agency must offer "a satisfactory explanation for its action [,] including a rational connection between the facts found and the choice made" and cannot simply ignore "an important aspect of the problem."  *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43.

281.    Recently, the U.S. Supreme Court issued its decision in *Ohio v. EPA*, 603 U.S. 279 (2024), where the Court held that the EPA had acted arbitrarily and capriciously by not fully considering or offering a rational response to the instance where certain states would fall into their ozone regulatory federal implementation plan while others would not—thus stating that the EPA could not properly accomplish its mandates by only addressing issues within its plan but not taking account for the very real problem of ignoring what is happening outside of the plan.

282.    Likewise, the BLM's closure of routes within the subject Travel Management Plan is an arbitrary and capricious agency action in violation of the Administrative Procedure Act because the decision to close routes mid-travel way lacks a rational basis and is pre-

decisional for routes on the other side of the TMA boundary.  This piecemeal approach—closing one segment of a route while leaving the other side of the imaginary line open—ignores the fundamental nature of a transportation network and fails to consider an essential aspect of the problem.

283.    The BLM's closure of roads in the San Rafael Swell TMP  is directly analogous to the agency failure identified in *Ohio v. EPA*, 603 U.S. 279 (2024), where the Supreme Court stayed the EPA's good neighbor rule because the agency failed to account for how its plan would function after a significant number of states were removed from the framework.  Here, the BLM has artificially removed segments of routes from the network without a rational explanation for the fragmented result, rendering the decision arbitrary, without reason, and indefensible.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this court grant relief against Defendants as follows:

1.    Declare unlawful and set aside the DR because it unlawfully deprives the State and SITLA of access to State-owned Trust Lands administered by SITLA.

2.    Declare unlawful and set aside the DR because it violates APA, FLPMA and NEPA, as well as the Dingell Act because it closed or restricted road access contrary to congressional intent, is contrary to law, without lawful authority and is arbitrary, capricious in violation of the APA and *Forest Guardians v. Babbit*, as well as failing to develop a management plan for the recreation area within five years of enactment of the Dingell Act. Defendant failed to allow cooperating agencies a meaningful opportunity to participate in development of the management plan, and failing to participate develop a management plan for the recreation area within five years of enactment of the Dingell Act,

3.      Declare unlawful and set aside the DR as contrary to law, without lawful authority, and arbitrary and capricious pursuant to the APA.

4.      Declare unlawful and set aside the DR because Defendants failed to follow and violated FLPMA's mandate to manage the public lands of the San Rafael Swell TMA in accordance with principles of multiple use and sustained yield.

5.      Declare unlawful and set aside the DR and find that Defendants acted beyond their statutory authority to manage the lands accessed by the approximately 806 miles of roads and road segments that were closed or limited in the San Rafael Swell Travel Management Plan.

6.      Declare unlawful and set aside the DR because BLM violated FLPMA by closing public motorized access to roads to which State and County hold vested title preserved by FLPMA.

7.      Declare unconstitutional and unlawful and set aside BLM's DR because the closure of roads that are subject to R.S. 2477 rights of way held by the State and Emery County constitutes a taking of property, in violation of the Fifth Amendment to the United States Constitution.

8.      Declare unlawful and set aside the DR because failed to take a "hard look" at the environmental consequences of a federal action warranting a NEPA analysis.

9.      Declare unlawful and set aside the DR because of failure to BLM to follow the National Historic Preservation Act, as implemented by the Section 106.  The road closures and restrictions have resulted in neglect, changing the character of the property's use, and changing the physical features within the property's setting that contribute to its historic significance which violates NHPA.

10.     Declare unlawful and set aside the DR because Defendants violated FLPMA and the Dingell Act when they failed to evaluate certain routes and closed routes of which Emery County holds prior existing rights.

11.     Declare unlawful and set aside the DR because it is contrary to law, without lawful authority, and arbitrary and capricious pursuant to the APA and a violation of *Ohio v. EPA*, 603 U.S. 279 (2024), *FCC v. Prometheus Radio Project*, 592 U. S. 414, 423 and *Motor Vehicle Mfrs. Assn. of U.S.s, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43.  The closure of routes in a piecemeal approach ignores the fundamental nature of a transportation network limiting the ability State, SITLA and Emery County and Sevier County.to effectively exercise their respective sovereign authorities to manage transportation within their borders.

12.     Declare that Defendants are unlawfully managing lands as *de facto* wilderness in violation of FLPMA, APA, other federal statutes and the Dingell Act and enjoin the United States from unreasonably and/or arbitrarily interfering with the State's, Emery County's, and Sevier County's vested R.S. 2477 property rights.

13.     To the extent that any provision of the DR is upheld, enjoin the provisions of the DR found by this court to be unlawful.

Respectfully submitted this 4th day of September 2025.

UTAH ATTORNEY GENERAL'S OFFICE

/s/ *Kathy A. F. Davis*
Kathy A. F. Davis
Assistant Attorney General

## STATE'S LIST OF EXHIBITS

Exhibit 1  San Rafael Travel Management Area Map

Exhibit 2  Senator Mitt Romney and Representative John R. Curtis Congressional Intent Records

Exhibit 3  State Comment Letters

Exhibit 4  Sevier County and Emery Comment Letters, Review Tables and Resolutions

Exhibit 5  SITLA Comment Letter and Road Comments

Exhibit 6  Memorandum of Understanding

Exhibit 7  Governors Consistency Review and Follow-up Letters to BLM

Exhibit 8  Map of SITLA Sections Closed and/or Restricted

Exhibit 9  Routes Required to Regain Access to State Trust Lands

Exhibit 10  Emery County Roads within Dingell Act Exchange