# EXHIBIT 2

to the Southern Utah Wilderness Alliance's
Motion to Intervene
*State of Utah v. U.S. Burgum*,
4:25-cv-00106-AMA-PK

 

March 3, 2021

Daniel Kauffman
Bureau of Land Management
Green River District
170 South 500 East
Vernal, UT 84078

Letter submitted via email to blm_ut_pr_comments@blm.gov and via BLM's e-planning portal

> Re:   *San Rafael Swell Travel Management Plan, DOI-BLM-UT-G-020-2019-EA Scoping Comments*

Greetings:

Please accept the following comments submitted by the Southern Utah Wilderness Alliance (SUWA) and The Wilderness Society (TWS) regarding BLM's forthcoming Environmental Assessment (EA) for the San Rafael Swell Travel Management Plan (TMP or "Travel Plan"), DOI-BLM-UT-G020-2019-EA.

In developing the EA, BLM must ensure that the Travel Plan complies with all aspects of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321-4370f; the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701-1785; the National Historic Preservation Act (NHPA), 54 U.S.C. §§ 300101-307108; the Clean Air Act, 42 U.S.C. §§ 7401-7671q; the minimization requirements for route designations set forth in FLPMA's regulations, and all other applicable federal regulations and agency guidance applying these laws and regulations. BLM also must comply with Executive Orders 13,990 and 14,008.

## I.   Background

The San Rafael Swell Travel Management Area (TMA) encompasses roughly 1,154,411 acres of BLM-managed lands within the Price and Richfield field offices. The Swell is home to irreplaceable cultural and historic resources, important wildlife and plant habitat, and unmatched recreation opportunities. The swell's sinuous slot canyons, soaring red rock cliffs, and prominent buttes provide endless opportunities for hikers, canyoneers, river runners, climbers, bikers, photographers, campers, and other visitors.

There have been several prior iterations of travel planning within the San Rafael Swell TMA. The Price field office's 1991 San Rafael Resource Management Plan (RMP) designated

approximately 1,031,631 acres of BLM-managed public lands as "limited to designated roads and trails," designated approximately 82,627 acres as limited on a seasonal basis, and placed "approximately 190,349 acres of public land in an 'open' OHV category." *See* Bureau of Land Mgmt., *San Rafael Route Designation Plan Environmental Assessment*, BLM/UT-067-94-010, 2-3 (2002) (2003 SRRDP EA).

In 2003, the Price field office finalized the San Rafael Route Designation Plan (SRRDP), an activity-level implementation of the 1991 San Rafael RMP. The 2003 SRRDP focused on route designations for routes with the "limited to designated roads and trails" category in the 1991 San Rafael RMP and areas that were "limited to designated roads and trails on a seasonal basis, but are in the 'open' category during the rest of the year." 2003 SRRDP EA at 2. The 2003 SRRDP ultimately designated 677 miles of OHV routes in that "limited to designated area," including about 567 miles of routes within the lands that now make up the San Rafael Swell TMA.

The 2003 San Rafael Route Designation Plan was the result of a multi-year public stakeholder process that involved county commissioners, OHV club representatives, environmental groups, mountain bike clubs, hiking groups and other public land users. Bureau of Land Mgmt., *Finding of No Significant Impact and Decision Record, San Rafael Route Designation Plan*, EA-UT-067-94-010 2 (2003). The plan considered roughly 470 miles of routes beyond those ultimately designated. BLM decided not to designate those 470 miles for motorized vehicle use generally because those routes were:

> (1) duplicate routes to destination points; (2) dead end routes (3) routes causing resource damage by inviting "route proliferation" (multiple parallel trails, hill climbs, additional routes around difficult spots); (4) routes that are naturally re-vegetating; (5) routes with conflicts between motorized and non-motorized users; (6) routes through riparian areas; (7) routes through critical soils susceptible to damage; (8) routes that have the most potential to affect threatened and endangered species; (9) routes that could affect cultural resources; (10) and routes that could impact the tentative classification of wild and scenic river segments.

*Id.* at 3. In the SRRDP, BLM committed to publishing maps and increasing signage to inform public land users. *Id.* at 5. The agency also committed to patrol areas to enforce the route designations and work with groups and individuals to put up signs and kiosks and monitor the areas. *Id.*

In 2008, the Price field office revised and unified the 1983 Price River Resource Area Management Framework Plan and the 1991 San Rafael RMP into the 2008 Price resource management plan. With regard to designated motorized use, the 2008 Price RMP both adopted the 2003 SRRDP in its entirety and designated areas and trails for motorized use in the lands previously considered under the 2003 SRRDP. *See* Bureau of Land Mgmt., *Price Field Office Record of Decision and Approved Resource Management Plan* 25 (2008) (Price RMP). The Price RMP designated 606 miles of routes within the areas not previously analyzed in the 2003 RMP. In combination, the Price RMP and 2003 SRRDP designated 1,276 miles of motorized routes available for public use across the Price field office. *Id.* at 26. Of those 1,276 miles of motorized routes, about 890 miles are within the San Rafael Swell TMA.

The San Rafael Swell TMA also includes 54,040 acres within the Richfield field office. In 2008, the Richfield RMP designated 3,739 miles of routes as open to all motorized vehicle use and an additional 538 miles of routes open to motorized vehicles with seasonal closure or size/width restrictions. About 119 miles of designated routes fall within the San Rafael Swell TMA.

Concerned about BLM's failure to comply with the NHPA, FLPMA, the Executive Orders and minimization criteria and other laws and regulations, SUWA, TWS and a coalition of conservation organizations challenged the Price RMP—along with five other Utah field office RMPs in court. A federal judge held that several aspects of the Richfield resource management plan and travel management plan violated environmental and cultural preservation laws. *See generally S. Utah Wilderness Alliance v. Burke*, 981 F. Supp. 2d 1099 (D. Utah 2013). Specifically, the court noted that there was "no indication that the BLM actually considered or applied the minimization criteria to the designation of OHV routes." *Burke*, 981 F. Supp. at 1105-06. Further, the BLM failed to comply with the NHPA when it failed to conduct a class III survey of OHV routes designated as open in the Richfield field office travel plan. *Id.* at 109-110.

In the wake of the court's Richfield RMP and travel plan decision, the conservation groups, BLM and three OHV groups signed a settlement agreement that established a schedule and process for BLM to update thirteen travel plans across eastern and southern Utah. Settlement Agreement, *S. Utah Wilderness All. v. U.S. Dep't of the Interior*, No. 2:12-cv-257 (D. Utah Jan. 13, 2017) (No. 513) (Settlement Agreement).

In these 2008 travel plans, BLM largely failed to adequately consider and apply the minimization criteria. Specifically, it failed to minimize impacts to cultural resources, soils, air, watershed, wildlife and wildlife habitat. BLM also failed to minimize conflicts between resource users. As a result, those plans inappropriately blanketed the TMA with an ill-conceived, largely user-created and damaging route network. Accordingly, in this new travel planning process BLM should not consider action alternatives that would designate routes as open to motorized vehicles beyond those designated in 2008. Instead, BLM should be removing motorized vehicle routes to adequately protect natural and cultural resources and establish a defensible, balanced plan.

The San Rafael Swell travel plan is a critically important plan covering some of the most popular and frequently visited BLM-managed lands in Utah. This travel plan is an opportunity to develop a reasonable, manageable and forward-thinking blueprint that ensures public access to the outdoors while preserving the backcountry and meeting BLM's duty to minimize damage to cultural and natural resources. Visitation to Utah's public lands is skyrocketing and shows no sign of diminishing. Utah's public lands and natural resources are under increasing threat from the impacts of climate change. Precisely because of these challenges, thoughtful and deliberate travel planning is critical. The planning process is an opportunity to find a balance between motorized vehicle use, preservation of sensitive resources and opportunities for quiet recreation.

## II.     Route Inventory and Baseline Data

### a.     Background

BLM must establish accurate baseline conditions within the TMA. The regulations implementing NEPA require agencies to "describe the environment of the areas to be affected or created by the alternatives under consideration." 40 C.F.R. § 1502.15. In *Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci*, the Ninth Circuit Court of Appeals stated that "without establishing . . . baseline conditions . . . there is simply no way to determine what effect [an action] will have on the environment, and consequently, no way to comply with NEPA." 857 F.2d 505, 510 (9th Cir. 1988). The court further held that "[t]he concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process." *Id.* at 510.

BLM's Travel and Transportation Handbook (H-8342) is clear that the "baseline" for travel and transportation planning does not include potential or future routes or features when these features do not currently exist on the ground in any form. "The GTLF [ground transportation linear features] geospatial database is the comprehensive baseline inventory of all transportation related routes, both motorized and non-motorized, that exist on the BLM managed lands for a particular planning area." H-8342 Travel and Transportation Handbook § IV(A)(i), at 9-10 (2012). H-8342 describes these "ground transportation linear features" as "transportation (from motorized to foot) linear features *as they exist on the ground.*" App. 3, at 46 (emphasis added).

As BLM proceeds through this travel planning process, it should endeavor to create a travel system that directs use away from sensitive areas, resolves resources user conflicts, reduces route duplication and reduces the overall number of routes. *Id.* § V(H)(i), at 30. "Individual roads, primitive roads, and trails should be chosen with the transportation network goals in mind rather than just using all the inherited roads, primitive roads and trails." *Id.*

### b.     BLM's San Rafael Swell Baseline Inventory

There are numerous problems with BLM's route inventory and baseline data both in the data itself and in BLM's presentation of that data to the public. There are currently around 1,017 miles of designated motorized vehicle routes in the San Rafael Swell TMA. Despite this, BLM included an *additional* 1,124 miles of "routes" in its baseline inventory for a total of around 2,140 miles of routes being considered for designation. BLM does not disclose how the agency identified the additional miles or routes or exactly what those routes represent.

In its public-facing information—interactive map and GIS data—BLM does not differentiate between those routes that are currently designated for motorized vehicle and those that are closed to motorized vehicle use. BLM also does not differentiate between those linear features which may simply be non-motorized trails or washes.[1] And in fact BLM inaccurately refers to every linear feature as a "road" in both the interactive map and the GIS data. BLM's failure to include this critical information biases the travel planning process by purporting to show *motorized*

---

[1] BLM includes many, but not all, washes in its inventory information. How BLM decides which washes to include in its baseline inventory data is entirely unclear.

*vehicle* routes far beyond those that are legal or reflect actual motorized vehicle use on the ground.

BLM has also included numerous routes that do not exist on the ground and again failed to specify that those routes differ from the rest of the inventory. Those non-existent routes must be removed from the inventory information. *See also* Section XIV, *infra*. Any routes that do not exist on the ground but are proposed to be constructed through active construction measures or by allowing new vehicle use where none currently exists must be clearly identified.



SS2280 – A non-existent route BLM includes in its inventory and refers to as a "tertiary *road*"



SS2486 – A non-existent route BLM includes on its inventory and refers to as a "tertiary *road*"



SS2504 – A wash with mature vegetation which shows no signs of motorized use that BLM nevertheless is considering for motorized vehicle designation.

Compounding the baseline data issues, BLM's assignment of route numbers is unnecessarily confusing. For instance, BLM combines routes that are currently open to motorized vehicles with routes that are closed to motorized vehicles. Route SS1552 is a designated, bladed route to a constructed drill hole, but according to the inventory data that route continues beyond the drill hole. Any motorized use beyond the drill hole is user-created, illegal and not designated as open to motorized vehicles. Treating these two separate routes as one biases the travel planning process by purporting to indicate a bladed route for the entire length. Similarly, route SS2491 should be split where the character, purposes and other features of the route changes, and assigned at least two different route numbers reflecting that the routes have different purposes and characteristics. The route purports to begin in the middle of Straight Wash but then continues west up the wash and southwest into Iron Wash. These routes—neither of which are open to motorized vehicles—should be considered separately to better reflect the conditions on the ground. Issues with the numerical identification of routes are pervasive throughout BLM's inventory data.

BLM must correct its baseline data by specifying where its route inventory data originates, clearly identifying currently-designated routes, differentiating between motorized routes and non-motorized trails and washes and accurately identifying routes numbers.

### III.    Dingell Conservation Management and Recreation Act

In February 2019, Congress passed the John D. Dingell, Jr., Conservation, Management and Recreation Act (Dingell Act). The Dingell Act designated 399,073 acres of wilderness within the San Rafael Swell TMA which must be managed in accordance with that Wilderness Act. Pub. L. 116-9, § 1231, 133 Stat. 580, 671-675 (2019). The Dingell Act also established the 217,000-acre San Rafael Swell Recreation Area "to provide for the protection, conservation, and enhancement of the recreational, cultural, natural, scenic, wildlife, ecological, historical, and educational resources of the Recreation Area." *Id.* § 1221(b). The Recreation Area is to be administered "in a manner that conserves, protects, and enhances the purposes for which the Recreation Area is established." *Id.* § 1222(a)(1). The entirety of the San Rafael Swell Recreation Area is within the TMA.

BLM must comply with the Dingell Act as it moves forward with the travel planning process. Accordingly, the travel plan must protect, conserve and enhance recreational, cultural, natural, scenic, wildlife, ecological, historical and educational resources in the Recreation Area. Pub. L. 116-9, § 1222(a)-(b). The travel plan cannot prioritize motorized vehicle use at the expense of natural, cultural and ecological resources. According to the Dingell Act, motorized vehicles "shall be permitted only on roads and motorized routes designated in the Management Plan for the used of motorized vehicles." *Id.* § 1222(d)(1). And, "[n]o new permanent or temporary roads or other motorized vehicle routes shall be constructed within the Recreation Area after the date of the enactment of this Act." *Id.* §1222(d)(2). BLM is considering designating 322 miles of routes *beyond* those routes designated in the 2008 Price RMP. BLM should not designate any new routes in the Recreation Area. Further, BLM must demonstrate how its route designations conserve, protect and enhance the purposes for which the Recreation Area was created, including the protection and conservation of cultural, natural, scenic, wildlife and ecological values.

In addition, prior to moving forward with the San Rafael Swell travel plan, BLM must correct the boundaries for the wilderness designated in the Dingell Act to reflect the legislative intent of the Act as well as the on-the-ground features. That GIS data establishes the baseline for all future management of these wilderness areas. Inaccurate GIS data leads to management difficulties, public confusion and potential for future conflict. SUWA has been working with Emery County and the State of Utah and provided BLM with details and a GIS layer. Despite multiple entreaties, BLM has not completed the necessary corrections. As a result, there are several routes that illegally intrude into the wilderness. Without any wilderness boundary clarifications and using the current BLM GIS data for Price FO wilderness boundaries, the following routes and/or portions of routes remain within wilderness and must be removed from BLM's inventory: SS2043, SS2044, SS2068, 222084, SS2093, SS2108, SS2109, SS2124, SS2125, SS2133, SS2146, SS2153, SS2174, SS2207, SS2246, SS2400, SS2504, SS2517, SS2532, SS2562, SS252733, SS3041, SS3083, SS3145, SS3173, SS3177, SS3178, SS3268, SS3271, SS3301, SS3321, SS4061, SS4242, SS4245, SS4261, SS4264m SS4296, SS4320, SS4321, SS4324, SS4327, SS4334, SS4368, SS4371, SS4401, SS4407, SS4408, SS5021, SS5023, SS5052, SS5058, SS5129, SS5139, SS5140, SS5389, SS5391.

## IV.    Executive Orders 13,990 and 14,008

Shortly after taking office, President Biden signed a series of executive orders highlighting the pressing threat of global climate change and directing federal agencies to help combat the climate crisis. On his first day in office, President Biden signed Executive Order (EO) 13,990, *Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*, 86 Fed. Reg. 7073 (Jan. 25, 2021), announcing a national commitment to "immediately commence work to confront the climate crisis." EO 13,990 § 1. EO 13,990 establishes a national policy to, among other things, reduce greenhouse emissions and "bolster resilience to the impacts of climate change." *Id.* It directs federal agencies to review all regulations, policies or similar agency actions that may be inconsistent with this mandate.

Executive Order 14,008 provides more detail regarding President Biden's expectation that federal agencies will play a pivotal role in combating the climate crisis. EO 14,008, *Tackling the Climate Crisis at Home and Abroad*, 86 Fed. Reg. 7619 (Feb. 1, 2021). President Biden committed to "deploy the full capacity of [federal] agencies to combat the climate crisis to implement a Government-wide approach that reduces climate pollution in every sector of the economy; increases resilience to the impacts of climate change . . . [and] conserves our lands, waters, and biodiversity . . . ." *Id.* § 201. The EO also directs the Department of the Interior to work with stakeholders to identify and recommend steps toward conserving 30 percent of U.S. lands and waters by 2030. *Id.* § 216.

OHV use on BLM-managed lands has significant impacts on lands and resources that relate to the climate crisis. Among other impacts with climate implications, OHV use causes soil compaction and erosion, degrades air and water quality, damages native vegetation, fragments plant and wildlife habitat and harasses wildlife. A changing climate only increases the vulnerability of resources and ecosystems to stressors like OHVs. Adam Switalski, *Off-highway vehicle recreation in drylands: A literature review and recommendations for best management practices*, 21 J. of Outdoor Recreation & Tourism 87, 88 (2018). On the other hand, large, intact

landscapes protected from surface-disturbing activities provide climate refugia that aid in the effort to combat the climate crisis.

Because of the significant climate implications of travel planning, BLM must consider travel planning in light of EOs 13,990 and 14,008. The agency-preferred alternative must prioritize reducing climate change impacts from OHV route designation. Furthermore, every aspect of the travel planning process—including applying the Minimization Criteria under 43 C.F.R. § 8342.1 and analyzing environmental impacts pursuant to NEPA—must be evaluated against the Biden Administration's stated goals of tackling the climate crisis.

## V.      Utah Resource Management Plan (RMP) Settlement Agreement

### a.    Applicable law and agency guidance

BLM must prepare the San Rafael Swell TMA:

> pursuant to applicable statutes, regulations, BLM-Utah Instruction Memorandum No. 2012-066 ("BLM-Utah IM 2012-066"), and the terms identified in paragraphs 16-24 of the Settlement Agreement. In addition to BLM-Utah IM 2012-066, relevant existing guidance includes, but is not limited to: BLM-Utah Guidance for the Lands with Wilderness Characteristics Resource, Instruction Memorandum No. UT 2016-027 (September 30, 2016); BLM National Environmental Policy Act Handbook H-1790-1 (January 2008); BLM-Utah Handbook 8110, *Guidelines for Identifying Cultural Resources* (2002); BLM Handbook H-8342, Travel and Transportation (March 16, 2012); BLM Manual 1613, *Areas of Critical Environmental Concern* (September 29, 1988); BLM Manual 1626, *Travel and Transportation* (July 14, 2011); BLM Manual 6320, *Considering Lands with Wilderness Characteristics in BLM Land Use Planning* (March 15, 2012); BLM Manual 6330, *Management of BLM Wilderness Study Areas* (July 13, 2012), 6340, *Management of BLM Wilderness* (July 13, 2012); and BLM Manual 8110, *Identifying and Evaluating Cultural Resources on Public Lands* (December 3, 2004).

Settlement Agreement at 7-8, *S. Utah Wilderness Alliance v. U.S. Dep't of the Interior*, No. 2:12-cv-257 (D. Utah Jan. 13, 2017) (No. 513-1).

### a.    Documentation Requirements

BLM must adhere to the following documentation requirements in preparing the San Rafael Swell TMP:

- BLM must identify the purpose and need for each route, taking "into account information indicating if a route is no longer used by motorized vehicles, is revegetating or reclaiming, and/or is impassable to motorized vehicles. A route without an identified purpose and need will not be proposed as part of the dedicated

9

route network in any action alternatives in the NEPA document." Settlement Agreement ¶ 17a.

- BLM must identify "any public land resources . . . that may be affected by motorized vehicle use of the route." Settlement Agreement ¶ 17b. These public land resources are set forth in 43 C.F.R. § 8342.1(a) and "include, but are not limited to, identified cultural resources and public lands with BLM-inventoried wilderness characteristics, regardless of whether BLM administers or manages the subject public lands to maintain or enhance those resources" as well as "soil, watershed, vegetation, or other resources of the public lands." *Id.* ¶ 17c.

- "BLM will document in the route report how each alternative route designation will 'minimize damage' to affected [public land resources]. In each route report, BLM will include a brief narrative summary of how it has applied the designation criteria to the route for each alternative route designation." Settlement Agreement ¶ 17d.

- "BLM will explain in the NEPA document for each TMP how each proposed alternative route network will 'minimize damage' to 'resources of the public lands,'" including each of the wilderness-characteristics elements. Settlement Agreement ¶ 17e.

- BLM must "consider in the NEPA document at least one proposed alternative route network that would not designate for ORV use any route where BLM has determined that such use may 'damage,' 43 C.F.R. § 8342.1(a), BLM-inventoried wilderness characteristics," unless "the use is authorized by an existing right-of-way or other BLM authorization or by law." Settlement Agreement ¶ 17e.

### b. Baseline Monitoring

BLM must complete a baseline monitoring report during the San Rafael Swell travel planning process "that will document visually-apparent unauthorized surface disturbances off routes as well as visually-apparent damage to public lands resources caused by motorized vehicle use within WSAs, Natural Areas, and/or lands with BLM-inventoried wilderness characteristics." Settlement Agreement ¶ 20a. To create this report BLM must "physically inspect those portions of routes within the TMA that are within or constitute a boundary to a WSA, Natural Area, and/or lands with BLM-inventoried wilderness characteristics" and "document by site photography and written narrative each disturbance and damage site." *Id.*

### VI.    Minimization Criteria

In the San Rafael Swell Travel Plan EA, BLM must apply the "minimization criteria" set out in 43 C.F.R. § 8342.1.[2] Federal courts have made clear that federal agencies must meaningfully apply and implement—not just identify or consider—the minimization criteria when designating each area or trail, and to demonstrate in the record how they did so. *See, e.g.*, *WildEarth*

---

[2] *See also* Executive Order No. 11644 (1972), as amended by Executive Order No. 11989 (1977).

*Guardians v. U.S. Forest Serv.*, 790 F.3d 920, 929-32 (9th Cir. 2015); *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 746 F. Supp. 2d 1055, 1071-81. Under the minimization criteria, all route designations "shall be based on the protection of the resources of the public lands, the promotion of the safety of all the users of the public lands, and the minimization of conflicts among various uses of the public lands." In meeting these goals, BLM must comply with the following criteria:

    (a)  Areas and trails shall be located to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability.

    (b)  Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats. Special attention will be given to protect endangered or threatened species and their habitats.

    (c)  Areas and trails shall be located to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.

    (d)  Areas and trails shall not be located in officially designated wilderness areas or primitive areas. Areas and trails shall be located in natural areas only if the authorized officer determines that off-road vehicle use in such locations will not adversely affect their natural, esthetic, scenic, or other values for which such areas are established.

43 C.F.R. § 8341.2.

BLM's obligation to minimize impacts to natural resources applies both to the travel network as a whole as well as individual route designations. *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 932 (9th Cir. 2015); *S. Utah Wilderness Alliance*, 981 F. Supp. 2d at 1104 (same, citing cases). Minimize refers "to the *effects* of route designations, i.e. the BLM is required to place routes specifically to minimize 'damage' to public resources, 'harassment' and 'disruption' of wildlife and its habitat, and minimize 'conflicts of uses." *Ctr. for Biological Diversity*, 746 F. Supp. 2d at 1080 (emphasis in original).

## VII.   National Environmental Policy Act

### a.  Range of Alternatives

In drafting an EA, NEPA dictates that BLM consider a range of reasonable alternatives. "Consideration of reasonable alternatives is 'the heart' of the NEPA process." *Wilderness Soc'y, Center for Native Ecosystems v. Wisely*, 524 F. Supp. 2d 1285, 1309 (D. Colo. 2007) (citing *Lee*

*v. U.S. Air Force*, 354 F.3d 1229, 1238 (10th Cir. 2004)); 40 C.F.R. § 1502.14. "An agency's obligation to consider reasonable alternatives is 'operative even if the agency finds no significant environmental impact.'" *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1277 (10th Cir. 2004). Though less detailed than an EIS, an EA must demonstrate that the agency took a "hard look" at alternatives—a "thoughtful and probing reflection of the possible impacts associated with the proposed project" so as to "provide a reviewing court with the necessary factual specificity to conduct its review." *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 781 (10th Cir. 2006) (quoting *Comm. to Preserve Boomer Lake Park v. Dep't of Transp.*, 4 F.3d 1543, 1553 (10th Cir.1993)); *see also* 40 C.F.R. § 1508.9(a)(1).

The range of alternatives an agency must analyze in an EA is determined by a "rule of reason and practicality" in light of a project's objective. *Davis v. Mineta*, 302 F.3d 1104, 1120 (10th Cir. 2002) (quoting *Airport Neighbors All., Inc. v. United States,* 90 F.3d 426, 432 (10th Cir. 1996)). "NEPA 'does not require agencies to analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or impractical or ineffective[.]'" *New Mexico ex rel. Richardson*, 565 F.3d at 708 (quoting *Colo. Envtl. Coal. v. Dombeck,* 185 F.3d 1162, 1174 (10th Cir. 1999)). But the number and nature of alternatives must be "sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned." *Id.* (quoting *Dombeck*, 185 F.3d at 1174).

### i. The No Action Alternative Must Reflect the 2008 Resource Management Plan Motorized Route Determinations.

Under NEPA's implementing regulations, BLM must fully consider a "No Action" alternative. 40 C.F.R. § 1502.14(d). The interpretation of what constitutes a No Action alternative depends on the type of action proposed. NEPA Handbook (Public), H-1790-1, 52 (January 2008). For land use planning decisions, such as travel planning or plan amendments, "[t]he No Action alternative is to continue to implement the management direction in the land use plan (*i.e.,* the land use plan as written). Any other management approach should be treated as an action alternative." *Id.*[3]

### ii. The Travel Plan EA Must Include an Alternative that Reflects the Minimum Network of Motorized Routes Necessary for Transportation

A range of reasonable alternatives in the Travel Plan EA must include the evaluation of an alternative that reflects the minimum network of motorized routes *necessary* for transportation. In determining the essential, necessary motorized route system, BLM must apply the minimization criteria discussed above. In doing so, BLM must analyze an alternative in the EA

---

[3] *See also* Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981) (stating that, for actions such as updating a land management plan, the "'no action' is 'no change' from current management direction or level of management intensity" and that the no action alternative "may be thought of in terms of continuing with the present course of action until that action is changed.").

that reflects that minimal route network, free of any management considerations that fall outside of the designation criteria listed in 43 C.F.R. § 8342.1.

### iii. The Travel Plan EA Must Include an Alternative that Protects All Lands Identified as Possessing Wilderness Characteristics

The planning area covered by the Travel Plan EA contains designated wilderness and BLM-identified lands with wilderness characteristics. In addition, the planning area contains land currently proposed for wilderness designation in America's Red Rock Wilderness Act (ARRWA).

In developing the Travel Plan EA, BLM must consider: (1) an alternative that protects all lands identified as possessing wilderness characteristics and (2) an alternative that protects all lands currently proposed for wilderness designation in ARRWA.

### iv. The Travel Plan EA Must Include an Alternative that Protects Wildlife and Wildlife Habitat

Motorized routes fragment habitat and decrease habitat quality for numerous species. The San Rafael Swell TMA provides habitat for pronghorn, mule deer, desert bighorn sheep, bald eagle, bobolink, Burrowing owl, Ferruginous hawk, Lewis woodpecker, Northern goshawk, Fringed myotis, kit fox and Spotted bat, among other species.

In developing the Travel Plan EA, BLM must analyze an alternative that protects wildlife and wildlife habitat for all wildlife species, with specific regard to threatened, endangered or candidate species.

### b. Hard Look

NEPA further dictates that agencies take a "hard look" at the environmental consequences of a proposed action and the requisite environmental analysis "must be appropriate to the action in question." *Metcalf v. Daley*, 214 F.3d 1135, 1151 (9th Cir. 2000); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). "NEPA 'prescribes the necessary process' by which federal agencies must 'take a "hard look" at the environmental consequences' of the proposed courses of action." *Pennaco Energy, Inc. v. U.S. Dept. of the Interior*, 377 F.3d 1147, 1150 (10th Cir. 2004) (quoting *Utahns for Better Transp. v. U.S. Dept. of Transp.*, 305 F.3d 1152, 1162—63 (10th Cir. 2002)) (citation omitted). The fundamental objective of NEPA is to ensure that an "agency will not act on incomplete information only to regret its decision after it is too late to correct." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1990) (citation omitted). In order to take the "hard look" required by NEPA, BLM must assess impacts and effects that include: "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, *whether direct, indirect, or cumulative*." 40 C.F.R. § 1508.8 (emphasis added).[4]

---

[4] Throughout these comments SUWA references the NEPA regulations in effect prior to September 14, 2020. Although the Council on Environmental Quality (CEQ) adopted new regulations implementing NEPA in July 2020, 85 Fed. Reg. 43304 (July 17, 2020), those regulations adopted in July 2020 have been challenged as illegal in

NEPA regulations define "direct effects" as those that "are caused by the action and occur at the same time and place." *Id.* § 1508.8(a). The regulations define "indirect effects" as those that are:

> [C]aused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects *related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.*

*Id.* § 1508.8(b) (emphasis added). "Cumulative impacts" are defined as:

> [T]he impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

*Id.* § 1508.7 (emphasis added). Thus, NEPA requires that BLM engage in a high degree of analysis on the environmental effects of its actions, including the likely effects from other nearby projects — as well as ongoing and foreseeable uses of land, such as off-road vehicle (ORV) use and livestock grazing, and changes to land from other factors such as climate change.

Pursuant to NEPA, the Travel Plan EA must take a hard look at each alternative's direct, indirect and cumulative impacts to natural and cultural resources, including wildlife, soils, watersheds, vegetation, wildlife and air quality. Cumulative and indirect impacts include those from nearby development projects, off-road vehicle use, domestic livestock grazing, and other foreseeable uses and impacts to the public lands managed by the Price and Richfield field offices.

## VIII.   Price RMP

In the travel planning process, BLM must consider the goals and objectives for resource values and uses in the Price RMP. *See* Settlement Agreement ¶ B.16(c); BLM Manual 1626 § 4.1. The Price RMP committed "[t]o reduce road density, maintain connectivity, and reduce habitat fragmentation, continue to require reclamation of redundant road systems or roads that no longer serve their intended purpose." Price RMP at 148.

The Price RMP also designated a number of Areas of Critical Environmental Concern (ACEC). ACECs are "areas within the public lands where special management attention is required . . . to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and

---

numerous courts and are likely to be vacated. *See Environmental Justice Health Alliance v. CEQ*, Case 1:20-cv-06143 (S.D.N.Y. Aug. 6, 2020); *Wild Virginia v. CEQ*, Case 3:20-cv-00045-NKM (W.D. Va. July 29, 2020); *Alaska Community Action on Toxics v. CEQ*, Case 3:20-cv-05199-RS (N.D. Ca. July 29, 2020); *States of California et al. v. CEQ*, Case 3:20-cv-06057 (N.D. Cal. Aug. 28, 2020).

wildlife resources or other natural systems or processes." *Id.* § 1702(a). According to BLM Manual 1613, *Areas of Critical Environmental Concern* (Sept. 29, 1988):

> An ACEC designation is the principal BLM designation for public lands where special management is required to protect important natural, cultural and scenic resources . . . BLM managers will give precedent to the identification, evaluation, and designation of areas which required "special management attention" during resource management planning.

BLM Manual 1613.06. ACECs are afforded special management attention to ensure the protection of the relevant and important values of the ACEC. BLM Manual 1613.12.

There are multiple ACECs within the San Rafael Swell TMA, including San Rafael Canyon, San Rafael Reef, Segers Hole, Muddy Creek, I-70 Scenic, as well as Rock Art, Heritage Sites and Uranium Mining Districts ACECs. For each of these ACECs BLM committed to limiting OHV use to designated routes. Expanding OHV use in any of these ACECs would adversely impact the relevant and important values for which the ACECs were designated. BLM must not designate additional OHV routes in any ACECs.

## IX.    Cultural Resources

BLM has dual obligations when considering the impacts of its undertakings on cultural resources. Pursuant to Section 106 of the NHPA, BLM must "make a reasonable and food faith effort" to identify cultural resources that may be affected by an undertaking. 36 C.F.R. § 800.4(b)(1). Pursuant to NEPA, BLM must take a "hard look" at the effects of the proposed action. *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 781 (10th Cir. 2006). BLM must comply with both statutes when it undertakes travel planning.

### a.    BLM Must Consider Adverse Impacts of its Undertakings on Cultural Resources

Congress enacted the NHPA in 1966 to implement a broad national policy encouraging the preservation and protection of America's historic and cultural resources. *See* 54 U.S.C. § 300101. The heart of the NHPA is Section 106, which prohibits federal agencies from approving any federal "undertaking" unless the agency takes into account the effects of the undertaking on historic properties that are included in or eligible for inclusion in the National Register of Historic Places. 54 U.S.C. §§ 306108, 300320; *see also Pueblo of Sandia v. United States*, 50 F.3d 856, 859 (10th Cir. 1995). Section 106 is a "stop, look, and listen provision" that requires federal agencies to consider the effects of their actions and programs on historic properties and sacred sites before implementation. *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999).

To adequately "take into account" the impacts on archeological resources, all federal agencies must comply with binding Section 106 regulations established by the Advisory Council on Historic Preservation (Advisory Council). Under these regulations, the first step in the Section 106 process is for an agency to determine whether the "proposed [f]ederal action is an

undertaking as defined in [Section] 800.16(y)." 36 C.F.R. § 800.3(a). Undertakings include any permit or approval authorizing use of federal lands. *Id.* § 800.16(y). If the proposed action is an undertaking, the agency must determine "whether it is a type of activity that has the potential to cause effects on historic properties." *Id.* § 800.3(a). An effect is defined broadly to include direct, indirect, and/or cumulative adverse effects that might alter the characteristics that make a cultural site eligible for listing in the National Register of Historic Places. *See id.* § 800.5(a)(1); *id.* § 800.16(i); 65 Fed. Reg. 77,698, 77,712 (Dec. 12, 2000).

The agency next "[d]etermine[s] and document[s] the area of potential effects" and then "[r]eview[s] existing information on historic properties within [that] area." 36 C.F.R. § 800.4(a)(1)-(2). "Based on the information gathered, . . . the agency . . . shall take the steps necessary to identify historic properties within the area of potential effects." *Id.* § 800.4(b). "The agency shall make a reasonable and good faith effort to carry out appropriate identification efforts." *Id.* § 800.4(b)(1).

If the undertaking is a type of activity with the potential to affect historic properties then the agency must determine whether in fact those properties "may be affected" by the particular undertaking at hand. *Id.* § 800.4(d)(2).[5] Having identified the historic properties that may be affected, the agency considers whether the effect will be adverse, using the broad criteria and examples set forth in section 800.5(a)(1). Adverse effects include the "[p]hysical destruction of or damage to all or part of the property," as well as "[i]ntroduction of visual, atmospheric or audible elements that diminish the integrity of the property's historic significant historic features." *Id.* § 800.5(a)(2)(i) & (2)(v). If the agency concludes that the undertaking's effects do not meet the "adverse effects" criteria—that is, the agency concludes that there *may* not be an adverse effect from the undertaking—it is to document that conclusion and propose a finding of "no adverse effects." *Id.* § 800.5(b), 800.5(d)(1).

If the agency official concludes that there *may be* an adverse effect, it engages the public and consults further with the state historic preservation officer, Native American tribes, consulting parties, and the Advisory Council in an effort to resolve the adverse effects. *Id.* §§ 800.5(d)(2), 800.6.

### b. Reasonable and Good Faith Effort

As discussed above, BLM must "make a reasonable and good faith effort" to identify cultural resources. 36 C.F.R. 800.4(b)(1). To do so, the agency must "take into account past planning, research and studies … the nature and extent of potential effects on historic properties, and the likely nature and location of historic properties within the area of potential effects." *Id.*

To satisfy its reasonable and good faith identification efforts, BLM must—at the very least—analyze all of its existing cultural resource information. BLM has recently completed a field-office-wide Class I inventory with associated archaeological site predictive models in the Price field office. Bureau of Land Mgmt., *A Class I Cultural Resource Inventory of Lands*

---

[5] The agency may also determine that there are no historic properties present or there are historic properties present but the undertaking will have no effect upon them, at which point it consults with the State Historic Preservation Officer and notifies relevant Native American tribes of its conclusion. *Id.* § 800.4(d)(1).

*Administered by the Bureau of Land Management, Price Field Office* (Feb. 2017) (Prepared by SWCA Environmental Consultants). While archaeological models are far from perfect, they do provide information about the potential location of undiscovered sites. *Id.* The predictive model for the Price field office is actually a series of different models—site type models representing the most common sites in the field office and one overall model.

The individual site type models provide BLM detailed information about certain specified site types (Prehistoric open architectural, prehistoric open artifact scatter, prehistoric rock art, prehistoric sheltered architectural etc.), which give BLM tools to assess potential adverse effects from travel planning. BLM is responsible for identifying and assessing effects regarding all site types.

Accordingly, BLM must use the site type models—and not the composite model—to identify those areas with a high potential for cultural resources. *See* Settlement Agreement at 19, *S. Utah Wilderness Alliance v. U.S. Dep't of the Interior*, No. 2:12-cv-257 (D. Utah Jan. 13, 2017) (No. 513-1). Once it has identified those areas using the site type maps, BLM must conduct Class III inventories along all routes or portions of routes that are designated as open in those high potential areas. *Id.*

### c.  Hard Look

In addition to BLM's obligations under the NHPA, NEPA requires BLM to take a "hard look" at the environmental effects of a proposed action. *Silverton Snowmobile Club*, 433 F.3d at 781. Pursuant to NEPA, BLM must analyze all potential direct, indirect, and cumulative impacts to *cultural resources*, regardless of whether those cultural resources are eligible for listing in the National Register. *See* BLM Manual 8100 – The Foundations for Managing Cultural Resources (Public) .03.F (Dec. 3, 2004) ("Cultural resources need not be determined eligible for the National Register of Historic Places . . . to receive consideration under [NEPA]."). That includes both sites that are not eligible for the NRHP as well as isolated finds. Though NHPA analysis is related to NEPA analysis, they are not one and the same.

### X.  Water Resources

The San Rafael Swell Travel Plan EA must analyze impacts to water resources. OHVs can have significant impacts on water resources, including by accelerating erosion and sedimentation and elevating levels of turbidity. *See* Douglas S. Ouren *et al.*, *Environmental Effects of Off-Highway Vehicles on Bureau of Land Management Lands: A Literature Synthesis, Annotated Bibliographies, Extensive Bibliographies, and Internet Resources*, USGS Open-File Report 2007-1353 25 (2007). "Wheel cuts and tracks within [OHV travel] networks may serve as water conduits that channel and direct water flow containing sediments and contaminants into aquatic ecosystems." *Id.* OHV use can also impact water quality through spills and emissions. *Id.* "Spill or emission contaminants may include 1,3 butadiene, benzene and ethylbenzene, xylenes, and toluene." *Id.* The EA must analyze these potential impacts.

## XI.    Plants and Wildlife

Plants and wildlife are impacted by motorized travel in several ways. Motorized travel creates stress from noise disturbance, direct mortality by vehicle crushing and collisions, altered behavioral or population distributions, and fragmented habitat. *See* Douglas S. Ouren *et al.*, *supra* at 16-22. Beyond the physical impact from OHV use and OHV routes, "[n]oise from OHVs can travel miles in open landscapes and can negatively impact wildlife in a variety of ways including disturbance, avoidance, disruption of breeding habitat, reduction of migration routes, reduction of quality of habitat and loss of habitat." *See* Adam Switalski, Off-highway vehicle recreation in drylands: A literature review and recommendations for best management practices, *Journal of Outdoor Recreation and Tourism*, Vol. 21, 87-96 at 89 (2018). These impacts can all lead to declines in local populations, and for some rare species, declines that impact their entire populations. *See* Douglas S. Ouren *et al.*, *supra* at 16-22

The San Rafael Swell TMA provides habitat for a number of special status species including bald eagle, bobolink, Burrowing owl, Ferruginous hawk, Lewis woodpecker, Northern goshawk, Sharp-tailed grouse, Great plains toad, western toad, fringed myotis, kit fox, spotted bat and western red bat among other species.

With regard to threatened and endangered species, BLM must engage in formal consultation with the U.S. Fish and Wildlife Service because the San Rafael Swell travel plan and its authorization of OHV use "may affect" listed species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

Furthermore, BLM must ensure that it is complying with the conservation measures it committed to in the 2008 Price RMP Biological Opinion. For instance, BLM committed to "address illegal and unauthorized OHV use and activity upon BLM administered lands" to protect, conserve and recover the Southwestern willow flycatcher. U.S. Fish & Wildlife Serv., *Biological Opinion for BLM Resource Management Plan (RMP), Price Field Office* 225 (Oct. 27, 2008). BLM also committed to completing a "comprehensive assessment of all OHV use areas that interface with Southwestern willow flycatcher populations." *Id.* With regard to the San Rafael and Winkler Cactus and Wright fishhook cactus, BLM committed to document new populations and concentrate dispersed recreation use away from habitat. *Id.* 227-230. BLM must comply with this Biological Opinion as it develops the travel plan and ensure that threatened and endangered species are protected.

The San Rafael Swell TMA also encompasses both "crucial" and "substantial" pronghorn habitat and "crucial" and "substantial" desert bighorn habitat. Motorized travel impacts big game by causing habitat fragmentation, stress from noise disturbance and direct mortality by vehicle collisions. Big game Crucial Habitat is defined as "habitat on which the local population of a wildlife species depends on for survival because there are no alternative ranges or habitats available. Crucial Habitat is essential to the life history requirements of a wildlife species. Degradation or unavailability of Crucial Habitat will lead to a significant decline in carrying capacity and/or numbers of wildlife species in question." (Utah Division of Wildlife Resources 2019).

BLM must fully analyze impacts to special status species and wildlife in the San Rafael Swell TMP EA. BLM must also minimize damage to wildlife and minimize damage to wildlife habitat.

## XII.    Air Quality and Climate Change

The Travel Plan EA must take a hard look at impacts to both air quality and climate change. The Travel Plan should model the impacts of travel management decisions on air quality in the planning area. NEPA, FLPMA and the Clean Air Act require BLM to prepare such analysis. Without preparing air quality analyses, BLM will not understand the effects of the pollutants generated by motorized use in the planning area, as required by NEPA. In addition, BLM must model pollutant concentrations to understand if Travel Plan decisions will comply with federal and state air quality standards, as required by FLPMA and the Clean Air Act.

FLPMA mandates that BLM manage the planning area in accordance with federal and state air quality standards. *See* 43 C.F.R. § 2920.7(b)(3) (requiring that BLM "land use authorizations shall contain terms and conditions which shall . . . [r]equire compliance with *air . . . quality standards* established pursuant to applicable Federal or State law") (emphasis added); *see also* 43 U.S.C. § 1712(c)(8) (requiring BLM land use plans—which would therefore require implementation in daily management—to "provide for compliance with applicable pollution control laws, including State and Federal air . . . pollution standards or implementation plans"). These air quality standards include both NAAQS and the prevention of significant deterioration (PSD) increment limits.

Motorized travel has the potential to impact air quality by causing significant surface disturbance, which increases erosion and the generation of dust (both when being driven by vehicles and when wind blows across the disturbed landscape), adversely affecting the air and water. To comply with FLPMA, BLM must ensure that the alternatives under consideration would not violate any air quality standards, including NAAQS, and must demonstrate compliance in the EA.

Authorizing motorized travel on public lands has the potential to result in increased particulate matter pollution and ozone precursors (NOx and VOCs). Because of the potential increase in pollutants, both directly and indirectly caused by authorizing motorized use, BLM must analyze these contributions through emission inventories and modeling. Furthermore, dirt roads and ORV routes may generate fugitive dust even when not being traveled by vehicles (e.g., by wind-blown dust). Thus, it is vital that the EA quantify all the surface-disturbing use that it is approving and estimate the rate at which it will generate fugitive dust as well as the generation of fugitive dust from areas disturbed by motor vehicles.

Fugitive dust suspended in the air has the potential to impact more total area than any other impact of roads (paved or unpaved), and it can have significant effects on ecosystems and wildlife habitat. Forman et al., *Road Ecology: Science and Solutions* (2003). Motorized vehicles create fugitive dust by travelling on unpaved roads and through cross country travel; it is then dispersed along roadsides or carried further afield via wind currents. An example of fugitive dust plumes caused by OHV traffic is documented in 1973 satellite photos. These photos show six dust plumes in the Mojave Desert covering more than 1,700 km$^2$ (656.2 mi$^2$). These plumes were

attributed to destabilization of soil surfaces resulting from OHV activities. Nakata et al., *Origin of Mojave Desert dust plumes photographed from space* (1976). Fugitive dust emissions can also have serious implications for climate change.

A hard look at impacts from fugitive dust is necessary to understand and disclose to the public the likely contributions to regional climate change caused by this plan. In September 2009, Dr. Jayne Belnap of the United States Geological Survey gave a presentation to the Colorado Water Conservancy District. Dr. Belnap's presentation addressed the connection between increased temperature, disturbance, invasive species, and dust. This presentation focused much attention on the impacts from ORVs and noted the cycle of increasing temperatures, which increases dust, which is exacerbated by ORV use, which increases the effects of climate change (temperature increases), with the key indicator of these problems being earlier snowmelts. Of particular concern is the amount of dust that results from motorized routes, which settles upon snow pack and alters the melt rate which, in turn, alters the availability of warm season infusion of water into streams and lakes, when such water is critical to wildlife. For example, in 2005 and 2006, disturbed desert dust melted snow cover 18 to 35 days earlier in the San Juan Mountains. Painter et al., *Impact of disturbed soils on duration of snow cover*, Geophysical Research Letters 34 (2007). In 2009, disturbed desert dust melted snow cover 48 days earlier in the San Juans. *See* Painter et al., *Response of Colorado River runoff to dust radiative forcing in snow*, PNAS 107(40) (2010).

Neff et al. (2008) found that "dust deposition onto snow cover in the western United States has recently been shown to accelerate melt and reduce snow-cover duration by approximately one month, a finding that has broad implications for water resources in mountainous regions of the United States" *See* Painter, T. H. et al. *The impact of disturbed desert soils on duration of mountain snow cover*, Geophys. Res. Lett. 24 (2007).

BLM should analyze impacts from fugitive dust emissions that would result from recreation activities authorized in the TMP and adopt a final decision that minimizes and/or mitigates those impacts.

In summary, the TMP should model the impacts of travel management decisions on air quality in the planning area. BLM must ensure that the alternatives under consideration would not violate any air quality standards, including NAAQS, and must demonstrate compliance in the EA. BLM must analyze contributions to particulate matter pollution and ozone precursors (NOx and VOCs) from motorized use authorized in the TMP through emission inventories and modeling. The EA must quantify all the surface-disturbing use that it is approving and estimate the rate at which it will generate fugitive dust as well as the generation of fugitive dust from areas disturbed by motor vehicles.

### XIII.   Revised Statute 2477

In 2005, the U.S. Tenth Circuit Court of Appeals held that BLM does not have the authority to conclusively adjudicate R.S. 2477 claims. *S. Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425 F.3d 735, 757 (10th Cir. 2005). This decision was cited in another case at the Tenth Circuit

in 2009 where counties in southern Utah claimed that BLM illegally ignored their prior-existing R.S. 2477 rights in closing roads through a travel management plan.

> To be sure, we recognized in *S. Utah* that the BLM possessed the authority to "determin[e] the validity of R.S. 2477 rights of way for its own purposes." 425 F.3d at 757. But, importantly, nothing in federal law requires the BLM to do so. Thus, even though the County plaintiffs might prefer that the BLM informally adjudicate their purported rights-of-way, they may not, as the district court correctly concluded, "shift their burden as R.S. 2477 claimants or shortcut the existing processes for determining their unresolved R.S. 2477 claims by insisting that the BLM import its [internal and] preliminary road inventory work on unresolved R.S. 2477 claims in 1991 and 1993 [prior to this court's decision in S. Utah] into its planning processes in formulating the 1999 Management Plan.

*Kane Cnty. v. Salazar*, 562 F.3d 1077, 1087 (10th Cir. 2009).

BLM Revised Manual 1626, § 6.2 provides clear language on consideration of R.S. 2477 claims in travel management planning:

> Travel management planning is not intended to address the validity of any R.S. 2477 assertions. All RMPs and TMPs at a minimum should include the following statement with regard to R.S. 2477 assertions:

> A travel management plan is not intended to provide evidence bearing on or addressing the validity of any R.S. 2477 assertions. R.S. 2477 rights are determined through a process that is entirely independent of the BLM's planning process. Consequently, [this RMP/TMP] did not take into consideration R.S. 2477 evidence. The BLM bases travel management planning on purpose and need related to resource uses and associated access to public lands and waters given consideration to the relevant resources. At such time as a decision is made on R.S. 2477 assertions, the BLM will adjust its travel routes accordingly.

BLM should neither make determinations regarding R.S. 2477 claims as part of this planning process nor permit those assertions to influence its decisions regarding permitting motorized use. As affirmed by the Tenth Circuit Court of Appeals, the BLM cannot make determinations as to the validity of R.S. 2477 claims—only a court of competent jurisdiction can make a final determination.

In sum, BLM must not consider R.S. 2477 assertions in the travel planning process and should make this limitation explicit throughout the process.

## XIV.  Route-Specific Issues

The following comments highlight several of the overarching problems with BLM's route inventory that BLM must address in its travel planning process.

- *Reclaiming Routes*: In its baseline inventory BLM includes routes that are reclaimed, reclaiming or have little to no use. *See* SUWA Map_Reclaiming Routes (attached). BLM should remove these routes from its inventory. To the extent that these linear features exist on the ground, many are simply washes or illegal, user-created routes that are now reclaiming.



SS4189 – A reclaiming and mostly reclaimed route that was once an old blade to uranium claims. This route should not be considered for motorized vehicle use in BLM's travel planning process.



SS5039 – A reclaimed route that should be removed from BLM's route inventory.

- *Washes*: BLM should remove the following routes from its inventory: SS1109, SS1236, SS1430, SS1477, SS1493, SS1518, SS1520, SS1529, SS1532, SS1533, SS1534, SS1539, SS1547, SS1549, SS1550, SS1559, SS1561, SS2008, SS2016, SS2062, SS2063, SS2090, SS2091, SS2092, SS2280, SS2395, SS2413, SS2414, SS2415, SS2416, SS2417, SS2418, SS2427, SS2428, SS2436, SS2438, SS2491, SS2493, SS2494, SS2507, SS2509, SS2538, SS2561, SS2727, SS2731, SS2742, SS3034, SS3061,SS3066, SS3067, SS3071, SS3119, SS3122, SS3131, SS3141, SS3206, SS3207, SS3208, SS3209, SS3210, SS3211, SS3230, SS3240, SS3247, SS3248, SS3249, SS3250, SS3252, SS3253, SS3345, SS3363, SS4061, SS4150, SS4153, SS4214, SS4442, SS5022, SS5023, SS5024, SS5036, SS5038, SS5041, SS5043, SS5044, SS5045, SS5058, SS5060, SS5071, SS5098, SS5099, SS5141, SS5154, SS5162, SS5181, SS5183, SS5196, SS5198, SS5199, SS5200. These routes are merely washes that are not currently designated for motorized vehicle use.

- *Dead End Routes:* BLM should not designate dead end routes, especially routes that lead directly to wilderness boundaries. As BLM has previously acknowledged, dead end routes are not manageable in part because they provide easy access to closed areas. *See* SRRDP EA at 16. For instance, the following inventory routes arbitrarily end at the new wilderness boundaries: SS2063, SS2084, SS2086, SS2088, SS2093, SS2108, SS2109, SS2146, SS2207, SS2246, SS2504, SS2515, SS2517, SS2518, SS2531, SS2532, SS2560, SS2562, SS2733, SS2746, SS2759, SS2767, SS3083, SS3224, SS3260, SS3301, SS4225, SS4232, SS4235, SS4236, SS4250, SS4251, SS4296, SS4321, SS4369, SS4370, SS4372, SS4376, SS4396, SS4401, SS4407, SS4408, SS4412, SS4551, SS5021, SS5022, SS5023, SS5038, SS5058. These routes will be difficult to manage and will likely lead to

unauthorized intrusions into wilderness. BLM should not designate these routes for motorized vehicle use.

- *Routes in Wilderness*: Even after BLM adjusts the wilderness boundaries, the following routes or portions of routes remain within wilderness and must be removed and/or adjusted to end prior to entering wilderness boundaries: SS2039, SS2040, SS2043, SS2044, SS2084, SS2108, SS2109, SS2125, SS2133, SS2146, SS2154, SS2162, SS2174, SS2190, SS2206, SS2207, SS2278, SS2282, SS2373, SS2375, SS2377, SS2400, SS2431, SS2517, SS2530, SS2532, SS2533, SS2560, SS2563, SS2733, SS2736, SS3041, SS3268, SS3269, SS3270, SS3271, SS3301, SS3321, SS4250. SS4251, SS4255, SS4281, SS4285, SS4290, SS4318, SS4320, SS4321, SS4325, SS4334, SS4419, SS5007, SS5058.

- *Illegal Routes*: Many of the routes that exist on the ground but are not designated as open to motorized vehicles are illegal, user-created routes. The use of these routes is a direct result of BLM's failure over the years to adequately sign and enforce its motorized travel plans despite its prior commitments to do so in both the 2003 SRRDP and 2008 Price and Richfield RMPs. BLM should not be legitimizing illegal routes by now designating them as open to motorized vehicles.

- *Riparian Areas:* There are a number of routes in BLM's route inventory that are in riparian areas. Desert washes, streams and riparian areas represent the most important wildlife habitats in the desert southwest. Johnson & Jones, *Importance, Preservation and Management of Riparian Habitat: A Symposium*, USDA Forest Service, General Technical Report RM-43 (1977). These habitats provide year-round or intermittent sources of water as well as cover and travel corridors for plants and wildlife. Recreational travel in riparian areas can alter geomorphology, crush vegetation and lead to increased turbidity and higher water temperatures. Custer et al., *Drawing a Line in the sand: Effectiveness of off-highway vehicle management in California's Sonoran Desert*, J. of Envtl. Mgmt. 193: 449-457 (2017). BLM should not designate routes in riparian areas.

- *Humbug Canyon area*: Route SS1533 is merely a stock trail that drops off the Humbug Canyon overlook and heads northeast down Humbug Canyon. This route has led to illegal route proliferation in the area including in the wash bottom. BLM should not designate this route, or any of the illegal, user-created routes extending from SS1533.

- *Price River*: SS1404 is another stock trail that drops off the Price River overlook into the Price River itself and along the riparian corridor. The route is reclaimed. OHV use of the route would significantly impact an important riparian area. It should not be designated as open to motorized vehicles.

- *Reds Canyon/Sulphur Canyon*: Routes SS4161, SS4154, SS4156 are old uranium mining routes that have reclaimed. OHVs are not using these routes. To protect natural resources as well as the relatively intact mining features, BLM should not designate these routes for motorized vehicle use.

24

- *San Rafael Knob*: Routes SS4542, SS4541 and SS4537 lead up to and surrounding the San Rafael Knob. They lead to several old uranium prospects. The San Rafael Knob is a popular hiking area as it is the highest point in the swell. Rather than designate these routes for motorized use, BLM should establish a hiking trailhead to the northwest and prevent motorized travel to the knob itself.

- *Upper Muddy Creek*: Routes SS5036, SS5071 are not currently designated for motorized vehicle use and should not be designated in the Travel Plan. The routes follow the Muddy Creek corridor and reflect merely a linear feature rather than a legitimately inventoried route.

- *Furniture Draw*: Routes SS2008 is a slot canyon hike that is regularly advertised as a family friendly hike. *See, e.g.*, Bureau of Land Mgmt., *Furniture Draw TH*, https://www.blm.gov/visit/furniture-draw-th ("Closest slot canyon to Price, if you don't have time to drive to Little Wild Horse or Chute Canyons, this might do the trick."); Utah's Adventure Family, *Furniture Draw Hike*, https://utahsadventurefamily.com/furniture-draw-hike/; The Trek Planner, *Furniture Draw Canyon-Buckhorn Draw, Utah*, https://thetrekplanner.com/furniture-draw-canyon-buckhorn-draw-utah/. This route should not be designated for motorized vehicle use.

When BLM has narrowed down its extensive route inventory, SUWA will provide additional route-specific comments and information.

## Conclusion

Thank you for your consideration of these comments. Please direct any questions and send any additional information to the undersigned points of contact.

Sincerely,

Laura Peterson
Staff Attorney
Southern Utah Wilderness Alliance
801-236-3762
laura@suwa.org

Soren Jesperson
Senior Field Representative
The Wilderness Society
970-819-7377
soren_jespersen@tws.org

# BLM's Scoping Route Data and Reclaimed and/or Reclaiming Routes in the San Rafael Swell TMA



**Legend:**
- San Rafael Swell TMA
- Reclaiming Routes
- Scoping Routes
- Wilderness

*Sources: BLM, SUWA, Utah AGRC, ESRI Living Atlas*



0   5   10   15   20
Miles





SUWA
SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, UT 84111
801 486 3161
www.suwa.org

Author: Michael Mason   Date: 03/02/2021   Project #201