# EXHIBIT 4

to the Southern Utah Wilderness Alliance's
Motion to Intervene
*State of Utah v. U.S. Burgum*,
4:25-cv-00106-AMA-PK

# Southern Utah Wilderness Alliance * Sierra Club

July 22, 2024

Jaydon Mead
Bureau of Land Management
Price Field Office
125 South 600 West
Price, UT 84501

Letter submitted via BLM's e-planning portal and via email to blm_ut_pr_comments@blm.gov; referenced attachments sent via USPS First Class Mail

> Re:     *San Rafael Swell Travel Management Plan Draft Environmental Assessment, DOI-BLM-UT-G020-2019-0019-EA*

Greetings:

Please accept the following comments submitted by the Southern Utah Wilderness Alliance and the Sierra Club (collectively, "SUWA") regarding BLM's San Rafael Swell Travel Management Plan (TMP) Draft Environmental Assessment, DOI-BLM-UT-G020-2019-0019-EA (TMP EA or EA).

SUWA, its members and supporters have a significant interest in the public lands encompassed by the San Rafael Swell Travel Management Area (TMA), which are valued for their abundant cultural resources, biological integrity and non-motorized recreational opportunities. SUWA members frequently visit these lands to, among other thing, hike, camp, canyoneer, view wildlife, sightsee, view and appreciate cultural and historic resources, mountain bike and float the San Rafael River and Muddy Creek.

BLM must ensure that the Travel Plan complies with all aspects of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321-4370f; the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701-1785; the National Historic Preservation Act (NHPA), 54 U.S.C. §§ 300101-307108; the minimization requirements for route designations set forth in FLPMA's regulations, 43 C.F.R. § 8342, BLM Manual 1626, and all other applicable federal regulations and agency guidance applying these laws and regulations. BLM also must comply with the John D. Dingell, Jr. Conservation Management and Recreation Act, Pub. L. 116-9, § 1231, 133 Stat. 580 (2019), with Executive Orders 13990 and 14008, and with the procedural and substantive terms of the Settlement Agreement in the matter captioned *Southern Utah Wilderness Alliance, et al. v. U.S. Department of the Interior,* Case No. 2:12-cv-257 (D. Utah Jan. 13, 2017) (No. 513).[1]

---

[1] A copy of the Settlement Agreement is available at BLM-Utah's Travel and Transportation webpage: https://www.blm.gov/programs/recreation/recreation-programs/travel-and-transportation/utah (last viewed July 20, 2024).

## I.    Background

The San Rafael Swell TMA encompasses roughly 1,154,000 acres of BLM-managed lands within the Price and Richfield field offices. The Swell is home to irreplaceable cultural and historic resources, important wildlife and plant habitat, and unmatched recreational opportunities. The Swell's sinuous slot canyons, soaring red rock cliffs, and prominent buttes provide endless opportunities for hikers, canyoneers, river runners, climbers, bikers, photographers, campers, and other visitors.

There have been several prior iterations of motorized vehicle travel planning within the San Rafael Swell TMA. The Price field office's 1991 San Rafael Resource Management Plan (RMP) designated approximately 1,031,631 acres of BLM-managed public lands as "limited to designated roads and trails," designated approximately 82,627 acres as limited on a seasonal basis, and designated approximately 190,349 acres of public land as OHV-Open. *See* Bureau of Land Mgmt., *San Rafael Route Designation Plan Environmental Assessment*, BLM/UT-067-94-010, 2-3 (2002) (2003 SRRDP EA).

In 2003, the Price field office finalized the San Rafael Route Designation Plan (SRRDP), an activity-level implementation of the 1991 San Rafael RMP. The 2003 SRRDP focused on route designations for routes with the "limited to designated roads and trails" category in the 1991 San Rafael RMP and areas that were "limited to designated roads and trails on a seasonal basis, but are in the 'open' category during the rest of the year." 2003 SRRDP EA at 2. The 2003 SRRDP ultimately designated 677 miles of OHV routes in that "limited to designated area," including about 570 miles of routes within the lands that now make up the San Rafael Swell TMA.

The 2003 San Rafael Route Designation Plan was the result of a multi-year public stakeholder process that involved county commissioners, OHV club representatives, environmental groups, mountain bike clubs, hiking groups and other public land users. Bureau of Land Mgmt., *Finding of No Significant Impact and Decision Record, San Rafael Route Designation Plan*, EA-UT-067-94-010 2 (2003). The plan considered roughly 470 miles of routes beyond those ultimately designated. BLM decided not to designate those 470 miles for motorized vehicle use for a number of reasons, including because those routes were determined to be:

> (1) duplicate routes to destination points; (2) dead end routes (3) routes causing resource damage by inviting "route proliferation" (multiple parallel trails, hill climbs, additional routes around difficult spots); (4) routes that are naturally re-vegetating; (5) routes with conflicts between motorized and non-motorized users; (6) routes through riparian areas; (7) routes through critical soils susceptible to damage; (8) routes that have the most potential to affect threatened and endangered species; (9) routes that could affect cultural resources; (10) and routes that could impact the tentative classification of wild and scenic river segments.

*Id.* at 3. In the SRRDP, BLM committed to publishing maps and increasing signage to inform public land users. *Id.* at 5. The agency also committed to patrol areas to enforce

the route designations and work with groups and individuals to put up signs and kiosks and monitor the areas. *Id.*

In 2008, the Price field office revised and unified the 1983 Price River Resource Area Management Framework Plan and the 1991 San Rafael RMP into the 2008 Price resource management plan. With regard to designated motorized use, the 2008 Price RMP both adopted the 2003 SRRDP in its entirety and designated areas and trails for motorized use in the lands not previously considered under the 2003 SRRDP. *See* Bureau of Land Mgmt., *Price Field Office Record of Decision and Approved Resource Management Plan* 25 (2008) (Price RMP). The Price RMP designated 606 miles of routes within the areas not previously analyzed in the 2003 RMP. In combination, the Price RMP and 2003 SRRDP designated 1,276 miles of motorized routes available for public use across the Price field office. *Id.* at 26. Of those 1,276 miles of motorized routes, about 890 miles are within the San Rafael Swell TMA.

The San Rafael Swell TMA also includes 54,040 acres within the Richfield field office. In 2008, the Richfield RMP designated 3,739 miles of routes as open to all motorized vehicle use and an additional 538 miles of routes open to motorized vehicles with seasonal closure or size/width restrictions. About 119 miles of designated routes fall within the San Rafael Swell TMA.

Taken together, and with the routes BLM referred to as "BLM/County Roads" in the Price RMP, there are about 1,429 miles of routes currently available for motorized use within the San Rafael Swell TMA.

Concerned about BLM's failure to comply with the NHPA, FLPMA, the Executive Orders and minimization criteria and other laws and regulations, SUWA, TWS and a coalition of conservation organizations challenged the Price RMP—along with five other Utah field office RMPs in court. A federal judge held that several aspects of the Richfield resource management plan and travel management plan violated environmental and cultural preservation laws. *See generally S. Utah Wilderness Alliance v. Burke*, 981 F. Supp. 2d 1099 (D. Utah 2013). Specifically, the court noted that there was "no indication that the BLM actually considered or applied the minimization criteria to the designation of OHV routes." *Burke*, 981 F. Supp. 2d at 1105-06. Further, the BLM violated the NHPA when it failed to conduct a class III survey of OHV routes designated as open in the Richfield field office travel plan. *Id.* at 1109-110.

In the wake of the court's Richfield RMP and travel plan decision, the conservation groups, BLM and three OHV groups signed a Settlement Agreement that established a schedule and process for BLM to update thirteen travel plans across eastern and southern Utah. Settlement Agreement, *S. Utah Wilderness All. v. U.S. Dep't of the Interior*, Case No. 2:12-cv-257 (D. Utah Jan. 13, 2017) (No. 513) (Settlement Agreement).

In these 2008 travel plans, BLM largely failed to adequately consider and apply the minimization criteria. Specifically, it failed to minimize impacts to cultural resources, soils, air, watershed, lands with wilderness character, wildlife and wildlife habitat. BLM also failed to minimize conflicts between resource users. As a result, those plans inappropriately blanketed the TMAs with ill-conceived, largely user-created and damaging route networks. Accordingly, in this travel planning process for the San Rafael Swell, BLM should be removing motorized vehicle routes

3

from the route network to adequately protect natural and cultural resources and establish a defensible, balanced plan.

Unfortunately, each of the action alternatives would add a significant number and mileage of *new* OHV routes to the travel network. And despite currently having a clear travel management plan, BLM has utterly failed to manage to that plan. As a result of this failure, BLM has allowed unauthorized, illegal OHV use to run rampant resulting in more than 1,000 miles of illegal, user-created routes that BLM now claims exist on the ground and have "been subject to ongoing use." EA at 26.

The San Rafael Swell travel plan covers some of the most popular and frequently visited BLM-managed lands in Utah. This is an opportunity to develop a reasonable, manageable and forward-thinking blueprint that ensures public access to the outdoors while preserving the backcountry and meeting BLM's duty to minimize damage to cultural and natural resources.

BLM must also prioritize arriving at a manageable plan, educating users about where they can and cannot drive, signing routes accordingly and then enforcing the plan. Visitation to Utah's public lands is skyrocketing and shows no sign of diminishing. Utah's public lands and natural resources also face a dramatic threat from the impacts of climate change. Precisely because of these challenges, thoughtful and deliberate travel planning is critical.

## II.    Route Inventory, Baseline Data and Assumptions

### a.    Background

Establishing an accurate baseline from which to evaluate the environmental impacts of each alternative is critical to both analyze the environmental impacts of the alternative route designations and to apply the minimization criteria on both a travel-network-wide and individual route basis. Pursuant to NEPA, agencies must "describe the environment of the areas to be affected by the alternatives under consideration." 40 C.F.R. § 1502.15 (a). The description of the "affected environment" includes "existing environmental conditions." *Id.* § 1502.15(b). In *Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci*, the Ninth Circuit Court of Appeals stated that "without establishing . . . baseline conditions . . . there is simply no way to determine what effect [an action] will have on the environment, and consequently, no way to comply with NEPA." 857 F.2d 505, 510 (9th Cir. 1988). The court further held that "[t]he concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process." *Id.* at 510. Establishing an accurate baseline for a travel plan includes establishing the physical conditions and actual presence of routes on the ground. *See Or. Natural Desert Ass'n v. Rose*, 921 F.3d 1185, 1190 (9th Cir. 2019).

### b.    Baseline Assumptions Regarding Route Conditions

BLM contends that all routes it is considering designating in the action alternatives—even if they were closed under the 2008 RMP—"have received continuous public OHV use over time even when such use was not authorized" such that designating any route in the "total evaluated network" "will not result in new surface disturbance." EA at 20. *See also id.* at 26, 43, 89, 115, 116, 135, 140, 142. BLM relies on that assumption in its analysis of impacts to each resource

value to then diminish the impacts that would result from the proposed route designations. *See, e.g.*, *id.* at 43 (arguing that BLM-identified LWC and Natural Areas would only be minimally impacted by route designations because all evaluated routes exist, are used and maintained); *id.* at 89 (claiming that there are already impacts to visual resources because "all evaluated routes were determined to exist"); *id.* at 115 (stating that air quality impacts would be minimal because none of the alternatives would "authorize use of a route that has not already been subject to ongoing use"); *id.* at 135 (declining to fully analyze impacts to sensitive plants and plant habitat because "only routes which physically exist on the ground" and which have "already been subject to ongoing use" are being evaluated for designation in the forthcoming travel plan); *id.* at 140 (declining to analyze impacts to big game species and habitat because "only routes which physically exist on the ground (open or closed) were evaluated for this plan"). BLM's contention that (1) all evaluated routes exist on the ground <u>and</u> (2) have been subject to ongoing use is inaccurate.

SUWA has conducted extensive fieldwork throughout the San Rafael Swell TMA over multiple years. Our fieldwork demonstrates that in fact a significant number of routes within the total evaluated route network have reclaimed, do not exist on the ground or are simply washes without associated motorized use. These routes have not received "continuous public OHV use" and designating reclaimed, non-existent routes or washes as OHV-Open or OHV-Limited will result in *new* surface disturbance. For example, BLM contends that route SS2512 is traveled by stock 4-wheel drive vehicles as well as UTVs and ATVs and that opening the route to all vehicle types in Alternatives C and D would not result in new surface disturbance. *See* BLM Route Report SS2512. SUWA's fieldwork demonstrates that this route does not exist on the ground and that designating this route for motorized vehicles would result in new surface disturbance.



Route SS2512 does not exist on the ground.

5

Similarly, Route SS6017 is a reclaimed route that largely no longer exists on the ground but that BLM proposes to open to all vehicles in Alternatives C and D. *See* BLM Route Report SS6017. BLM claims this route is used currently used by stock 4-wheel drive vehicles as well as UTVs and ATVs and that opening this route will not result in any new surface disturbance. *Id.* SUWA's fieldwork shows, instead, that opening this route to motorized vehicles will in fact lead to new surface disturbance. Those impacts must be analyzed as part of the NEPA analysis.



SS6017, which BLM proposes to open to all motorized vehicles in Alternatives C and D.

The following photographs from SUWA fieldwork provide only a few examples of routes that are reclaiming, do not exist on the ground or that are washes with no associated motorized use. Other routes or portions of routes that are similarly reclaiming, do not exist on the ground or that are washes not associated with motorized use within the total evaluated route network include, but are not limited to: SS1404, SS1406 SS2145, SS2512, SS2514, SS2515, SS2523, SS3045, SS3214, SS3285, SS3345 SS3505, SS4070, SS4114, SS4154, SS4156, SS4184, SS4185, SS5024, SS5038, SS5058, SS5060, SS5071, SS5077, SS5079, SS5080, SS5081, SS5229, SS5221, SS5381,SS5392, SS5402, SS5170, SS5171, SS5420, SS5135, SS5164, SS5111, SS6044.



BLM contends that opening SS3286, pictured here, to all vehicles would not result in any new surface disturbance.



BLM proposes to open SS4553 to all vehicles in Alternative D and maintains that this designation would not result in any new surface disturbance.



BLM proposes to allow motorized vehicles 66-inches and under on route SS4187 and asserts that use of this "route" will not result in any surface disturbance.



BLM proposes to allow motorized use on this route—SS1235—and asserts that this designation will not result in any new surface disturbance.

As illustrated with these examples, the TMP EA's environmental impact and minimization analysis relies on the demonstrably incorrect assumption that <u>all</u> of the routes within the total evaluated route network exist on the ground <u>and</u> are presently being used. Designating routes for motorized vehicles authorizes immediate impacts from the vehicles that use those routes, including damage to cultural resources, soil resources, riparian areas, water quality, wildlife, wildlife habitat, native plants, pollinators, wilderness characteristics and introduction of invasive plant species. By introducing motorized vehicle use onto routes that do not exist on the ground, that have fully naturalized, that are partially reclaiming or that are washes, BLM is actually creating new routes that must be analyzed accordingly.

Establishing an accurate baseline is essential to analyze potential impacts of a new travel network. *See e.g.*, *Great Basin Resource Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016). Because BLM failed to establish an accurate baseline, it cannot effectively analyze the environmental impact of the TMA's action alternatives. Nor can it accurately analyze whether various alternative route designations would minimize impacts to the resources identified in 43 C.F.R. § 8342.1 and the Settlement Agreement, as required by law and the Agreement.

### III. Travel and Transportation Management

### a. Executive Orders, Minimization Criteria and Settlement Agreement

Executive Order 11,644, as amended by Executive Order 11,989, imposes a substantive obligation on BLM to *locate* designated OHV trails in order to *minimize* damage to natural and cultural resources and conflicts with other existing or proposed recreational uses. These "minimization criteria" are set forth at 43 C.F.R. § 8342.1. The Settlement Agreement further specifies that BLM will minimize damage to "identified cultural resources and public lands with BLM-inventoried wilderness characteristics." ¶ 17.d.

Federal courts have repeatedly made clear that federal agencies must meaningfully apply and implement—not just identify or consider—the minimization criteria when designating each area (as open, closed or limited), system of designated trails, or individual trail, and to demonstrate in the administrative record how they did so. *See, e.g.*, *WildEarth Guardians v. U.S. Forest Serv.*, 790 F.3d 920, 929-32 (9th Cir. 2015); *S. Utah Wilderness All.*, 981 F. Supp. 2d at 1104-06 (collecting and citing cases); *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 746 F. Supp. 2d 1055, 1071-81 (N.D. Cal. 2009).

Under the minimization criteria, all route designations "shall be based on the protection of the resources of the public lands, the promotion of the safety of all the users of the public lands, and the minimization of conflicts among various uses of the public lands." 43 C.F.R. § 8342.1. In meeting these goals, BLM must comply with the following criteria:

> (a) Areas and trails shall be located to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability.

(b)  Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats. Special attention will be given to protect endangered or threatened species and their habitats.

(c)  Areas and trails shall be located to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.

(d)  Areas and trails shall not be located in officially designated wilderness areas or primitive areas. Areas and trails shall be located in natural areas only if the authorized officer determines that off-road vehicle use in such locations will not adversely affect their natural, esthetic, scenic, or other values for which such areas are established.

43 C.F.R. § 8342.1(a)-(d). *See also* Bureau of Land Mgmt., *Manual 1626—Travel and Transportation Management Manual* § 4.1 (2016) ("[R]outes available to OHV use should be located to minimize damage, harassment, disruption, and conflict with various resources.").

BLM's obligation to minimize impacts to natural resources applies both to the travel network as a whole as well as individual route designations. *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 932 (9th Cir. 2015); *S. Utah Wilderness All.*, 981 F. Supp. 2d at 1104 (same, citing cases). Minimize refers "to the *effects* of route designations, i.e. the BLM is required to place routes specifically to minimize 'damage' to public resources, 'harassment' and 'disruption' of wildlife and its habitat, and minimize 'conflicts of uses." *Ctr. for Biological Diversity*, 746 F. Supp. 2d at 1080 (emphasis in original). Simply reducing the number and/or miles of routes and trails designated for off-road vehicle use is not evidence of compliance with the minimization criteria. *See id.* at 1080-81; *see also Mont. Snowmobile Ass'n*, 790 F.3d at 932.

In addition to the minimization criteria, BLM must comply with the Settlement Agreement. BLM is required to adhere to certain documentation requirements, including identifying each route's purpose and need, affected resources, resource impact and route-specific minimization alternatives. *See* Settlement Agreement § B.17(a)-(d). With regard to identifying a route's purpose and need, BLM must "identify all known current motorized and non-motorized use that occurs on the route." *Id.* § B.17(a) (emphasis added). BLM must also "take into account information indicating if a route is no longer being used by motorized vehicles, is revegetating or reclaiming, and/or is impassable to motorized vehicles." *Id.*

###   b.  Application of the Minimization Criteria

Here, BLM must demonstrate that it identified, considered and applied the Minimization Criteria on both a network-wide and route-by-route basis. Furthermore, routes must be located with the purpose of minimizing impacts to identified resources.

The TMP EA summarizes the general process BLM used and the factors it considered in developing the various SRS travel plan alternatives. *See* EA at 20-21. However, the EA does not explain *how* BLM has or will apply that process to its proposed route designations in a way in which satisfies the regulations' substantive requirements that BLM locate routes to minimize impacts.[2] Specifically, neither the EA nor the route reports, contain any meaningful discussion of how BLM has *applied* the minimization criteria (as opposed to merely considering them).

With regard to route network, alternative-wide minimization, BLM relies on comparing the miles or number of routes designated in each alternative with particular resources. *See generally* EA Ch. 3. BLM then uses these comparative mileages and numbers as a surrogate to <u>analyzing</u> environmental effects and presumably in an attempt to comply with its duty to minimize impacts. This approach is flawed.

Simply comparing the mileage of routes that impact various resources in a table does not demonstrate compliance with BLM's substantive duty to minimize impacts on both a route-by-route and alternative-wide basis. The duty to minimize goes to the *effects* of route designations not simply the number or mileage of route designations. Comparing number of routes or mileage of routes and choosing an alternative with less "mileage" of impact does not in itself demonstrate that BLM has minimized effects.

For instance, routes that damage riparian areas and streams will cause significant impacts beyond what can be captured in a simple comparison of percentages of routes near a resource. Riparian areas are disproportionately important in dry lands. *See* Adam Switalski, *Off-highway vehicle recreation in drylands: A literature review and recommendations for best management practices*, Journal of Outdoor Recreation and Tourism, Vol. 21, 87-96 at 89 (2018) (attached); *see also* EA at 52 (Riparian areas "are among the most important, productive and diverse ecosystems in the state"). Riparian areas in drylands "only account for a small percentage of the land base, [but] they are the most productive lands and provide fish and wildlife habitat, water supply, cultural and historic values, and economic values." Switalski, *supra* at 89. Accordingly, even one route or small number of route mileage that damages a riparian area may have a disproportionate impact that cannot be captured through a comparison of miles of routes near a given resource.

Furthermore, the relative *condition* of a particular route is an important aspect of understanding its impact on various resources. The condition of routes is not captured in BLM's comparative figures. *See also* EA at 92 (acknowledging routes that are eroded contribute more to total dissolved solid loading in riparian areas). Rather than simply compare the mileage of routes associated with a resource, BLM must describe how its proposed route designations comply "with the objective of minimizing impacts."[3] *Idaho Conservation League v. Guzman*, 766 F. Supp. 2d 1056, 1073 (D. Idaho 2011); *Wildlands CPR v. U.S. Forest Serv.*, 872 F. Supp. 2d 1064, 1082 (D. Mont. 2012).

---

[2] *See also* Bureau of Land Mgmt., H-8342 Travel and Transportation Handbook § V.H.i (2012) ("Individual roads, primitive roads, and trails should be chosen with the transportation network goals in mind rather than just using all the inherited roads, primitive roads and trails.").

[3] *See also* Bureau of Land Mgmt., Manual 1626, Travel and Transportation Management Manual § 4.1 (2008) (requiring BLM to demonstrate compliance with the minimization criteria by clearly linking RMP goals and objectives to the minimization criteria and further requiring BLM to *explain* how this minimization goal is achieved).

BLM's discussion of resource impacts in Appendix C is similarly unavailing. Appendix C is largely a discussion about recreation in 22 "route network geographic areas" describing the recreation opportunities in each area followed by a general list of the different resources present in these areas. *See generally* EA App. C. After listing resources in each area, BLM then asserts that the various alternatives would not lead to the construction of new routes and would close a percentage of total evaluated routes. *See, e.g.*, *id.* App. C at 174-74. BLM then concludes that each analyzed alternative is therefore consistent with the minimization criteria. *See, e.g.*, *id.* However, simply stating something does not make it so. "Closing routes"—many of which are not open to or used by motorized vehicles in the first instance—is not enough. BLM must demonstrate and explain how it designated (1) individual routes and (2) the route network as a whole with the intention of minimizing impacts. It has not done so here.

### c.  BLM Must Select a Modified Alternative B

Among the alternatives BLM is considering in the draft EA, Alternative B is the only option that remotely complies with the minimization criteria. BLM should modify Alternative B to close some additional routes to properly be classified as the "resource protection emphasis" alternative. EA at 23. These proposed changes would close several additional routes that unnecessarily damage natural and cultural resources and cause conflict between resource users. Specifically, BLM should change the designation of the following routes, or identified portions of routes, to OHV-Closed in Alternative B to properly be considered a resource protection emphasis alternative:

> SS1316, SS1354, SS1380, SS1378, SS1492, SS2079, SS2766, SS4303, SS4265, SS4264, SS4263, SS4245, SS4242, SS4238, SS4237, SS4241, SS5051, SS4537, SS4071, SS6090, SS6068, SS6088, SS5208, SS5216, SS5209, SS3441, SS3499, SS3500, SS3501.

*See* SUWA Map_Routes to Close in Alternative B Map 1; SUWA Map_Routes to Close in Alternative B Map 2; SUWA Map_Routes to Close in Alternative B Map 3; SUWA Map_Routes to Close in Alternative B Map 4.

While Alternative B still favors motorized recreation, it would reduce some of the excess number and mileage of OHV routes in the TMA. Alternative B would also establish some semblance of balance between resource protection, opportunities for non-motorized recreation and opportunities for motorized recreation.

### i.  Alternative B Minimizes Damage to Soil and Vegetation

The San Rafael Swell TMA contains of variety of soil types and native vegetation, all of which are susceptible to damage from OHV travel. Biological soil crusts—vital soil stabilizers that play a critical role in maintaining soil and ecosystem health—are found throughout the TMA. EA at 75. OHVs have a significant impact on biological soil crusts, such that even a single pass of an OHV will increase wind and water erosion of surface soils. *See* Diane W. Davidson *et al.*, *Selecting Wilderness Areas to Conserve Utah's Biological Diversity*, The Great Basin Naturalist, vol. 56(2), 95-118, at 111 (1996) (attached); EA at 75. Repeated disturbance of soil crusts can

permanently destroy soil crusts. Once disturbed, soils are more susceptible to wind erosion. *See* J. Belnap et al., *Wind Erodibility of Soils at Fort Irwin, California (Mojave Desert), USA, before and after trampling disturbance: implications for land management*, 32 Earth Surface Processes and Landforms, 75-84 (2007). Dust production resulting from wind erosion represents "a significant threat to western US drylands, and the urgency to address this threat will likely only increase in a hotter, drier future." Michael C. Duniway *et al.*, *Wind erosion and dust from US drylands: a review of causes, consequences, and solutions in a changing world*, Ecosphere 19 (March 2019) (attached).[4] In addition to wind erosion, OHV use "accelerate[s] water erosion by decreasing infiltration rates, loosening surfaces, and channeling run-off." EA at 75.

Native vegetation is also susceptible to damage from OHV travel. OHV use crushes plants and compacts and contaminates soils. EA at 45. "[F]ugitive dust from OHV use can also disrupt photosynthetic processes, suppressing plant growth and vigor." *Id.* OHV use also introduces and spreads non-native vegetation, accelerating plant invasions that impact biodiversity. *Id.*

Because of the substantial damage OHV use causes to soil and vegetation it is necessary to reduce the number and miles of designated OHV routes throughout the TMA and especially in areas that are particularly vulnerable to soil and vegetation damage. Only Alternative B would do this. Alternative B would minimize impacts to soils and vegetation by reducing the routes designated for motorized use by about 230 miles. There are fewer miles of routes in each of the analyzed vegetation types in Alternative B, as opposed to alternatives A, C and D such that Alternative B "would have the overall lowest potential of any alternative for OHV-related impacts on native vegetation." EA at 46-48. Similarly, with regard to soils, Alternative B would substantially decrease the number of routes[5] crossing highly erosive and moderately erosive soils. EA at 76-77. Importantly, Alternative B would also significantly decrease the number of routes within 150 feet of cryptobiotic soils. *Id.* at 77-78. Both Alternatives C and D would open a significant number of new routes that cross through highly erosive and moderately erosive soils. Those alternatives would also significantly increase the number of routes within cryptobiotic soils. *Id.* Accordingly, Alternative B "would have the overall lowest potential of any alternative for OHV-related impacts on soils and cryptobiotic soils." *Id.* at 78.

## ii. Alternative B Minimizes Damage to Riparian Resources

The San Rafael Swell TMA encompasses critically important water resources, including the Price River and San Rafael Swell River, springs, perennial and intermittent streams, seasonal/ephemeral drainages and wetlands. EA at 89. While streams, riparian areas and wetlands account for only a small percentage of the land base in dryland areas like Utah, they have a disproportionate importance as the most productive lands. *See* Adam Switalski, *supra*, at 89.

---

[4] *See also* Travis W. Nauman et al., *Elevated aeolian sediment transport on the Colorado Plateau, USA: The role of grazing, vehicle disturbance, and increasing aridity*, Earth Surface Processes and Landforms 1 (2018) (attached).

[5] The EA generally uses the *miles* of routes impacting a certain resource as a proxy for evaluating the relative impact of the alternative route networks, for soils BLM instead relies on the *number* of routes crossing through highly erosive, moderately erosive and cryptobiotic soils. *See* EA at 76. While there are a number of problems with BLM's analysis using miles of designated route as a surrogate for analysis, *see supra*, using simply the number of routes is even more problematic. For instance, one short route that travels through cryptobiotic soils is effectively deemed to have the same impact as a single route that travels for miles through cryptobiotic soils.

OHVs can have significant impacts on water resources, including by accelerating erosion and sedimentation and elevating levels of turbidity. *See* Douglas S. Ouren *et al.*, *Environmental Effects of Off-Highway Vehicles on Bureau of Land Management Lands: A Literature Synthesis, Annotated Bibliographies, Extensive Bibliographies, and Internet Resources*, USGS Open-File Report 2007-1353 25 (2007) (attached). "Wheel cuts and tracks within [OHV travel] networks may serve as water conduits that channel and direct water flow containing sediments and contaminants into aquatic ecosystems." *Id.*; *see also* EA at 89. OHV use can also impact water quality through spills and emissions. Ouren *et al.*, *supra*, at 25. "Spill or emission contaminants may include 1,3 butadiene, benzene and ethylbenzene, xylenes, and toluene." *Id.*

Despite the significant damage that OHVs can cause and in many cases are causing to precious riparian resources in the TMA, only Alternative B would help minimize damage to riparian areas. EA at 92-96. For instance, Alternative B would reduce the crossing points on perennial streams by 2 and reduce the crossing points on intermittent streams by 267. Alternative B would also reduce the miles of routes designated for motorized use in or within 100 meters of riparian areas. *Id.* at 93-94. Both Alternatives C and D would substantially *increase* the number and mileage of designated routes that damage riparian areas. Alternative C would significantly increase the number of crossings on perennial and intermittent streams, adding 296 crossings. *Id.* at 92-93. Alternative D would go even further, adding 728 perennial or intermittent stream crossings. *Id.* Alternatives C and D would also significantly increase the mileage of motorized routes in or within 100 meters of riparian areas. *Id.* at 93-94. Alternative C would designate 58 miles of routes in or within 100 meters of a riparian area and Alternative D would designate 78 miles of routes. *Id.* Alternative B is the only option that would minimize impacts to riparian resources.

### iii.    Alternative B Minimizes Impairment of Wilderness Characteristics

As an initial matter, BLM's analysis of impacts to lands with wilderness character (LWC) is incomplete. Between 2017 and 2021, BLM undertook inventories that significantly reduced the acres of lands identified as possessing wilderness character. These inventories failed to comply with BLM Manual 6310, *Conducting Wilderness Characteristics Inventory on BLM Lands*, Release 6-138 (Jan. 2021), and should not be followed as BLM goes about its work to minimize the impacts of route designations to wilderness characteristics which is required by the Settlement Agreement. Instead, BLM should use the LWC areas identified in the Price RMP and minimize route designations based on those polygons.

Although based on an incomplete analysis, among the alternatives, only Alternative B would minimize damage to lands with wilderness character. According to BLM's analysis, the TMA encompasses 270,715 acres of BLM-identified LWC. EA at 34-36. The TMA also includes 15,460 acres of BLM Natural Areas (outside of designated wilderness), lands BLM must manage to preserve wilderness character. *Id.* at 35-36. BLM Natural Areas and LWC are lands in a natural condition and provide outstanding opportunities for solitude and/or primitive recreation. Preserving large, intact wilderness-eligible landscapes is more important than ever. These lands offer a respite from the sight and sound of modern society, a refuge for imperiled species and other native wildlife, protection of cultural landscapes and artifacts, and opportunities for

14

families to engage in non-motorized activities. Further, reducing dust-producing land uses like OHV use and protecting large, intact areas is "the most assured strategy for conserving soil resources, air quality, and limiting the deleterious effects of wind erosion and atmospheric dust to ecosystems, [and] humans." Duniway et al., *supra* at 19. Preserving intact landscapes also furthers the Biden Administration's commitment to conserve 30% of the country's terrestrial and marine environments by 2030. EO 14,008, *Tackling the Climate Crisis at Home and Abroad*, 86 Fed. Reg. 7619 (Feb. 1, 2021).

Alternative B is the only alternative that would reduce impacts to BLM-identified LWC. Under Alternative B, BLM would designate 25 miles of OHV routes in BLM-identified LWC. A meaningful reduction from the 91 miles currently designated. Alternatives C and D, on the other hand would substantially increase the miles of routes available for motorized use in LWC. Under Alternative D, BLM would go even further, designating 231 miles of routes in LWC. At least 140 miles of these routes are *new routes*, routes where motorized use was not previously authorized and, in many cases, is not occurring. Rather than minimize damage to LWC, Alternative D and Alternative C would increase damage to wilderness suitability.

Alternative B is also the only alternative that would minimize damage to BLM Natural Areas within the TMA. In the Price RMP, BLM committed to manage Natural Areas to "[p]rotect, preserve, and maintain wilderness character (appearance of naturalness, outstanding opportunities for solitude and primitive unconfined recreation)" as well as to "[m]anage primitive backcountry landscapes for undeveloped character and provide opportunities for primitive recreational activities and experience of solitude." Price RMP at 93. Only Alternative B would comport with these goals. Alternative B would reduce the miles of routes available for OHV use in BLM Natural Areas from 29.5 miles to 14 miles. Alternatives C and D, on the other hand, would significantly increase the mileage of routes available for motorized use in Natural Areas. Alternatives C and D would designate 41.8 miles and 46.5 miles, respectively. As with routes in LWC, Alternatives C and D would open *new routes* where motorized use has not been previously authorized. Both alternatives C and D would significantly damage the appearance of naturalness, opportunities for solitude and opportunities for primitive unconfined recreation.

Alternative B is the only option that would preserve the large, intact landscapes, advance the Biden Administration's climate goals and minimize impacts to wilderness suitability.

### iv.   Alternative B Minimizes Damage to Cultural Resources

The San Rafael Swell TMA contains an incredible array of cultural resources. Cultural sites in the area reflect almost 13,000 years of human history. *See, e.g.*, Bureau of Land Mgmt., *A Class I Cultural Resource Inventory of Lands Administered by the Bureau of Land Management, Price Field Office* 5-1, 6-1(July 2017) (Prepared by SWCA) (Class I Inventory). The Price field office Class I inventory predictive models indicate that there is a medium and high potential for cultural resources throughout the TMA. *See, e.g.*, Bureau of Land Mgmt., *Cultural Resource Probability Models for Lands Administered by the Bureau of Land Management, Price Field Office: Draft* 30 (Feb. 2019) (Prepared by SWCA); Bureau of Land Mgmt., *San Rafael Swell TMA (Southern Part) Cultural Site Probability Model* (Feb. 2019); Bureau of Land Mgmt., *San Rafael Swell TMA (Northern Part) Cultural Site Probability Model* (Feb. 2019). Those models also confirm

that canyons, dissected washes and "uplands adjacent to dissected stream networks" are particularly sensitive areas. *See Cultural Resource Probability Models* at 31.

While the TMA has abundant and significant cultural resources, OHVs are actively damaging cultural sites in the TMA. OHVs cause soil erosion that exposes and erodes artifact deposits or subsurface features. EA at 31. Easy public access to sites via motorized routes is correlated with vandalism and site looting. *Id.* Dust from OHVs also damages cultural sites. *Id.* Under the current travel plan (Alternative A), at least 96 NRHP-eligible sites and 2 NRHP listed sites are intersected by motorized routes. "[D]esignating routes OHV-Closed . . . . would be the most effective method of protecting cultural resources in the TMA." *Id.* at 32. Alternative B would meaningfully reduce the number of cultural sites intersected by motorized routes, within 100 feet of motorized routes and within ¼ mile of motorized routes. Alternative B "has the fewest potential adverse effects compared to the other alternatives." *Id.* at 33.

###### v.  Alternative B Minimizes Harassment of Wildlife and Minimizes Disruption of Wildlife Habitat.

The TMA contains habitat for a variety of species, including big game, migratory birds, threatened and endangered fish species, threatened and endangered bird species, and species on BLM's sensitive species list. The Price and San Rafael Rivers provide habitat for the Bonytail, Colorado Pikeminnow, Razorback Sucker, and Humpback chub. EA at 100-101. The TMA encompasses modeled habitat for the Mexican spotted owl and "defined habitat" for the Southwestern willow flycatcher. EA at 105-06. The riparian areas within the TMA provide possible habitat for the ESA-listed yellow-billed cuckoo. EA at 106. The TMA also includes habitat for BLM sensitive species, including burrowing owl, ferruginous hawk, golden eagle, kit fox and white-tailed prairie dog. EA at 107.

OHVs impact both wildlife and wildlife habitat. Motorized travel creates stress from noise disturbance, direct mortality by vehicle crushing and collisions, altered behavioral or population distributions, and fragmented habitat. *See* Douglas S. Ouren *et al.*, *supra* at 16-22. Beyond the physical impact from OHV use and OHV routes, "[n]oise from OHVs can travel miles in open landscapes and can negatively impact wildlife in a variety of ways including disturbance, avoidance, disruption of breeding habitat, reduction of migration routes, reduction of quality of habitat and loss of habitat." *See* Adam Switalski, *supra* at 89 (2018). These impacts can all lead to declines in local populations, and for some rare species, declines that impact their entire populations. *See* Douglas S. *et al.*, *supra* at 16-22

Alternative B would minimize the harassment of wildlife and minimize the disruption of wildlife habitat by reducing the "area of impact" for route designations, especially in important habitat for ESA-listed fish species, ESA-listed bird and butterfly species, and BLM sensitive species. EA at 103, 109-10. Alternative B would also reduce the mileage of routes designated in big game habitat. *Id.* at 140.

### vi. Alternative B Minimizes Conflicts Between OHV Use and Other Existing or Proposed Recreational Uses

The TMA provides opportunities for a variety of outdoor recreation opportunities, including paddling, hiking, canyoneering, backpacking, horseback riding, rock climbing, cultural site viewing, mountain biking, bikepacking, camping, and photography. EA at 54-56. Each of these non-motorized recreation opportunities is impacted by OHV use. OHV use generates significant sound impacts traveling well beyond the designated route itself as well as short- and long-term visual impacts (e.g. dust plumes).

Alternative B designates nearly 1200 miles of routes for motorized vehicle use. It provides access to non-motorized recreation opportunities. It provides access to scenic overlooks and cultural sites. It provides access to dispersed campsites. It also provides substantial opportunities for motorized recreation, including on trails specifically designated for smaller vehicles like dirt bikes and UTVs. EA at 61. While Alternative B provides access to and opportunities for both motorized and non-motorized recreation, it also minimizes damage to natural and cultural resources. As BLM acknowledges "Alternative B would have the lowest potential of any alternative for conflicts between motorized users, recreation users and authorized users, and motorized users and nonmotorized users." *Id.*

In sum, BLM should select a modified Alternative B in its final travel plan. Alternative B will minimize damage to soils, native vegetation, wilderness-quality lands, cultural resources, wildlife and wildlife habitat. It will also minimize conflicts between resource users.

## IV. National Environmental Policy Act

### a. Legal Background

NEPA has two fundamental purposes: (1) to guarantee that agencies take a "hard look" at the consequences of their actions before the actions occur by ensuring that agencies, "in reaching [their] decision[s], will have available, and will carefully consider detailed information concerning significant impacts," *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-350 (1989); and (2) to ensure "the relevant information will be made available to play a role in both the decisionmaking process and the implementation of that decision," *id.* at 349.

NEPA achieves its purpose through action-forcing procedures that require agencies to take a hard look at the environmental consequences of their actions and authorizations "utilizing public comment and the best available scientific information." *Id.* at 350. NEPA requires that federal agencies carefully consider relevant "detailed information concerning significant environmental impacts" and share that information with the public. *See Blue Mountain Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998). General statements about "possible" effects and "some risk" do not constitute a hard look.

### b.  BLM Has Failed to Take a Hard Look at the Direct, Indirect and Cumulative Impacts of the Proposed Route Networks

NEPA requires agencies take a "hard look" at the environmental consequences of a proposed action and the requisite environmental analysis "must be appropriate to the action in question." *Metcalf v. Daley*, 214 F.3d 1135, 1151 (9th Cir. 2000); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). "NEPA 'prescribes the necessary process' by which federal agencies must 'take a "hard look" at the environmental consequences' of the proposed courses of action." *Pennaco Energy, Inc. v. U.S. Dept. of the Interior*, 377 F.3d 1147, 1150 (10th Cir. 2004) (quoting *Utahns for Better Transp. v. U.S. Dept. of Transp.*, 305 F.3d 1152, 1162—63 (10th Cir. 2002)) (citation omitted). The fundamental objective of NEPA is to ensure that an "agency will not act on incomplete information only to regret its decision after it is too late to correct." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1990) (citation omitted)). In order to take the "hard look" required by NEPA, BLM must assess impacts and effects that include: "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, *whether direct, indirect, or cumulative.* Effects also include effects on cultural resources and climate change-related effects." 40 C.F.R. § 1508.1(i)(4) (emphasis added).

NEPA regulations define "direct effects" as those that "are caused by the action and occur at the same time and place." *Id.* § 1508.1(i)(1). The regulations define "indirect effects" as those that are:

> [C]aused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects *related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.*

*Id.* § 1508.1(i)(2) (emphasis added). "Cumulative impacts" are defined as:

> [E]ffects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person undertakes such actions. Cumulative effects can result from individually minor but collectively significant effects taking place over a period of time.

*Id.* § 1508.1(i)(3). Accordingly, NEPA requires that BLM engage in a searching and detailed analysis on the environmental effects of its actions, as well as ongoing and foreseeable uses of land, such as mineral development (e.g., uranium, helium, oil and gas), livestock grazing, OHV use and changes to land from other factors such as climate change.

### i.  BLM Failed to Take a Hard Look at Cumulative Impacts

The EA fails to take a hard look at the cumulative impacts of the proposed action when viewed with past, present, and reasonably foreseeable future actions. In the EA, BLM provides a general "Cumulative Impact Scenario" section that lays out a generic list of "influences on the landscape

in the region of southeastern Utah." EA at 27. The EA then lists certain projects BLM deems relevant to the cumulative impacts in the analysis area and projected acres of land that would be impacted by those projects. *Id.* The "Cumulative Impact Scenario" section provides a brief overview of the different types of projects BLM purports to consider as part of its cumulative effects analysis. *Id.* at 28-29. Then, for each resource, BLM outlines the Cumulative Impact Analysis Area (CIAA) and for most resources provides a sentence or two of what it labels as "analysis," but which merely highlights the unsurprising fact that these actions, when viewed together, will have incremental impacts on the relevant resource value. *See, e.g.*, EA at 49 (noting that "Alternatives B-D would add route-related impacts to vegetation where routes are newly designated for OHV use"); EA at 78-79 (same but for soil impacts); EA at 89 (regarding impacts to visual resources: "Alternatives A-D contribute to the effects listed previously in the Environmental Effects Analysis"). This approach violates NEPA.

To take a "hard look" at the cumulative impacts of its actions, BLM must (1) identify all relevant past, present, and reasonably foreseeable future actions, and (2) analyze the cumulative impacts of those actions on the affected environment. *See San Juan Citizens Alliance v. Stiles*, 654 F.3d 1038, 1056 (10th Cir. 2011) (setting out 10th Circuit's test for analyzing cumulative impacts); *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1104 (9th Cir. 2016).

## 1. BLM Improperly Limited its Identification of All Past, Present, and Reasonably Foreseeable Future Actions

Identifying all past, present, and reasonably foreseeable future actions is a two-step process. First, BLM must define a CIAA for each affected resource. A CIAA is the "geographic scope for each cumulative effects issue, which . . . help[s] [BLM] bound the description of the affected environment." Bureau of Land Mgmt., *National Environmental Policy Act*, Handbook 1790-1 § 6.8.3.2, pg 58 (Jan. 2008) (BLM NEPA Handbook). A properly defined CIAA "is generally based on the natural boundaries of the resource affected, rather than jurisdictional boundaries." *Id.* A properly defined CIAA is necessary to "insure a fully informed and well-considered decision." *Colo. Envtl. Coal.*, 108 IBLA 10, 18 (1989) (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Res. Defense Council*, 435 U.S. 519, 558 (1978)). *See also Citizens for a Healthy Comm. v. Bureau of Land Mgmt.*, 377 F. Supp. 3d 1223, 1246 (D. Colo. 2019) (setting-aside BLM's decision because it was based on improperly defined and inconsistent CIAAs).

Second, after defining the CIAAs, BLM must "identify the relevant 'past, present, and reasonably foreseeable future actions,' that might affect the environment in the area of the [proposed action]." *Great Basin Res. Watch*, 844 F. 3d at 1104. Reasonably foreseeable actions include those that "have been publicly announced and at least some of their specifics known." *S. Utah Wilderness All.*, IBLA No. 2019-94, at *6-7 (Sept. 16, 2019) (citations omitted; decision attached).

The identification of other projects—past, present, and reasonably foreseeable—forms the baseline data on which BLM's cumulative impacts analysis is built. Accurate baseline data is essential to satisfy BLM's informed decision-making mandate because without such information "there is simply no way to determine what effect the project will have on the environment and,

19

consequently, no way of complying with NEPA." *Or. Natural Desert Ass'n*, 921 F.3d at 1190 (quoting *Great Basin Res. Watch*, 844 F.3d at 1101).

There are two primary problems with the EA's identification of all past, present and reasonably foreseeable future actions. First, the CIAA for recreation is arbitrarily limited, thereby improperly skewing the cumulative effects analysis. And second, the list of projects and associated acres of impact for resources is incomplete and underestimates the potential acres of impact.

In the general "Cumulative Impact Scenario" Section, the EA highlights other completed travel plans, noting that BLM is not including nearby ongoing travel plans because those are not yet complete–even though vehicle use in those areas is active and ongoing. EA at 28.

In the Recreation Section, the EA then defines the OHV Recreation CIAA as only the BLM-designated routes within the San Rafael Swell TMP as well as BLM-designated routes in the Labyrinth/Gemini Bridges, Canyon Rims and San Rafael Desert TMPs. *Id.* at 49, 67-68. BLM explains that "the analysis area was chosen because the recent OHV route designation changes in these areas accumulate with the San Rafael Swell TMP alternatives to define the route networks available for motorized use." *Id.* at 49. This CIAA arbitrarily limits the cumulative effects analysis and overinflates the impact of proposed route closures within the San Rafael Swell TMP. There are roughly 5,000 miles of designated routes on BLM-managed lands in the Price, Richfield and Moab field offices outside of the ongoing or completed TMPs. *See* SUWA Map_Cumulative Impact Analysis Area: Travel Management Planning/OHV Recreation (attached). There are also about 2,500 miles of Forest Service system routes available for motorized use on Forest Service-managed lands within the exterior boundaries of the Price, Richfield and Moab field offices. *See id.* Like the routes in the completed TMP, these routes "define the route networks available for motorized use." These roughly 7,500 miles of routes are currently available for OHV use and associated dispersed camping and should properly have been included in the cumulative impact analysis. By failing to include these routes BLM has painted an incomplete picture with regard to routes available for motorized use, skewed the cumulative impacts analysis, and acted arbitrarily. BLM must revise the CIAA for Recreation.

In addition to the improper CIAA for Recreation, BLM fails to adequately estimate potential acres of impact from the listed past, present and reasonably foreseeable future actions. For instance, the EA notes that mineral development within the TMA is reasonably foreseeable. EA at 27-29. The EA explains that there are 7 existing shut-in oil wells and 3 temporarily abandoned wells that BLM claims are "relevant to the plan."[6] *Id.* at 29. BLM predicts that there are 150 acres of disturbance from those 10 wells. *Id.* BLM also notes that there are 27 "existing, relevant leases within the region, making oil and gas development reasonably foreseeable." *Id.* However, despite acknowledging that development of these leases is reasonably foreseeable, BLM does not include this potential development in the predicted acres of impact, undercutting the potential cumulative effects from development of these leases. *Id.* at 28-29. BLM similarly fails to adequately estimate potential areas of impact from development of locatable minerals. While the EA acknowledges that there are approximately 127 acres of locatable minerals and 77 acres of mineral materials disturbance *currently* allowed in active plans of development, BLM does not

---

[6] BLM does not explain (but should) what it believes makes a well or lease "relevant to the plan."

even try to identify the number of valid mining claims in the CIAA nor those which can proceed under Notice-level operations. *Id.* BLM's failure to account for these reasonably foreseeable impacts is arbitrary.

## 2. BLM failed to Analyze the Cumulative Impacts of Past, Present and Reasonably Foreseeable Future Actions

In addition to <u>identifying</u> past, present, and reasonably foreseeable future actions, BLM must <u>analyze</u> the cumulative impacts of those actions in combination. "[S]imply listing all relevant actions is not sufficient." *Great Basin Res. Watch*, 844 F.3d at 1104. BLM must also provide some quantified or detailed information. *Id.* "Without such information, neither the courts nor the public . . . can be assured that the [agency] provided the hard look that it is required to provide." *Id.* (internal citations omitted) (citing *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1379 (9th Cir. 1998)). *See also Diné CARE*, 923 F.3d at 853-54, 856-59 (setting-aside permits to drill for BLM's failure to identify and analyze cumulative impacts); *San Juan Citizens All. v. U.S. Bureau of Land Mgmt.*, 326 F. Supp. 3d 1227, 1247-48, 1252-54 (D.N.M. 2018) (BLM failed to analyze cumulative impacts of oil and gas leasing decisions).

NEPA demands a full accounting of cumulative impacts for the simple reason that "the total impact from a set of actions may be greater than the sum of the parts." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 994 (9th Cir. 2004). To illustrate this principle:

> [T]he addition of a small amount of sediment to a creek may have only a limited impact on salmon survival, or perhaps no impact at all. But the addition of a small amount here, a small amount there, and still more at another point could add up to something with a much greater impact, until there comes a point where even a marginal increase will mean that *no* salmon survive.

*Id.*

The same principle is true here. While it may be true that the designation of a few routes in cryptobiotic soils, wildlife habitat, within 100 meters of riparian areas or in any other resource value, may have limited impact when viewed in isolation, "the addition of a small amount here, a small amount there, and still more at another point"—such as through new access roads for energy projects or for grazing improvements—the combined effect of these projects "could add up to something with a much greater impact."

But BLM failed to provide any meaningful analysis of cumulative effects to most resources. Instead of providing quantified or detailed information regarding cumulative effects to different resources, BLM simply states the general conclusion that there will be cumulative effects to the analyzed resource. For instance, with regard to noxious weeds, the EA states that "Alternatives B-D would add route-related impacts where routes are newly designated for OHV use." EA at 99-100. Similarly, with regard to special status species, the EA generally reiterates the anticipated impacts from route designations in the travel plans and states that the incremental

effects are "described in Table 3 and Table 3 above."[7] EA at 110. However, tables in EA Section 3.3.11.2 simply include the acreage of impact from the alternative route networks; they do not include acreage from the various identified past, present and reasonably foreseeable actions *in addition to* the alternative route networks and therefore do not provide any information about *cumulative effects*. EA at 109-10. Similarly unhelpful tables and discussion is pervasive throughout the EA's "analysis" of route designation impacts to identified resources. Without more detailed information, BLM cannot meaningfully understand the cumulative effects of the alternative route networks.

## ii. BLM Failed to Take a Hard Look at Impacts to Water Resources

The EA fails to take a hard look at impacts to water resources. The EA generally outlines the broad impacts that OHVs can have on water resources and notes the alternative route networks will have varying crossing points on perennial and intermittent streams and varying miles of designated routes within 100 meters of a riparian area. However, the EA leaves out important information required to take the required "hard look" at water resources.

The EA notes that "BLM monitors wetland and riparian areas using "Assessment, Inventory, and Monitoring (AIM) Strategy and Proper Functioning Condition (PFC) tools." EA at 90. Critically, however, BLM does not discuss the results of that monitoring. *Id.* The EA does not mention whether BLM has recently assessed wetlands and riparian areas within the TMA or what the status of those assessments were. *Id.* Without that information, it's difficult for BLM or the public to understand the impacts of the alternative route networks on water resources. *Compare* Bureau of Land Mgmt., *Labyrinth/Gemini Bridges Travel Management Plan Environmental Assessment*, DOI-BLM-UT-Y010-2020-0097-EA 57-58 (Sept. 2023) (Labyrinth/Gemini TMP EA) (discussing the results of a PFC assessment in Ten Mile Wash, for example, which found that it was "Functioning at Risk" and how route designations could impact the condition of riparian areas within the TMA) *with* TMP EA at 89-97 (providing no meaningful information about the current status of wetlands and riparian areas within the TMA or any discussion of how the alternative route networks would affect the status of wetlands and riparian areas).

Similarly, the EA acknowledges that Muddy Creek, the Price River and the San Rafael River are considered impaired waterbodies by the Utah Division of Water Quality. EA at 89-90. The EA also acknowledges that best practices for these waters include "closing routes that are eroded and limiting OHV use to non-sensitive areas away from streams." *Id.* at 92. However, rather than provide any real analysis about the relative impact of each route and each route network alternative on water quality, the EA instead confusingly states that implementing these best practices "may improve the stream's observed/expected bioassessment." *Id.* This type of "analysis" is unhelpful, does not provide sufficient information to BLM or to the public to understand the different impacts that each alternative will have on water resources within the TMA, and therefore fails NEPA's hard look test.

---

[7] This section does not actually list the Tables referred to in the EA. It just says the incremental effects are in "Table 3 and Table 3 above." EA at 110.

### iii. BLM Failed to Take a Hard Look at Impacts to Big Game, Upland Game, Migratory Birds and BLM Sensitive Species.

BLM declined to analyze impacts to big game and upland game, including desert bighorn sheep, mule deer, pronghorn, Rocky Mountain elk, chukar and wild turkey. *See* EA at 139-40. It also declined to analyze impacts to migratory birds and BLM sensitive wildlife species and their associated habitats. *See id.* at 130-132; 139-142. For each of these resource values, BLM claims that analysis is not necessary because BLM is only evaluating routes that already physically exist on the ground and have received ongoing OHV use and further that BLM is not authorizing construction of a new route. *Id.* at 140. This argument fails under NEPA.

BLM's explanation for its failure to take hard look at impacts to big game, migratory birds, BLM sensitive species and the associated habitat for these wildlife species is problematic for several reasons. First, as discussed *supra* in Section II, many of the routes in the "total evaluated route network" are reclaiming, do not exist on the ground or do not receive motorized use. In fact, under Alternatives C and D, BLM would be authorizing new surface disturbance that could impact big game, migratory birds and BLM sensitive species and their habitats.

Second, it is not only the physical existence of routes that impacts species and their habitat, but also the motorized *use* of those routes. Indeed, noise from OHVs can travel long distances and impact wildlife, including through "disturbance, avoidance, disruption of breeding habitat, reduction of migration routes, reduction of quality habitat, and loss of habitat." *See* Switalski, *supra* at 89; *see also* D.J. Schubert & Jacob Smith, *The Impacts off Off-Road Vehicle Noise on Wildlife*, The Road RIPorter 5.1 (attached) (collecting studies discussing the impact that OHV noise has on wildlife). And motorized use of routes can cause big game like mule deer to avoid areas where such use is taking place. *See* Switalski, *supra* at 89 (explaining that mule deer avoided motorized access roads *during oil and gas development*, in other words, when routes are being used). OHV use can also lead to declines in breeding success and survival in song birds. *Id.* Closing routes in wildlife habitat—regardless of whether those routes exist on the ground or at some point have received OHV use—could meaningfully improve outcomes for a number of species. And BLM must analyze the varying impacts of the alternative route networks on big game, upland game, migratory birds and BLM sensitive species. *See also* Labyrinth/Gemini TMP EA at 68-87 (analyzing impacts to big game, migratory birds and BLM sensitive species despite that the Moab field office only analyzed alternative route networks that contemplated route designations for routes where use was *already authorized*). BLM's failure to undertake this analysis violates NEPA's hard look mandate.

### iv. BLM Failed to Take a Hard Look at Impacts to Recreation.

BLM failed to take a hard look at impacts to motorized and non-motorized recreation when it arbitrarily divided the TMA into "route network geographic areas" for analysis and also underestimated impacts to non-motorized recreation opportunities.

As part of its analysis of impacts to recreation, BLM subdivided the TMA into 22 different "route network geographic areas." EA at 49-50, App. C. BLM claims these geographic areas were based on "natural separating features" and chosen "based on different recreational experiences and opportunities." *Id.* App. C at 159. In practice, these boundaries are entirely

23

arbitrary and improperly magnify the impact that any proposed route closure would have on motorized recreation. For example, the EA highlights Alternative B's "Notable Impacts" in each route network geographic area. *Id.* at 61-63. Within the Behind the Reef Area, the EA notes that Alternative B would close the Waterfall Trail, "the only single-track route in this route network geographic area." *Id.* at 61. While that may be true, it does not capture the reality that the Twin Knolls trail system–which would remain open to single-track use in Alternative B–is less than 4 miles away in the adjacent Temple Mountain geographic area. *Compare id.* at 61 *with id.* App. B, Map 3. The Twin Knolls system is a more extensive route network, so the impact to motorized recreation would not be nearly as significant as the EA contends.

BLM's discussion about the relative impacts of each alternative similarly suffers from this misleading method of "analysis." EA at 61. The discussion confusingly re-groups the 22 route network geographic areas into nine different route network geographic areas, without any explanation for that change. *Id.* at 61. Whether there are 22 geographic areas or nine geographic areas, the effect is the same: it distorts the analysis to overinflate the impact of route closures in any given area. *Compare* EA at 60 (noting that Alternative B would result in a 16% (218-mile) reduction in OHV-Open routes and a 17% (17-mile) reduction in OHV-Limited routes) *with id.* at 62 (highlighting that Alternative B would close 88% of the seasonally-restricted route mileage in the Fremont Junction/Limestone Cliffs route network geographic areas). Closing routes in route network geographic areas with fewer total evaluated routes will always seem more significant when viewed and analyzed in isolation. The narrow focus on individual route network geographic areas prevents BLM from taking a hard look at the impacts of proposed closures to motorized and non-motorized recreation.[8]

At the same time the EA improperly magnifies the impact of route closures on recreation opportunities, it downplays motorized route designation impacts to non-motorized recreation. The EA claims–without support–that "[t]he majority of nonmotorized recreation occurs in designated wilderness." EA at 55. While there are significant nonmotorized opportunities in designated wilderness, there is also substantial nonmotorized recreation outside of designated wilderness that must be adequately considered and analyzed in this EA. For instance, the hikes for Chute, Crack, Ding and Dang canyons all begin outside of designated wilderness and are impacted by motorized recreation. Places like Family Butte, San Rafael Knob, Iron Wash, Short Canyon, Mussentuchit Dunes, Calf Mesa and Molen Reef all provide important non-motorized recreation outside of designated wilderness. Also, long-distance bicycling and bikepacking, which BLM acknowledges are emerging recreational uses within the TMA, occur outside of designated wilderness and are affected by motorized trail designations. Further, even if non-motorized recreation occurs in designated wilderness it is still impacted by motorized use from things like noise, dust and visual impacts.

BLM also claims that six of the route network geographic areas do not have any well-established nonmotorized recreation opportunities and thus does not analyze impacts to nonmotorized

---

[8] Tellingly, while BLM arbitrarily subdivides the TMA into geographic regions to analyze the impacts to recreation, it refuses to analyze impacts to resources like cultural sites, vegetation, soils and visual resource within already-defined subregions. *Compare* EA at 41-74 *with* EA App. A at 117-18. The TMA encompasses the San Rafael Swell Recreation Area and multiple Areas of Critical Environmental Concern—areas specifically designated to protect certain resources. *See infra* Sections V, VI. However, BLM declined to analyze impacts within those defined, designated areas claiming it had sufficiently analyzed impacts in its broader analysis. *Id.*

recreation in those regions. EA at 55 n. 25. This is not accurate. The following nonmotorized recreation opportunities are available in those areas and BLM should analyze impacts from the various proposed route and route network designations to these nonmotorized recreation opportunities accordingly.

- **Mounds**: The Price River, which forms the boundary of the area, offers an exceptional nonmotorized river trip from the bridge crossing to Woodside, which eventually extends to the Green River through the Book Cliffs. There are also different packrafting loop opportunities throughout the area and adjacent network areas. There are day hiking opportunities in portions of the river corridor, including one that descends an old stock trail. The area also provides good opportunities for wildlife viewing in the river corridor.

- **Grassy Trails**: The Price River, which forms the boundary of the area, offers the same river trip from the bridge crossing to Woodside as discussed above. The Grassy Trail Creek flows through this area with known hikes to cultural sites.

- **Humbug Canyon/Chimney Rock**: Again, the Price River forms the boundary of this geographic area and offers the nonmotorized river trip from the bridge crossing to Woodside. There is known hiking and backpacking in Humbug Canyon in the western portion of the area. Stove Gulch, and its deep canyon also offer an excellent day hike.

- **North Jurassic/Flat Top:** This area again provides the nonmotorized river trip down the Price River. Flattop Mountain is also a hiking and "peak bagging" destination.

- **Fremont Junction:** This area offers hiking opportunities in the North Hollow, North Fork and Indian Canyons, as well as in part of Last Chance Creek.

- **Limestone Cliffs**: This area offers opportunities for big game hunting as well as hiking and backpacking trips connecting with contiguous Forest Service lands through Solomon and Last Chance Creeks.

By both magnifying the purported impacts of potential route closures on motorized recreation and underestimating potential route impacts on non-motorized recreation, BLM has failed to take a hard look at impacts to recreation.

### V. Price Resource Management Plan

As BLM finalizes the San Rafael Swell TMP, the agency must consider the goals and objectives for resource values and uses in the Price RMP. *See* Settlement Agreement ¶ 16(c); BLM Manual 1626 § 4.1. The Price RMP committed "[t]o reduce road density, maintain connectivity, and reduce habitat fragmentation, continue to require reclamation of redundant road systems or roads that no longer serve their intended purpose." Price RMP at 148. Despite this, BLM proposes to significantly increase route density and increase habitat fragmentation throughout the San Rafael Swell TMA. *Compare* EA Map 2 *with* EA Map 4 (adding 273 miles of *new* route designations throughout the TMA, increasing density throughout but especially in the Molen Reef area) *and*

EA Map 5 (adding 678 miles of *new* route designations, increasing route density and habitat fragmentation throughout the EA).

### a. Areas of Critical Environmental Concern

The Price RMP designated a number of Areas of Critical Environmental Concern (ACEC). *See* SUWA Map_Areas of Critical Environmental Concern. ACECs are "areas within the public lands where special management attention is required . . . to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes." *Id.* § 1702(a). According to BLM Manual 1613, *Areas of Critical Environmental Concern* (Sept. 29, 1988):

> An ACEC designation is the principal BLM designation for public lands where special management is required to protect important natural, cultural and scenic resources . . . BLM managers will give precedent to the identification, evaluation, and designation of areas which required "special management attention" during resource management planning.

BLM Manual 1613.06. ACECs are afforded special management attention to ensure the protection of the relevant and important values of the ACEC. BLM Manual 1613.12.

There are multiple ACECs within the San Rafael Swell TMA, including San Rafael Canyon, San Rafael Reef, Segers Hole, Muddy Creek, I-70 Scenic, as well as Rock Art Sites, Heritage Sites, Cleveland-Lloyd Dinosaur Quarry and Uranium Mining Districts ACECs. There are about 163,490 acres of ACECs within the TMA. While some ACECs or portions of ACECs are now within designated wilderness, there are about 64,600 acres of ACEC outside of designated wilderness. Despite this significant ACEC acreage, BLM declined to analyze impacts to designated ACECs, claiming that it generally analyzed overall impacts to relevant and important values including scenic quality, cultural and historic values, vegetation and paleontological resources. EA at App. A at 117. This is not sufficient.

While the EA generally discusses impacts to cultural sites, it does not discuss how the alternative travel networks may impact cultural values within individual ACECs that were designated specifically to protect cultural values. *See* EA at 30-33 (failing to discuss or mention ACECs designated to protect cultural values). The EA also does not discuss how route designations will *protect* cultural resources. *Id.* Instead, it mostly lists the number of different site categories that may be damaged by OHV use. *Id.*

Similarly, with regard to the I-70, Muddy Creek, San Rafael Canyon, San Rafael Reef and Segers Hole ACECs which were designated, in part, to protect scenic values, the EA only discusses impacts to visual resources generally. *Id.* at 83-88. Rather than analyze impacts from route designations to scenic impacts to each ACEC, the EA merely discusses overall impacts to the three overall visual resource inventory and visual resource management classes. *Id.* It does not discuss the specific impacts to scenic values in each ACEC.

BLM is considering designating 35 miles of new OHV routes in designated ACECs in Alternative C and 83 miles of new OHV routes in Alternative D within designated ACECs. BLM must analyze how these route designations in each ACEC will protect the relevant and important values for which those ACECs were designated. It has not done so here.

## VI. Dingell Conservation Management and Recreation Act

In February 2019, Congress passed the John D. Dingell, Jr., Conservation, Management and Recreation Act (Dingell Act). The Dingell Act designated 399,073 acres of wilderness within the San Rafael Swell TMA which must be managed in accordance with that Wilderness Act. Pub. L. 116-9, § 1231, 133 Stat. 580, 671-675 (2019). The Dingell Act also established the 217,000-acre San Rafael Swell Recreation Area "to provide for the protection, conservation, and enhancement of the recreational, cultural, natural, scenic, wildlife, ecological, historical, and educational resources of the Recreation Area." *Id.* § 1221(b). The Recreation Area is to be administered "in a manner that conserves, protects, and enhances the purposes for which the Recreation Area is established." *Id.* § 1222(a)(1). The entirety of the San Rafael Swell Recreation Area is within the TMA.

There are currently about 400 miles of designated routes within the San Rafael Swell Recreation Area. BLM is considering designating more than 200 miles of new routes within the Recreation Area but has thus far refused to analyze the impacts of doing so, despite the fact that the travel plan will have a significant impact to the administration and purposes of the Area. *See* EA App. A at 117-18. As with ACECs, BLM claims its analysis of various resource values is sufficient to comply with the Dingell Act. It is not.

The San Rafael Swell TMA encompasses 1.15 million acres of BLM-managed land. The San Rafael Swell Recreation area is a fraction of that—216,995 acres. In its analysis of different resource values, BLM does not identify potential impacts specific to the San Rafael Swell Recreation Area, instead merely discussing impacts more broadly. *See generally* EA at 30-109. For example, in its analysis of impacts to native vegetation, BLM acknowledges that the analysis area includes the San Rafael Swell Recreation Area, but the EA does not then specify and discuss impacts to native vegetation within the Recreation Area itself. EA at 44-49. Instead, the EA gives a broad overview of potential impacts to native vegetation within the entire TMA. *Id.* Similarly, in its analysis of potential impacts to special status plant species, the EA acknowledges that analysis area includes the Recreation Area, but does not then analyze impacts to special status plants specifically within the Recreation Area. *Id.* at 79-83. The EA simply discusses impacts to acres of potential special status plant habitat in the entire TMA. *Id.* at 79-83; *see also id.* at 30-33 (failing to discuss impacts to cultural sites within the Recreation Area); *id.* at 75-78 (failing to discuss impacts to soils within the Recreation Area); *id.* at 83-89 (failing to discuss impacts to visual resources within the Recreation Area); *id.* at 89-96 (failing to discuss impacts to water resources in the TMA). This is not sufficient. An impact to a particular resource might be relatively minor when viewed against 1.15 million acres of land, but that impact might be much more significant when analyzed in the context of the smaller San Rafael Swell Recreation Area. Accordingly, BLM must undertake more specific impacts analysis that focuses on the Recreation Area.

To comply with the Dingell Act, BLM must analyze the impacts of the alternative route networks on resource values specifically within the San Rafael Swell Recreation Area. BLM must also discuss how each alternative route network protects, conserves and enhances, recreational, cultural, natural, scenic, wildlife, ecological, historical, and educational resources in the Recreation Area. BLM has not done so here.

## VII.    Cultural Resources

BLM has dual obligations when considering the impacts of its undertakings on cultural resources. Pursuant to Section 106 of the NHPA, BLM must "make a reasonable and good faith effort" to identify cultural resources that may be affected by an undertaking. 36 C.F.R. § 800.4(b)(1). Pursuant to NEPA, BLM must take a "hard look" at the effects of the proposed action. *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 781 (10th Cir. 2006). BLM must comply with both statutes when it undertakes travel planning.

### a.    National Historic Preservation Act

Congress enacted the NHPA in 1966 to implement a broad national policy encouraging the preservation and protection of America's historic and cultural resources. *See* 54 U.S.C. § 300101. The heart of the NHPA is Section 106, which prohibits federal agencies from approving any federal "undertaking" unless the agency takes into account the effects of the undertaking on historic properties that are included in or eligible for inclusion in the National Register of Historic Places. 54 U.S.C. §§ 306108, 300320; *see also Pueblo of Sandia v. United States*, 50 F.3d 856, 859 (10th Cir. 1995). Section 106 is a "stop, look, and listen provision" that requires federal agencies to consider the effects of their actions and programs on historic properties and sacred sites before implementation. *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999).

To adequately "take into account" the impacts on archeological resources, all federal agencies must comply with binding Section 106 regulations established by the Advisory Council on Historic Preservation (Advisory Council). Under these regulations, the first step in the Section 106 process is for an agency to determine whether the "proposed [f]ederal action is an undertaking as defined in [Section] 800.16(y)." 36 C.F.R. § 800.3(a). Undertakings include any permit or approval authorizing use of federal lands. *Id.* § 800.16(y). If the proposed action is an undertaking, the agency must determine "whether it is a type of activity that has the potential to cause effects on historic properties." *Id.* § 800.3(a). An effect is defined broadly to include direct, indirect, and/or cumulative adverse effects that might alter the characteristics that make a cultural site eligible for listing in the National Register of Historic Places. *See id.* § 800.5(a)(1); *id.* § 800.16(i); 65 Fed. Reg. 77,698, 77,712 (Dec. 12, 2000).

The agency next "[d]etermine[s] and document[s] the area of potential effects" and then "[r]eview[s] existing information on historic properties within [that] area." 36 C.F.R. § 800.4(a)(1)-(2). "Based on the information gathered, . . . the agency . . . shall take the steps necessary to identify historic properties within the area of potential effects." *Id.* § 800.4(b). "The agency shall make a reasonable and good faith effort to carry out appropriate identification efforts." *Id.* § 800.4(b)(1).

If the undertaking is a type of activity with the potential to affect historic properties then the agency must determine whether in fact those properties "may be affected" by the particular undertaking at hand. *Id.* § 800.4(d)(2).[9] Having identified the historic properties that may be affected, the agency considers whether the effect will be adverse, using the broad criteria and examples set forth in section 800.5(a)(1). Adverse effects include the "[p]hysical destruction of or damage to all or part of the property," as well as "[i]ntroduction of visual, atmospheric or audible elements that diminish the integrity of the property's historic significant historic features." *Id.* § 800.5(a)(2)(i) & (2)(v). If the agency concludes that the undertaking's effects do not meet the "adverse effects" criteria—that is, the agency concludes that there *may* not be an adverse effect from the undertaking—it is to document that conclusion and propose a finding of "no adverse effects." *Id.* § 800.5(b), 800.5(d)(1).

If the agency official concludes that there *may be* an adverse effect, it engages the public and consults further with the state historic preservation officer, Native American tribes, consulting parties, and the Advisory Council in an effort to resolve the adverse effects. *Id.* §§ 800.5(d)(2), 800.6.[10]

### a.  Reasonable and Good Faith Effort

As discussed above, BLM must "make a reasonable and good faith effort" to identify historic properties. 36 C.F.R. § 800.4(b)(1). To do so, an agency official "shall take into account past planning, research and studies . . . the nature and extent of potential effects on historic properties, and the likely nature and location of historic properties within the area of potential effects." *Id.* As stated in the preamble to the Section 106 regulations, knowing the historic properties at risk from an undertaking is essential: "[i]t is simply impossible for an agency to take into account the effects of its undertaking on historic properties if it does not even know what those historic properties are in the first place." 65 Fed. Reg. 77,698, 77,715 (Dec. 12, 2000); *see also Pueblo of Sandia*, 50 F.3d at 861-62 (holding that the U.S. Forest Service failed to make a good faith effort to identify cultural resources when it concluded that a canyon did not contain traditional cultural properties despite having information to the contrary).

Pursuant to the Settlement Agreement, BLM must conduct Class III surveys "along all routes or portions of routes that are designated as open in the TMAs . . . and that are located in areas that BLM has identified in a Class I cultural resource inventory as having a high potential for cultural resources." Settlement Agreement ¶ 24.c. BLM must also complete Class III surveys "along all routes or portions of routes that are designated as open" within certain ACECs, including Big Hole, Copper Globe, Cottonwood Canyon, Dry Wash, Grassy Trail, Hidden Splendor, Hunt Cabin, King's Crown, Little Susan Mine, Lucky Strike, Molen Seep, Muddy Creek, Muddy Creek-Tomsich Butte, North Salt Wash, Pictographs, Sand Cove, Shepard's End, Short Creek, Smith Cabin, Swasey's Cabin, Temple Mountain, Tidwell Draw, and Wild Horse Canyon. *Id.* ¶ 24.b.ii. In other words, BLM must complete a Class III survey for all routes it is considering

---

[9] The agency may also determine that there are no historic properties present or there are historic properties present but the undertaking will have no effect upon them, at which point it consults with the State Historic Preservation Officer and notifies relevant Native American tribes of its conclusion. *Id.* § 800.4(d)(1).
[10] SUWA is a consulting party on the Dolores travel plan and recently submitted comments regarding the appropriate "area of potential effects" for this undertaking.

designating as open that meet the criteria of paragraph 24 of the Settlement Agreement. The failure to do so means that route(s) could not be designated as open.

The EA notes that BLM conducted Class III surveys but does not specifically confirm that it has complied with the requirements of the Settlement Agreement. BLM must provide more information regarding the extent of its Class III inventories.

### b. Consultation

SUWA is a consulting party on the San Rafael Swell TMP. *See, e.g.*, Email from Natalie Fewings, Archaeologist, Bureau of Land Mgmt., to Steve Bloch & Laura Peterson, Attorneys, SUWA (June 24, 2024) (acknowledging that SUWA is a consulting party on the San Rafael Swell TMP and confirming contact information); Letter from Laura Peterson, Attorney, SUWA, to Nicole Lohman, Archaeologist, Bureau of Land Mgmt. (Feb. 22, 2017) (requesting consulting party status for all Price field office travel plans on behalf of SUWA). SUWA only received information regarding BLM's determination of effect as part of the Section 106 consulting party process on July 15, 2024. *See* Letter from Kyle Beagley, Acting Field Manager, BLM Price field office, to Steve Bloch, Legal Director, SUWA (July 12, 2024).[11] Rather than provide the technical reports for the Class III surveys, as BLM has with other travel management plans, BLM included only overview tables, which are essentially a list of cultural sites within the TMA with the site types redacted.[12] The minimal information BLM has provided as part of the Section 106 process does not allow consulting parties to meaningfully participate in the process.

Further, as the Section 106 process is taking place so late in the travel planning process, it's difficult to see how BLM could possibly be using cultural resource information to inform its route designations. Even the EA notes that while the agency anticipates reaching a determination of adverse effects to historic properties, the analysis process is incomplete. *See* EA at 32 (acknowledging that the table delineating "TMP Effects on Historic Properties Under Section 106" is not complete). BLM cannot properly comply with NEPA or the NHPA if it does not know how many cultural sites and historic properties may be impacted by route designations in the varying alternatives.

### c. Hard Look

In addition to BLM's obligations under the NHPA, NEPA requires BLM to take a "hard look" at the environmental effects of a proposed action. *Silverton Snowmobile Club*, 433 F.3d at 781 (10th Cir. 2006). An EA must demonstrate "the agency's thoughtful and probing reflection of the possible impacts associated with the proposed project." *Id.* (quoting *Comm. To Preserve Boomer*

---

[11] The next day, July 16, SUWA requested copies of two technical reports which should provide more detail about the Class III surveys conducted in the TMA and the results of those efforts. The requested information was provided the same day these comments are due: July 22.

[12] In previous and other ongoing travel planning efforts, BLM has not redacted site types. Site types do not provide protected information about the location of sites, but do provide important information to help consulting parties understand the potential adverse effects to cultural sites. *See, e.g.*, HRA, Inc. Conservation Archaeology, *An Archaeological Survey of 1,936 Acres for the Trail Canyon Travel Management Area near Kanab, Kane County, Utah* Archeological Report No. 17-11, Utah Project No. U17HQ0992 (May 2018). Discussing the different site types in detail with location information properly redacted.

*Lake Park v. Dep't of Transp.*, 4 F.3d 1543, 1553 (10th Cir. 1993)). Pursuant to NEPA, BLM must analyze all potential direct, indirect, and cumulative impacts to *cultural resources*, regardless of whether those cultural resources are eligible for listing in the National Register. *See* BLM Manual 8100 – The Foundations for Managing Cultural Resources (Public) .03.F (Dec. 3, 2004) ("Cultural resources need not be determined eligible for the National Register of Historic Places . . . to receive consideration under [NEPA]."). Though NHPA analysis is related to NEPA analysis, they are not one and the same.

Here, BLM failed to take a hard look at the direct, indirect and cumulative impacts to cultural resources, including ineligible sites and isolated finds. First, the EA provides no real information about the different cultural resources that are present in the TMA. The EA merely provides the number of cultural sites and isolated finds documented within the APE. EA at 30. It does not even discuss the different kinds of sites within the TMA or the time period of sites. *Id.* at 30-33. Without even basic information about the kinds of cultural resources in the TMA, it is impossible for the public to understand the potential impacts to cultural sites and historic properties from this plan. Second, the EA provides only a general and cursory assessment of potential impacts that OHVs can cause to cultural resources. *Id.* at 30-33. The EA states that OHV travel can cause soil erosion and erosion of artifact deposits. *Id.* at 31. Indirect effects from OHV use includes site vandalism or looting as well as dust accumulation on cultural resources. *Id.* These sorts of generalized statements are not helpful in determining the comparative impact of the proposed route networks to cultural sites, *especially where*, as here, BLM has provided so little information about the potentially affected sites.

BLM has failed to take a hard look at impacts to cultural resources.

## VIII.    Route-Specific Comments

Attached to these comments as Attachment B are route-specific comments providing significant information on numerous routes within the San Rafael Swell TMA. This information includes observed route attributes and narratives discussing BLM's compliance (or lack thereof) with the Minimization Criteria and the Settlement Agreement. These route-specific comments must all be considered part of the comment record for every route segment mentioned.

## Conclusion

In the San Rafael Swell Travel Plan, BLM should select a modified Alternative B that closes not only the routes identified in Alternative B but the additional routes highlighted in these comments. Alternative B is the only option that is consistent with BLM's legal obligation to minimize damage to natural and cultural resources. BLM must also remedy the deficiencies identified in these comments. Thank you for your consideration of these comments.

Sincerely,

Laura Peterson
Southern Utah Wilderness Alliance
www.suwa.org



SS1354

SS1378

SS1316

SS1380

SS1492

⑥ 6

*Woodside*

0  0.75  1.5  2.25  3
Miles
N



SOUTHERN UTAH WILDERNESS ALLIANCE

425 East 100 South
Salt Lake City, UT 84111
801 486 3161
www.suwa.org

D. Callahan (7/19/2024) | Data: BLM | Project #680

**Alternative B Recommended Route Closures**

Draft EA San Rafael Swell TMP

Map 1 of 4



—— Alt B Recommended Closures

—— Alt B Open

—— Alt B Limited

▨ TMA Boundary



SAN RAFAEL
SWELL TMA



Clawson

Ferron

SS3499
SS3494
SS3501
SS3500
SS2079

Moore

SS3441

SS5209
SS5208
SS5216

70

0   0.75  1.5  2.25   3
Miles



**Alternative B Recommended Route Closures**

Draft EA San Rafael Swell TMP

Map 2 of 4

— Alt B Recommended Closures
— Alt B Open
— Alt B Limited
TMA Boundary



SOUTHERN UTAH WILDERNESS ALLIANCE

425 East 100 South
Salt Lake City, UT 84111
801 486 3161
www.suwa.org



SAN RAFAEL
SWELL TMA

D. Callahan (7/19/2024) | Data: BLM | Project #680





**Alternative B Recommended Route Closures**

Draft EA San Rafael Swell TMP

Map 3 of 4

Legend:
— Alt B Recommended Closures
— Alt B Open
— Alt B Limited
▢ TMA Boundary

SOUTHERN UTAH WILDERNESS ALLIANCE

425 East 100 South
Salt Lake City, UT 84111
801 486 3161
www.suwa.org

D. Callahan (7/19/2024) | Data: BLM | Project #680





**Alternative B Recommended Route Closures**

Draft EA San Rafael Swell TMP

Map 4 of 4



425 East 100 South
Salt Lake City, UT 84111
801 486 3161
www.suwa.org

D. Callahan (7/19/2024) | Data: BLM | Project #680

— Alt B Recommended Closures
— Alt B Open
— Alt B Limited
▢ TMA Boundary





Manti La Sal National Forest

Price FO

Moab FO

Price

Fillmore

Green River

Manti La Sal National Forest

Moab

Hanksville

Fishlake National Forest

Cedar City

Monticello

Richfield FO



SUWA
SOUTHERN UTAH WILDERNESS ALLIANCE

425 East 100 South
Salt Lake City, UT 84111
801 486 3161
www.suwa.org

D. Callahan (7/17/2024) | Data: BLM | Project #680



**Cumulative Impact Analysis Area**
Travel Management Planning/OHV Recreation

— Designated Routes w/in Completed TMPs        — Designated Routes in Ongoing TMPs        TMA Boundaries
— Designated Routes Outside TMAs        BLM Field Offices        National Forests



# Areas of Critical Environmental Concern
San Rafael Swell TMA



Castle Dale

Fremont
Junction

SUWA
SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, UT 84111
801 486 3161
www.suwa.org

D. Callahan (7/17/2024) | Data: BLM | Project #680

ACEC Name

- Cleveland-Lloyd Dinosaur Quarry
- Heritage Sites
- Interstate 70
- Muddy Creek
- Rock Art Sites
- San Rafael Canyon
- San Rafael Reef
- Segers Hole
- Uranium Mining Districts

0 2 4 6 8 Miles

# Route-Specific Comments

*These route-specific comments supplement individual Route Reports that SUWA previously provided to BLM. Those Route Reports included detailed information, including route condition, photographs and GIS data.*

## Little Wild Horse Area

### SS4336

SS4336 extends to the mesas above the Ding and Dang Canyon hiking route. It was likely an old mine prospect route. The route is closed to motorized vehicles. The route is within the San Rafael Route Designation Plan (SRRDP) area, and was designated as OHV-Closed. It is a very lightly-used two-track. It cuts through desert bighorn sheep habitat. Motorized use of the route causes conflicts between resource users, especially those hiking the Ding and Dang Canyons who are impacted by OHV noise and visual impacts. Designating the route would also create issues with OHV compliance as it is an out and back route with no real destination. Opening this route to motorized vehicles would cause new impacts to soils, recreation, vegetation and wildlife habitat. Opening the route would also cause conflicts between resource users.

**BLM should maintain the OHV-Closed Designation for SS4336.**

## San Rafael Knob/Reds Canyon Area

### SS4115

SS4115 is part of a network of old mining routes on a mesa north of Family Butte. This route is not open to motorized vehicles, but BLM's failure to enforce its travel management plan has led to some unauthorized use. Unauthorized use of the route is creating proliferating damage to both vegetation and soils as motorized users travel off route looking for better views. Rather than create an unmanageable and damaging route network on this mesa, BLM should close this route at the junction of SS4115 and SS4121. That would allow access to a viewpoint and dispersed camping on SS4121while also minimizing damage and creating a more manageable OHV route network.

**BLM should maintain the OHV-Closed Designation for SS4115 beyond the junction with SS4121.**

### SS4116

SS4116 is among a network of unauthorized routes on a mesa north of Family Butte. This is the western spur. It does not lead to any particular point of interest or destination. Instead, it ends in the middle of the mesa. Opening this route to motorized use would invite route proliferation and unauthorized use. Maintaining the OHV-Closed designation for this route would minimize

damage to wildlife and wildlife habitat as the route is in crucial habitat for desert bighorn sheep and pronghorn as well as modeled habitat for fringed myotis, Townsend's big-eared bat and spotted bat and potential habitat for western bumble bee and Monarch butterfly. Maintaining the OHV-Closed designation would also minimize damage to soils and vegetation which would be damaged by motorized use.

**BLM should maintain the OHV-Closed Designation for SS4116.**

## SS4120

SS4120 is a short spur off of SS4115 and a part of the unauthorized and unnecessary route network on this mesa near Family Bute. In recent years, someone left an abandoned trailer, contributing to expanding damage to soils, vegetation and habitat. This route is currently designated OHV-Closed. The route cuts through crucial habitat for desert bighorn sheep crucial habitat. Opening this route would contribute to route proliferation on this mesa. Maintaining the OHV-Closed designation for this route would minimize damage to soils, vegetation, wildlife and habitat.

**BLM should maintain the OHV-Closed Designation for SS4120.**

## SS4122

SS4122 is a short spur off of SS4115. It is currently designated as OHV-Closed. Opening the route would contribute to an unnecessary and unmanageable route network on the mesa. The route cuts through desert bighorn crucial habitat, Fringed myotis, Townsend's big-eared bat and spotted bat modeled habitat as well as Western bumblebee and Monarch butterfly potential habitat. There are other nearby dispersed campsites that provide similar recreation opportunities. Maintaining the OHV-Closed designation on this route would minimize damage to soils, vegetation, wildlife and wildlife habitat.

**BLM should maintain the OHV-Closed Designation for SS4122.**

## SS4071

SS4071 is a short route in the Family Butte area. The end of BLM's currently-designated SS4071 is at the "pass." However, in each of the action alternatives, the agency is proposing extending this route beyond that point. BLM should maintain the current ending location of the route at the pass area because it is a better location for managing use and would stop route proliferation down and onto the bench. BLM's new proposed ending point would make management difficult and lead to new surface disturbance and impacts to resources. To minimize damage to soils, vegetation, habitat and wildlife, BLM should not extend the route, but rather keep the current closure point.

**BLM should maintain the current closure location of SS4071 and should not extend the route.**

2

**SS4070**

SS4070 is an old mining prospect route that is reclaiming and largely does not exist on the ground. *See also* SUWA Route Report SS4070 (submitted March 2024). While dispersed camping is spreading in this area, this route has not been subject to that proliferation. Accordingly, designating this route for OHV use would introduce new surface disturbance and damage soils, vegetation and habitat. Instead, BLM should allow motorized use and dispersed camping on nearby routes, including SS4067 and SS4068, but should designate SS4070 as OHV-Closed.



SS4070 is substantially reclaimed. Nearby routes provide better, more established opportunities for dispersed camping and motorized use.

SS4070 cuts through desert bighorn sheep crucial habitat as well as modeled habitat for spotted bat, Townsend's big-eared bat and Fringed myotis. Designating SS4070 as OHV-Closed would minimize damage to soils, vegetation, habitat, wildlife and visual resources.

**BLM should designate SS4070 as OHV-Closed.**

**SS4099, SS4100, SS4102**

SS4099, SS4100 and SS4102 are a collection of old mining routes on a mesa that are designated as OHV-Closed. These routes are largely reclaiming, so opening the routes to new motorized use

would introduce new impacts to soils, vegetation and habitat. There are substantial opportunities for dispersed camping and motorized recreation nearby, BLM should not invite further route proliferation here. Instead, the agency should maintain the current closures. Maintaining the OHV-Closed designation for SS4099, SS4100 and SS4102 would minimize damage to soils, vegetation, habitat and wildlife.

**BLM should maintain the OHV-Closed designation for SS4099, SS4100, SS4102.**

### SS4154

SS4154 is Sulphur Canyon, a side wash to Reds Canyon. Sulphur Canyon contains many historic mining structures and artifacts that can be impacted by motorized use both by direct damage and indirect damage from increased access, including artifact collection. Both the Lucky Strike mine area and SS4177 to the southwest allow motorized access providing similar motorized experiences and opportunities. This route is in desert bighorn sheep crucial habitat. It is in modeled habitat for fringed myotis, Townsend's big-eared bat and spotted bat as well as potential habitat for southwestern willow flycatcher, Monarch butterfly and western bumble bee. The route is also within the San Rafael Swell Recreation area. Opening this route to motorized vehicles would not conserve, protect and enhance the cultural, natural, scenic, wildlife, historical or educational purposes of the Recreation Area.

Opening this route to motorized vehicles would also create management issues. There are a number of side canyons off of Sulphur Canyon and nothing to stop vehicles from unauthorized travel up those various side canyons. To minimize damage to resources, minimize conflicts between resource users and comport with the purposes of the Dingell Act, BLM should not open SS4154 to motorized vehicle use.

**BLM should maintain the OHV-Closed designation for SS4154.**

### SS4176/SS4177

These routes are currently designated as OHV-Closed. BLM should consider these route designations in combination with SS4154. Similar to Sulphur Canyon, this canyon contains some historic mine areas as well as a similar driving experience. BLM should *only* open these routes to motorized vehicles if BLM designates SS4154 as OHV-Closed. That compromise would allow motorized use while also preserving certain areas and minimizing damage to resources.

### SS4178

Regardless of BLM's designation decisions on SS4176 and SS4177, it should maintain the OHV-Closed designation for SS4178. This route climbs beyond the larger mine areas and proceeds onto the bench. The route is barely used, so designating the route would lead to more intensive motorized use that would damage soils, vegetation and habitat. It would also increase noise impacts to nonmotorized recreationists. The route ends at an arbitrary point on the bench, which will invite further unauthorized use, route proliferation and resource damage. To minimize

damage to resources, minimize conflicts between resource users and provide a more sustainable and manageable motorized network, BLM should not open this route to motorized vehicles.

**BLM should maintain the OHV-Closed designation for SS4178.**

### SS4542/SS4541/SS4537

Each of these routes proceeds to the San Rafael Knob. Rather than designate each of these routes BLM should reduce and minimize the motorized network in this area. Motorized use conflicts with hiking and climbing opportunities around the knob, by exacerbating the sights and sounds of vehicles. BLM should not designate each of these routes to the San Rafael Knob.

### SS4533

SS4533 is just to the southwest of the San Rafael Knob bench area. There are already multiple routes to various view points here. Rather than designate a route to every point, BLM should close some routes to reduce the impacts of motorized vehicles here. Closing SS4533 would also improve visual resources by reducing excess route density on this bench area. To minimize damage to resources and minimize conflicts between resource users, BLM should close this route to motorized vehicles.

**BLM should designate SS4533 as OHV-Closed.**

### Tomsich Butte Area

The Tomsich Butte area is known for its mining history and serves as the access point for seasonal Muddy Creek river running. Rather than designating every spur BLM has placed on a map, the agency should be analyzing this area holistically to provide reasonable access and camping opportunities while also protecting scenic values, riparian resources and habitat. To that end, BLM should designate the following routes as OHV-Closed.

### SS4204

SS4204 is part of a network of old mining routes in the Tomsich Butte area, it is currently designated as OHV-Closed. This route has reclaimed and no longer exists on the ground. Opening this route would lead to new surface disturbance, damaging soils, habitat and wilderness values. The route is in an open badlands area, which would make management difficult as there is nothing to stop vehicles from traveling cross country and causing additional damage to resources. There are better, less damaging dispersed camping opportunities nearby that would allow BLM to better manage expanding OHV use in this sensitive area. To comply with the Minimization Criteria, BLM should not open this route to motorized use.

**BLM should maintain the OHV-Closed designation for SS4204.**

### SS4206A/SS4207

SS4206A and SS4207 are extensions of a route from the north. BLM is effectively ending motorized travel at the thicker tamarisk trees at the end of SS4206. Extending motorized use beyond that point will allow motorized vehicles into a broad wash area, creating an impossible management situation. Motorized vehicles will likely continue and proceed up the wash to the east. Allowing motorized vehicles on SS4206 and SS4207 will damage riparian resources, vegetation, soils and habitat. It would also create conflicts between motorized and nonmotorized recreationists.

At the very most, BLM should only consider designating the western end of SS4207 to allow access to camping and a potential secondary river put in.

**BLM should designate SS4206A and most of SS4207 as OHV-Closed.**

### SS4198

SS4198 proceeds up an old, rugged dugway and above the primary old mine sites. It receives very little motorized use and is largely reclaiming. Allowing motorized use on this route would invite new surface disturbance, damaging soils, vegetation and habitat, among other resources. Allowing motorized use on this route also creates a difficult management situation as vehicles depart from the route. The route is not critical for visiting historic mining sites. To minimize damage to resources, eliminate new surface disturbance and create a more manageable and enforceable travel network, BLM should not designate this route for OHV use.



The old dugway on SS4198 is largely reclaimed and opening this route to vehicles would require new surface disturbance.

6

**BLM should designate SS4198 as OHV-Closed.**

## Copper Globe Area

### SS4564

SS4564 is designated as OHV-Closed. It was specifically designated as OHV-Closed in the 2003 SRRDP to protect the historic mine site and area from motorized vehicle damage. Over the years, BLM has taken many management actions to prevent unauthorized OHV use in this area because of damage to historic resources. SS4557 and SS4559 provide the primary and best access to the Copper Globe historic mine area. SS4564 is redundant. Rather than turn this area into a motorized playground, BLM should maintain the OHV-Closed designation. Designating this route as OHV-Closed would help minimize damage to soils, vegetation, wildlife, habitat and cultural.

**BLM should maintain the OHV-Closed designation for SS4564.**

### SS4562

Like SS4564, SS4562 was purposely designated as OHV-Closed in the 2003 SRRPD to protect the historic site and surrounding area from OHV damage. To further that goal, BLM established a signed trailhead for short hikes to allow users to explore the Copper Globe area without being disturbed by OHV play. Opening this route would introduce new conflicts between hikers seeking to explore this area and motorized users, especially because BLM is proposing to open this route to UTVs and ATVs more likely to utilize the area for OHV play.


Established nonmotorized trailhead on SS4562.

To minimize damage to soils, vegetation, habitat and wildlife and to minimize conflicts between motorized and nonmotorized resources users, BLM should not open SS4562 to motorized vehicles.

**BLM should maintain the OHV-Closed designation for SS4562.**

## Link Flats

### SS4571

SS4571 is a user-created route that is designated as OHV-Closed. It is a redundant route. Nearby route SS4570 provides better views as well as dispersed camping opportunities. Opening this route will damage soils, vegetation, wildlife and habitat. Opening this route will also cause conflicts between dispersed campers seeking a quiet and remote camping experience off of SS4570 and OHV users seeking motorized loop opportunities. Rather than open this route, BLM should maintain the quality camping experience on SS4570. To minimize damage to soils, vegetation, wildlife and habitat, and to minimize conflicts between different resource users, BLM should not open this route to motorized vehicles.

**BLM should maintain the OHV-Closed Designation for SS4571**.

## SS4576

SS4576 is a redundant and unnecessary route. Nearby routes SS4572, SS4573 and SS4574 serve as the primary access for the overlooks in the area. To better manage motorized use in this area and prevent route proliferation and attendant damage to resources, BLM should designate this route as OHV-Closed. By closing SS4576 and allowing motorized use on SS4572, SS4573, SS4574, BLM would allow access to and opportunities for motorized and non-motorized recreation while also minimizing damage to natural resources.

**BLM should designate SS4576 as OHV-Closed.**

## SS4581

SS4581 is currently designated as OHV-Closed. Unauthorized use of this route is damaging soils and vegetation where motorized users not only travel on SS4581 but create additional paths short-cutting and extending beyond the old mine route blade. Routes SS4575 provide better access to the scenic viewpoints and dispersed camping opportunities. Rather than open this route to motorized vehicles and induce route proliferation along canyon rims, BLM should keep vehicles on SS4575. To minimize damage to soils, vegetation, habitat and wildlife, BLM should not open this route to motorized use.

**BLM should designate SS4581 as OHV-Closed.**

## <u>Quandary Canyon</u>

## SS4322

SS4322 is the hiking trail for Quandary Canyon and Wayne's Wiggle, as well as other hikes in the San Rafael Reef. BLM has already created a trailhead for these hikes at the junction of SS4322 and the Behind the Reef route. Some vehicle use continues just beyond that junction to a dispersed campsite in the trees. Beyond this dispersed campsite there is no need for SS4322. The route is in a BLM Natural Area and is closed to motorized vehicle users. SUWA members have reported conflicts between hiking and unauthorized OHV use on this trail. There is no purpose or need for this route as that purpose and need is met by the Behind the Reef route and nearby dispersed camping opportunities. Opening this route to motorized vehicles would introduce new damage to soils, vegetation, wildlife and habitat. Opening the route to OHV use would also cause conflict between those who are hiking and motorized users. To minimize damage to resources and minimize conflicts between resource users, BLM should not open this route to motorized vehicles.

**BLM should maintain the OHV-Closed designation for SS4322 beyond the initial dispersed campsite.**

## Crack Canyon

### SS4303/SS4304/SS4305

Routes SS4303, SS4304 and SS4305 all conflict with the Crack Canyon hiking trail. BLM created a trailhead for this hike at the junction of SS4303 and the Behind the Reef route. Allowing motorized use beyond that trailhead is both unnecessary and causes conflicts between hikers and backpackers seeking a nonmotorized recreation experience and motorized users who push farther down this scenic canyon. The routes are currently designated as OHV-Closed. Just beyond the trailhead, there is a rugged obstacle that stops most vehicles from continuing. As a result, this is not a great area for dispersed camping. Instead, dispersed camping should be directed just to the east near Wild Horse Canyon and on routes around SS4295. Opening these routes would also cause significant management issues as vehicles pioneer new routes. To minimize damage to soils, vegetation, wildlife and habitat; to minimize conflicts on one of the more popular hiking trails in the Swell; and to create a more manageable route network, BLM should not open these routes to motorized vehicles.

**BLM should maintain the OHV-Closed designation for SS4303, SS4304 and SS4305.**

### SS4298/SS4300/SS4301/SS4302

Routes SS4298, 4300, 4301 and 4302 are just to the east of Crack Canyon. None of these routes are open to motorized vehicles. This area is relatively open, which makes it difficult to manage to prevent route proliferation and attendant damage to resources. With the exception of SS4300, these routes are generally used for dispersed camping. Campers here can also hike to Crack Canyon from this location.

SS4300 is just a wash without any associated motorized use. It should not be opened to motorized vehicles. Opening the route to motorized vehicles would introduce new surface disturbance and damage soils, vegetation and habitat.

BLM's designation decision on routes SS4298, SS4301, SS4302 should be made in the context of route designations in the nearby Crack Canyon area. BLM should *only* open these routes to motorized vehicles *if* it designates routes SS4303, SS4304 and SS4305 as OHV-Closed. Further, if BLM opens SS4298, SS4301 and SS4302 to motorized use for dispersed camping, it must also implement management strategies to ensure OHVs do not keep pushing farther into this canyon system.

## Wild Horse Canyon

### SS4281

SS4281 is the primary route into the Wild Horse Creek system on the back of the reef. The route is currently designated as OHV-Closed. Since 2003, the route has received significant unauthorized OHV use for dispersed camping. This is generally a good location for dispersed camping in this popular area. BLM should designate most of the route as OHV-Open but should

end the OHV-Open designation at the last campsite on the east side of the route. While this would only shorten the route by a few hundred feet, it would allow BLM to better manage motorized vehicles and ensure compliance with wilderness boundaries.

### SS4287/SS4288/SS4289/4291

While BLM should allow dispersed camping in the Wild Horse Creek system, BLM should not designate these routes to campsites. These are newly-created camps on a bench and expanding use has significantly damaged soils, vegetation, habitat and scenic resources. The routes are effectively no longer discrete sites as motorized use has proliferated. To minimize damage to resources and to minimize conflicts between resource users, BLM should not designate these spurs.

**BLM should maintain the OHV-Closed designations for SS4287, SS4288, SS4289, SS4291.**

### Segars Hole/Western Swell

### SS5138

SS5138 is a redundant route. The route to the Segars Hole overlook is to the south. Most of the route on BLM-managed land is reclaiming. While SS5138 begins on what is currently a SITLA section, that SITLA section will become BLM land as part of the Dingell Act land exchange. To that end, BLM should end the route at the first view point (on current SITLA but soon-to-be BLM-managed land) before the route drops down an old dugway to the bench. Opening this route to motorized vehicles beyond that first view point will introduce new surface disturbance and lead to new damage to soils, vegetation, habitat and wildlife. To minimize damage to resources and reduce route redundancy, BLM should not allow motorized use on SS5138.

**BLM should designate SS5138 as OHV-Closed.**

### SS5139

SS5139 is a very lightly-used, user-created two-track. It is closed to motorized vehicles, though has been receiving some light use as a result of BLM's failure to properly manage OHV use in this area. The route follows the canyon rim within designated wilderness. SS5139 is redundant as the Segars Hole route overlook provides expansive views with dispersed camping nearby. Opening this route to motorized vehicles would lead to significant issues with motorized intrusions into designated wilderness. To minimize damage to soils, vegetation, habitat and wilderness quality and minimize conflict between resource users, BLM should not open this route to motorized vehicles.

**BLM should maintain the OHV-Closed designation for SS5139.**

## SS5144

SS5144 is a user-created route that ends on a knoll. It is currently designated as OHV-Closed. The route is also redundant. Just to the east, route SS5143 provides access to the trailheads for Chimney Canyon and East Cedar Mountain Spring. The route is unnecessarily damaging sensitive soils and vegetation. To reduce route proliferation, create a more manageable and easily understandable vehicle network and minimize damage to soils, vegetation and habitat, BLM should not open this route to motorized vehicles.

**BLM should maintain the OHV-Closed designation for SS1444.**

## SS5392/SS5402

Routes SS5392 and SS5402 are extensions of the same "route." These routes are simply a wash that is not associated with any motorized use. The routes should not have been identified or included in the total evaluated route network. The routes are designated as OHV-Closed. Opening these routes would introduce new surface disturbance, damaging soils, vegetation and habitat. There is also no purpose or need for these routes. They are redundant to SS5391. To minimize damage to resources and reduce route redundancy, BLM should not open these routes to motorized vehicles.

**BLM should maintain the OHV-Closed designations for SS5392 and 5402.**

## SS5176

BLM should designate the northern loop end of SS5176 as OHV-Closed. Generally, SS5176 proceeds to the base of the Mussentuchit dunes. While BLM needs to correct the location of the main route, the northern loop of SS5176 that is displayed on BLM's map and GIS data should be closed. The area has sensitive plant species that can be impacted by OHV use. While OHV use can proceed to the base of the dunes, BLM should establish a trailhead there to prevent further motorized vehicle encroachment and damage. To allow access to this area, while also minimizing damage to soils, vegetation, and sensitive plant species and minimizing conflicts with other resource users, BLM should not open the northern loop of SS5176 to motorized vehicles.

**BLM should designate the northern loop of SS5176 as OHV-Closed.**

## SS5178

BLM should not open SS5178 to motorized vehicles. The route proceeds from SS5176. It does not really exist on the ground. As with SS5176, BLM should allow access to the base of the dunes and establish a non-motorized trailhead at that point. To prevent further OHV damage, BLM should not open SS5178 to motorized vehicles.

**BLM should maintain the OHV-Closed designation for SS5178.**

### SS5051

SS5051 is a very lightly-used, user-created two-track. It is designated as OHV-Closed. The route has no real purpose and need. Motorized use of the route proceeds into the Muddy Creek Wilderness. This route would be difficult to properly manage for OHV use because there are not many landscape features to prevent vehicles from traveling off-route and creating new resource damage. The route is currently damaging soils, vegetation and wilderness values. BLM should not open this route to motorized vehicles.

**BLM should maintain the OHV-Closed designation for SS5051.**

### SS5125

SS5125 is a very lightly-used, user-created two track. In many locations, the route is barely visible on the ground. It is designated as OHV-Closed. The route has no real purpose or need. It is redundant to routes SS5050 and SS5012. The nature of the landscape in this area coupled with the fact that this route is barely visible on the ground makes it likely that, if BLM opens the route to vehicles, there will be substantial off-route use and attendant damage to resources. To reduce route redundancy and minimize damage to soils and vegetation, BLM should not open this route motorized vehicles.

**BLM should maintain the OHV-Closed designation for SS5125.**

### SS5099

SS5099 is not a motorized route of any kind, but rather is a natural wash that does not receive any motorized use. It is currently designated as OHV-Closed. Opening this wash to motorized vehicles would damage soils, vegetation and wilderness quality. It would also result in new surface disturbance. Further, there is no purpose or need for this route. It ends arbitrarily after about 4 miles without any particular destination. This out and back route would also create a management problem for BLM which would be unable to manage the ending, leading to vehicles traveling beyond the end of the route designation. To reduce route proliferation and minimize damage to resources, BLM should not open this route to motorized vehicles.

**BLM should maintain the OHV-Closed designation for SS5099.**

### SS5071

SS5071 does not exist on the ground. It eventually enters a wash where it ends arbitrarily with no defined end point or particular destination. Opening this route would lead to new surface disturbance, damaging soils. The route is also redundant and serves no purpose or need. BLM should not open this route to motorized vehicles.



SS5071 does not exist on the ground. Opening this route to motorized vehicles would lead to new surface disturbance, which BLM did not analyze in its environmental assessment.

**BLM should maintain the OHV-Closed designation for SS5071.**

**SS5036/SS5072**

Routes SS5036 and SS5072 are extensions of the same purported route but neither exist on the ground. They are natural features that are not associated with any motorized use. Designating these routes for motorized use would introduce new surface disturbance, damaging soils, vegetation, habitat and wilderness values. The routes also serve no purpose or need as they do not lead to any particular destination or point of interest. To minimize damage to resources, BLM should not designate these routes for motorized use.



SS5036 does not exist on the ground and would lead to new surface disturbance.



SS5072 also does not exist on the ground such that designating this route for motorized vehicles would lead to new surface disturbance.

**BLM should maintain the OHV-Closed Designations for SS5036 and SS5072.**

### SS5383

Like routes SS5036 and SS5072, SS5383 is simply a natural wash without any associated motorized use. Opening this route to motorized vehicles would lead to new surface disturbance, damaging soils, vegetation, habitat, riparian areas and wilderness characteristics. Opening the route would introduce a new, unmanageable route network within connected washes that would impossible for BLM to manage effectively. BLM has struggled to keep OHVs on designated routes in the past. Designating SS5383 would only exacerbate this problem and lead to route proliferation. To minimize damage to soils, habitat, vegetation, wilderness character and riparian resources, BLM should not open this route to motorized vehicles.

**BLM should maintain the OHV-Closed Designations for SS5383.**

### SS5024

SS5024, otherwise known as South Salt Wash is a natural wash. While it has periodically received some light, unauthorized use over the years, that use has been infrequent. SS5024 has intermittent streams flowing in sections and is an important riparian area in the region. This route is entirely redundant to SS5012 which provides a similar recreation opportunity with significantly fewer impacts to resources. To minimize damage to riparian resources, habitat, wilderness character, soils and vegetation, BLM should not open this route to any motorized vehicles.

**BLM should maintain the OHV-Closed Designations for SS5024.**

### SS5147

Route SS5147 is in the Slaughter Slopes area of the TMA. This route is currently designated as OHV-Closed. It was recently illegally bladed and improved. The illegal blading proceeds into the Muddy Creek Wilderness. Unauthorized use of this route is facilitating illegal use into designated wilderness. Unauthorized use of the route is also impacting wilderness character, including the appearance of naturalness and opportunities for solitude. In addition to maintaining the OHV-Closed designation for this route, BLM should implement management actions to prevent motorized use at the junction with SS5146. To minimize damage to soils, vegetation, habitat and wilderness character, BLM should not open this route to motorized vehicles.

**BLM should maintain the OHV-Closed Designation SS5147.**

### SS5394

SS5394 is a natural wash. Any motorized use of this route damages riparian resources. The route cuts through high value migratory bird habitat and pronghorn crucial habitat, as well as fringed myotis, spotted bat and Townsend's big-eared bat modeled habitat. It is also within southwestern

willow flycatcher, Monarch butterfly and western bumble bee potential habitat. Allowing motorized use of the route damages, riparian vegetation, water resources, habitat and wilderness character. To minimize damage to resources, BLM should not allow motorized use of this route.

**BLM should designate SS5394 as OHV-Closed.**

## Mexican Mountain Area

### SS2079

Under Alternative C, BLM is proposing to add a significant number of short routes to accommodate dispersed camping off of the Mexican Mountain Road. While SUWA agrees with adding formal designations to many of those dispersed camping routes, BLM should not designate SS2079 for motorized use. This route is a recent, user-created route. Use of the route is damaging soils and vegetation, damage which will likely expand and proliferate because of the particular location of this route. Motorized use of the route also damages visual resources. Instead, with the exception of three locations to the west of SS2079, BLM should limit dispersed camping to already-established campsites south of the Mexican Mountain Road. To minimize damage to soils, vegetation, wilderness character, habitat and visual resources, BLM should not open this route to motorized vehicles.

**BLM should maintain the OHV-Closed designation for SS2079.**

### SS2174A/SS2176

Routes SS2174A and SS2176 are currently closed to motorized use. Despite that, motorized users have been illegally using this route to access a pictograph panel. Motorized vehicles are also pushing beyond the purported end of route SS2176 and driving into the Mexican Mountain Wilderness, damaging the appearance of naturalness as well as opportunities for solitude. Motorized use of this route is damaging vegetation, soils and wilderness character. It also has the potential to damage cultural sites. BLM would not be able to effectively manage motorized use here to keep vehicles from traveling into designated wilderness. To minimize damage and minimize conflicts between resource users as well as improve manageability, BLM should not open these routes to motorized vehicles.

**BLM should maintain the OHV-Closed designations for SS2174A and SS2176.**

### SS2182

Route SS2182 is designated as OHV-Closed. There is a decent amount of unauthorized use on this route into the Joe Hole Wash area that has been damaging soils, vegetation, habitat and wilderness character. The route ends at the wilderness boundary. However, unauthorized use is proceeding into designated wilderness. The proposed end to this route is not logical. There is no landscape feature or destination that the route leads to that will prevent vehicles from proceeding into designated wilderness. Instead, the route invites illegal use into designated wilderness. The only logical location from which to manage this route is at the junction with SS2173. To

17

minimize damage to soils, habitat, vegetation and wilderness values, BLM cannot open this route to motorized vehicles.

**BLM should maintain the OHV-Closed designation for SS2182.**

## SS2217/SS2226/SS224

Routes SS2217, SS2226 and SS224 are extensions of the same route. Each are currently designated as OHV-Closed. These routes are in a designated BLM Natural Area, which the agency committed to manage to "[p]rotect, preserve, and maintain wilderness character (appearance of naturalness, outstanding opportunities for solitude and primitive unconfined recreation)" as well as to "[m]anage primitive landscapes for undeveloped character and provide opportunities for primitive recreational opportunities and experience of solitude." Price RMP at 93. Unauthorized use of these routes has instead damaged the wilderness character BLM committed to preserve. Opening these routes to motorized use would only damage wilderness character by introducing more noise impacts as well as impacts to soils, vegetation and habitat. It would also cause conflicts between non-motorized users who value this area for its non-motorized recreation opportunities. To minimize damage to resources and to minimize conflicts between resource users, BLM should not open these routes to motorized vehicles.

**BLM should maintain the OHV-Closed designations for SS2217, SS2226 and SS2224.**

## SS2241/SS2242

SS2241 and SS2242 are both within a BLM Natural area. In the 2008 Price RMP, BLM committed to manage Natural Areas to preserve wilderness character and provide opportunities for primitive recreation and experiences of solitude. Allowing motorized use of these routes contradicts that objective and introduces new resource damage and interferes with opportunities for solitude and primitive recreation. There is an extensive motorized network just outside this Natural Area, especially just to the north and east, so there is no need to add more motorized recreation within the Natural area. To minimize damage to resources, including wilderness character, to minimize conflicts between resource users and to comply with the objectives set forth in the Price RMP, BLM should not open these routes to motorized vehicles.

**BLM should designate SS2241 and SS2242 as OHV-Closed.**

## SS2243/SS2245

Routes SS2243 and SS2245 in the Horse Haven area are designated as OHV-Closed. SS2245 is within the BLM Natural Area which BLM committed to preserve in the 2008 Price RMP. The routes are barely visible on the ground in many locations so opening them to motorized use would cause new surface disturbance and new impacts to soils, vegetation, habitat and wilderness character. BLM did not analyze the potential for new surface disturbance in the San Rafael Swell TMA environmental assessment. There is an extensive motorized vehicle network just to the north and east. Expanding motorized use into the Natural Area and onto these routes is entirely unnecessary. To minimize damage to resources, including wilderness character, to

18

minimize conflicts between resource users and to comply with the Price RMP, BLM should not open these routes to motorized vehicles.

**BLM should maintain the OHV-Closed designation for SS2243 and SS2245.**

### SS2044

Route SS2044 is Calf and Pine Canyon off of Buckhorn Wash. The eastern portion of this route is within the Mexican Mountain Wilderness. This portion of the route was not cherry-stemmed and cannot be designated for OHV use. BLM appears to be trying to alter the wilderness boundary by designating this route. Hikers and climbers also use this area and motorized use of these canyons creates user conflicts between motorized and nonmotorized users. BLM should maintain a trailhead at the beginning of the canyon and rehabilitate the OHV path into a hiking trail. There are many other OHV routes in this area that provide significant motorized recreation opportunities. To minimize damage and minimize conflicts between resource users, BLM should not designate this route for motorized use.

**BLM should designate SS2044 as OHV-Closed.**

### SS2376

BLM should modify the designation of SS2376. Rather than designate the route as currently depicted on BLM maps and GIS data, BLM should designate the route to the newer dispersed camp area. There is not motorized use beyond that point and ending the route there would improve management, keeping motorized users to a defined ending location, thereby also minimizing damage to resources.

**BLM should modify the designation of SS2376 and make the dispersed camp spot the ending location of the route.**

### SS2372

BLM should modify the designation of SS2372. Instead of extending this route onto private property, BLM should end the route designation just before the private property. At that location, BLM should create a parking area and hiking trailhead that would allow the public to then enter the designated wilderness. Allowing motorized use to continue onto the private property creates significant management issues because motorized users then travel into designated wilderness causing damage to soils, vegetation, habitat and riparian resources.

**BLM should modify the designation of SS2372 to end the route before it enters private property.**

## Sids Mountain Area

### SS3115/SS3145

SS3115 and SS3145 are in the Wedge Overlook area near the Good Water Rim Trail. BLM has not managed this area well and, as a result, damage to resources has proliferated. Adding more trails in this area will increase the pressure on already-strained camping opportunities. It will also lead to new impacts from dispersed camping as visitors drive farther off of routes to find camp sites. To the extent this route is being used, it is damaging vegetation and soils. There are also sensitive plant species in this area. To minimize damage to resources, BLM should not designate these routes for motorized use.

**BLM should maintain the OHV-Closed designation for SS3115 and SS3145.**

### S3114

SS3114 is a short spur in the Wedge Overlook area. It has contributed to expanding impacts from route proliferation in this area. As part of the SRRDP, BLM intentionally kept motorized use out of this area to preserve as a nonmotorized landscape. BLM has failed to adequately manage and enforce its travel plan. As a result, motorized use and damage from that motorized use has proliferated. BLM should not further expand that damage by opening SS3114. Instead, BLM should keep motorized use closer to the existing dispersed campsites and better manage use.

**BLM should maintain the OHV-Closed designation for SS3114.**

### SS3117

SS3117 is designated as OHV-Closed. In the past, BLM has attempted to reduce the impacts of motorized use on the rims of Little Grand Canyon. Opening this route to motorized vehicles would undermine those management goals. Opening this route on a prominent point will damage visual resources. It will also damage soils, vegetation, habitat and wilderness character. To comply with the minimization criteria and protect the scenery in this spectacular area, BLM should not open SS3117 to motorized vehicles.

**BLM should maintain the OHV-Closed designation for SS3117.**

### SS3071

SS3071 is a broad, natural wash. There has been some motorized use of the wash as the first mile of the wash was previously designated as OHV-Open. However, that OHV-Open designation has led to route proliferation and damage to resources as vehicles veer off route and up side washes. It has the potential to become an even more damaging OHV play area. Rather than introducing and increasing OHV use in this area, BLM should be reducing impacts in this exceptionally scenic landscape. The route is both redundant and unnecessary as Buckhorn Wash Road provides the primary access to this area. To minimize damage and increase manageability, BLM should designate all of SS3071 as OHV-Closed.

**BLM should designate SS3071 as OHV-Closed.**

### SS3061

The northern portion of SS3061 is an old mineral route to the base of the cliffs, but the southern portion of the route is a natural wash that is not associated with motorized use. These are two separate routes that should not be considered one and the same for planning purposes. While it may make sense to designate the old mining route for motorized use because it is an old blade and easier to manage, it does not make sense to open the wash portion of the route to motorized use. To allow access while also minimizing damage to resources, BLM should maintain the OHV-Closed designation for the wash portion of SS3061.

### SS7000

SS7000 is currently designated as OHV-Closed. It is within the Eagle Canyon Wilderness and BLM cannot designate the route for motorized use. BLM's attempt to *change* the wilderness boundaries extend well beyond any authority given in the Dingell Act to clarify wilderness boundaries. This is a user-created, redundant, dead end route that serves no purpose or need. SS3322 provides access to the area as well as motorized recreation area.

**BLM must designate SS7000 as OHV-Closed.**

### <u>San Rafael Reef Area</u>

### SS2419/SS2420/SS2421

SS2419, SS2420 and SS2421 are a collection of routes on Shadescale Mesa. The routes are all designated OHV-Closed. There has been some unauthorized use on these routes as a result of BLM's failure to properly manage the route closures. In recent years, unauthorized use has developed a car camping, dispersed campsite on SS2420. Beyond that dispersed campsite, BLM should close the remaining routes to motorized use. Use of these routes is damaging soils, vegetation and habitat. It is also leading to route proliferation. There is no purpose or need for these routes beyond the dispersed campsite. To minimize damage while also allowing for recreation and to create a more manageable travel network, BLM should designate SS2421 as OHV-Closed and designated SS2419, beyond the junction with SS2420 as OHV-Closed.

### SS2481

SS2481 is currently designated as OHV-Closed. It is an old seismic line that has received some unauthorized OHV use. The route is redundant SS2412, which provides access to this area. The route serves no independent purpose or need and instead contributes to unnecessary damage of resources like soils, vegetation and habitat. BLM should not open this redundant and unnecessary route to motorized vehicles.

**BLM should maintain the OHV-Closed designation for SS2481.**

### Front of the Reef

*With Alternatives C and D, BLM is contemplating significantly increasing the number and mileage of routes throughout the Front of the Reef. In essence, BLM would connect all currently-designated routes with new links. Each of the vehicle-accessed canyons on the Front of the Reef have significant OHV compliance concerns that the agency has been unable to manage effectively, even with the current route network. Significantly expanding the route network here will only compound the problem and drive more use to this area. It will also lead to substantial damage in this spectacular area. Rather than significantly increasing the motorized network in this area, BLM should be making minor tweaks to route designations to better achieve compliance with the existing travel plan.*

### SS2514, SS2512, SS2505

SS2512, SS2514, SS2505 are all extensions of the an old seismic line along the Front of the Reef. The route is not receiving any use, has largely reclaimed and is barely visible on the ground. The route is connected to Straight Wash which is an important and sensitive location. Opening this route to motorized use would lead to new impacts to soils, vegetation and habitat. It would also invite off-route travel as visitors would have trouble following the "route." To avoid new surface disturbance and minimize damage to resources, BLM should not open these routes to motorized vehicle use.



SS2512, pictured, is substantially reclaimed and should not be opened to motorized use.

**BLM should maintain the OHV-Closed designation for routes SS2512, SS2514, SS2505.**

### SS2491

SS2491 is a wide natural wash: Iron Wash. While it receives occasional unauthorized use, that unauthorized use is not significant. However, opening this route to motorized vehicles has the potential to lead to substantial damage. Opening this wash to motorized vehicles would likely invite vehicles to continue up Iron Wash into the seasonal creek and sensitive canyon system. There is no overarching purpose or need for this route as access to and recreation in this area is provided by other, nearby routes that would result in less resource damage. To comply with the Minimization Criteria and establish a manageable motorized route network, BLM should not open this route to motorized vehicles.

**BLM should maintain the OHV-Closed designation for SS2491.**

### SS2497

SS2497 is an old, reclaiming seismic line that connects with SS2498. The route is an unnecessary addition to the already-sufficient route network in the Front of the Reef area. SS2497 is currently OHV-Closed. Opening this route to motorized vehicles would introduce new damage, including to soils, vegetation and habitat. The route has no purpose or need that is not met by other, already-designated routes in this area. To comply with the Minimization Criteria and create a more sustainable and manageable route network, BLM should not open this route to motorized use.

**BLM should maintain the OHV-Closed designation for SS2497.**

### SS2498

SS2498 proceeds from the highway and through a SITLA section before reaching BLM-managed lands. The route has caused management issues in the past. Motorized use of the route has been limited, but motorized recreationists primarily use the route to access to a knoll over Iron Wash. Beyond that point, vehicle use is very limited. Rather than open this entire route and extending it to connect with SS2497—which would cause new resource damage—BLM should close this route beyond the knoll.

### SS2525/SS2526

Routes SS2525 and SS2526 make up the old highway through the area. The routes are largely reclaimed with substantial vegetation re-growth. There is no purpose or need for these routes as other, nearby routes provide access to the area as well as motorized recreation opportunities. Designating the routes would lead to new surface disturbance, which BLM did not analyze the impacts of in the environmental assessment. To minimize damage and create a more manageable travel network, BLM should not open these routes to motorized vehicles.

23

**BLM should maintain the OHV-Closed designation for SS2525 and SS2526.**

### SS2531

SS2531 proceeds north of the main Ernie Wash route. It is currently designated as OHV-Closed. BLM has had challenges managing OHV use in this area because it is an open landscape and the route goes to an older drill truck. It would be best to designate the route to the top of the knoll and end the route before it drops into the wash. Once vehicles enter the wash, it will be difficult for BLM to manage motorized use to ensure that such use does not proliferate beyond the end of the route designation. To allow access while also minimizing damage, BLM should only designate this route to the top of the knoll.

### <u>Price River Area</u>

### SS1002/SS1003

SS1002 is at the end of the route that climbs onto Flattop Mountain and roughly overlooks the Chimney Rock area. It is a user-created route resulting from BLM's failure to effectively manage motorized use in this area. SS1003 is also a user-created spur that has emerged after failed BLM management. The routes cause unnecessary damage to soils, vegetation and habitat. There is also no overarching purpose or need for these routes as many nearby routes provide access to overlooks and dispersed camping. To minimize damage and create a more sustainable route network, BLM should not open these routes to motorized use.

**BLM should maintain the OHV-Closed designation for SS1002 and SS1003.**

### SS1561

SS1561 is largely non-existent on the ground. It is currently designated as OHV-Closed. This was never a route. To the extent there is any use, it was likely a few dirt bikes that pioneered a track from the flanks of Flattop Mountain down to Sulphur Canyon. Once in Sulphur Canyon, the route is merely a natural wash. BLM appears to being trying to create a new single-track motorized route network. There is already an extensive single-track motorized network in the Chimney Rock area. Opening this route would lead to substantial new impacts to soils, native vegetation and habitat. There is no purpose or need for this route. To minimize damage and create a sustainable travel network, BLM should not open this route to motorized vehicles.

**BLM should maintain the OHV-Closed designation for SS1561**

### SS1543

Similar to SS1561, SS1543 largely does not exist on the ground. It is currently-designated as OHV-Closed and has never been a designated route. Motorized use of this route, including single-track use, will result in new surface disturbance and will damage resources, including soils, vegetation and habitat. Rather than create a new single-track trail system where one does not exist, BLM should be directing that use to the already-established system in the Chimney

Rock area. To minimize damage, and create a more sustainable travel network, BLM should not open this route to motorized vehicles.

**BLM should maintain the OHV-Closed designation for SS1543.**

### SS1234A

SS1234A proceeds beyond Balanced Rock and down into the Price River corridor to connect with old stock trails. Motorized use of the route damages soil and vegetation. As the route proceeds toward the Price River, motorized use damages important riparian vegetation and habitat. Desert waterways have an outsized importance as some of the most productive lands. This route is unnecessary and any purpose for the route is outweighed by the damage it facilitates to riparian resources. To comply with the Minimization Criteria and create a more sustainable travel network, BLM should not open this route to motorized vehicles.

**BLM should designate SS1234A as OHV-Closed.**

### SS1235

SS1235 largely does not exist on the ground. It traverses the Price River corridor and proceeds out of the river bottom. Designating this route would lead to new surface disturbance, which BLM did not analyze in its SRS TMP environmental assessment. Opening this route would damage native vegetation, soils, important riparian resources as well as wildlife habitat. Designating the route would also cause conflicts between nonmotorized recreationists in the Price River corridor. To comply with the minimization criteria, BLM should not designate this route for motorized use.



Opening SS1235, pictured, to motorized use would cause new surface disturbance and damage to riparian resources.

**BLM should designate SS1235 as OHV-Closed.**

### SS1404

SS1404 is an old stock trail that does not receive motorized use. It leads to the Price River corridor and weaves through substantial vegetation. Once the stock trail reaches the river corridor, the vegetation and Price river would make any vehicle travel difficult. Allowing motorized use on this route would lead to new surface disturbance and would damage resources, including soils, vegetation, riparian areas and habitat. To comply with the Minimization Criteria and create a manageable and sustainable route network, BLM should not designate this route for motorized use.

**BLM should designate SS1404 as OHV-Closed.**

### SS1493

SS1493 is a natural wash: Humbug wash. It is currently designated OHV-Closed. There is not a lot of motorized use on this wash. BLM appears to be trying to expand the already-extensive Chimney Rock route network area. BLM already has trouble managing that area and motorized users are expanding impacts. BLM should not be adding to the network, but rather should be improving management of the already-available motorized routes to ensure vehicles stay on trail and to prevent resource damage. Opening this route will lead to further route proliferation and

impacts. To minimize damage to resources, BLM should not open this route to motorized vehicles.

**BLM should maintain the OHV-Closed designation for SS1493.**

### SS1160

SS1160 proceeds from Grassy Trail Creek over a slight rise and down to the Price River. It is lightly-used and the southern portion of the route is reclaiming with vegetation masking the route. It is currently designated as OHV-Closed. The route is unnecessary and does not have any overarching purpose or need. Opening this route to motorized vehicles would lead to new surface disturbance and would damage, soils, habitat, native vegetation and riparian resources. To comply with the Minimization Criteria, BLM should not open this route to motorized vehicles.

**BLM should maintain the OHV-Closed designation for SS1160.**

### SS1414/1415

Routes SS1414 and SS1415 are remnants of an old blade. The routes are very lightly used and in spots difficult to see on the ground. The routes are currently designated OHV-Closed. Opening these routes would damage resources, including wildlife habitat, soils and native vegetation. To comply with the Minimization Criteria and create a more sustainable and manageable route network, BLM should not open these routes to motorized vehicles.

**BLM should maintain the OHV-Closed designation for SS1414 and SS1415.**

### SS1418

SS1418 is a short spur off of SS1414 and SS1415. It proceeds to a rim area over the Price River. It is currently designated as OHV-Closed and receives very little use. The route is redundant with SS1420 which provides access to a large Price River overlook. Opening this route to motorized vehicles would lead to new damage to soils, vegetation and habitat, among other resources.

**BLM should maintain the OHV-Closed designation for SS1418.**

### SS1426

SS1426 proceeds off of SS1408 and drops into an unnamed wash where the route then ends. It does not lead to any particular point of interest or ending location and instead would invite unauthorized motorized use within the wash. Motorized use of the wash would damage soils, native vegetation, wildlife habitat and wilderness character. There is no purpose or need for the route. BLM should not open this route to motorized vehicles.

**BLM should maintain the OHV-Closed designation for SS1426.**

### SS1533

SS1533 is Humbug Canyon, a large and scenic canyon system, the upper stretches of which are remote and wild. Motorized use in this beautiful canyon damages soils, vegetation, habitat and wilderness values. There is already substantial motorized use and single-track systems to the east in the more-established Chimney Rock area. BLM should not allow motorized use in this canyon. SUWA members have reported motorized use damages their hiking experience in this remote canyon. To minimize damage, minimize conflicts between resource users, establish some balance and create a more sustainable route network, BLM should not designate this route for motorized use of any kind.

**BLM should designate SS1533 as OHV-Closed.**

### SS1354

SS1354 is a user-created route that damages soils and vegetation and proceeds to the rims above the Price River. It is designated as OHV-Closed. There is no purpose or need for this route. It impacts wilderness character. BLM should not open this route to motorized vehicles.

**BLM should maintain the OHV-Closed designation for SS1354.**

### SS1378

SS1378 is barely visible on the ground. The user-created path is seldom used and is currently designated as OHV-Closed. Opening this route to motorized vehicles would lead to new surface disturbance and would damage soils, vegetation and habitat, among other resource values. Opening this route would also likely lead to even more route proliferation in this area. To create a more sustainable route network and minimize damage, BLM should not open this route to motorized vehicles.

**BLM should maintain the OHV-Closed designation for SS1378.**

### SS1386

SS1386 is a largely non-existent, user-created route. It is currently designated as OHV-Closed. Opening this route would lead to new surface disturbance, which BLM did not analyze as part of its environmental assessment. Opening the route would also damage resources including soils, native vegetation and habitat. To comply with the minimization criteria and create a more sustainable route network, BLM should not open this route to motorized use.



SS1386 does not exist on the ground and should not be opened to motorized use.

**BLM should maintain the OHV-Closed designation for SS1386.**

### SS1381/SS1383/SS1385

These are a collection of user-created routes that are designated as OHV-Closed. These routes are largely barely visible on the ground. Authorizing new motorized use on these routes would create new impacts and damage soils, vegetation and habitat. There is no purpose or need for these routes. To comply with the Minimization Criteria and create a more sustainable route network, BLM should not open these routes to motorized vehicles.

**BLM should maintain the OHV-Closed designations for SS1381, SS1383 and SS1385.**

### SS1294

SS1294 is in the Church Flats area south of the Price River. The route is currently designated as OHV-Closed. With the exception of the very beginning of the route from the east, the route is not used by motorized vehicles. The route does not serve any purpose or need. Opening the route would invite new resource damage, including to soils, vegetation and habitat. BLM should not open this pointless route to motorized vehicles.

**BLM should maintain the OHV-Closed designation for SS1294.**

## SS1342

SS1342 is a user-created route that proceeds along the bench near the Price River. It is currently designated as OHV-Closed. This unauthorized route is impacting sensitive soils in the area as well as wildlife habitat. Opening this route would cause significant management issues as the route is in a badlands landscape without landscape features to keep motorized users on route. To improve manageability and minimize damage to resources, BLM should not open this route to motorized vehicles.

**BLM should maintain the OHV-Closed designation for SS1342.**

### Limestone Cliffs Area

## SS6044

SS6044 largely does not exist on the ground and does not receive any meaningful OHV use. It is currently designated OHV-Closed. Opening this non-existent route will introduce new damage to soils, vegetation, habitat and wilderness character. There is no purpose or need for this route. It's unclear why BLM included the route in its inventory in the first instance, let alone why BLM is considering opening this non-existent route to all vehicles in Alternatives C and D. BLM's route report calling this a "primary maintained road" within the San Rafael Swell does not reflect reality and is absolutely incorrect. Opening this route would result in new surface disturbance, which BLM did not analyze in the environmental assessment. Opening the route would also damage soils, vegetation, habitat and wilderness character. BLM should not open this non-existent route to motorized vehicles.



SS6044, which BLM's route reports refer to as critical to network connectivity and a "bladed major road," does not actually exist on the ground as of 2022.

**BLM should retain the OHV-Closed designation for SS6044.**

### SS6017

SS6017, which is currently designated as OHV-Closed, largely does not exist on the ground. It serves no purpose or need. Vegetation masks the route such that any motorized use would cause new surface disturbance. BLM did not analyze the potential impact of new surface disturbance in its environmental assessment. Opening this route to motorized use would lead to new surface disturbance to soils, vegetation and habitat. BLM should not open this route to motorized vehicles.

SS6017 does not exist on the ground. Opening this route would lead to new surface disturbance and damage resources.

**BLM should retain the OHV-Closed designation for SS6017.**

## Eagle Canyon Area

### SS3345

SS3345 is the Wood Hollow wash. It is not a wash that is associated with motorized vehicle use. The route is redundant to SS3328, which provides access to this area. The route is currently designated OHV-Closed. Opening this route would lead to new impacts to soils, vegetation and wilderness character. The route serves no purpose or need that would outweigh impacts to resources. To minimize damage to resources and create a more sustainable and manageable route network, BLM should not open this route to motorized vehicles.

**BLM should retain the OHV-Closed designation for SS3345.**

### SS3343

SS3343 proceeds to North Salt Wash. It is currently designated as OHV-Closed. There has been some unauthorized use of this route as a result of BLM's failure to adequately enforce the current travel management plan. While it may make sense for BLM to designate the route across the Bellevue Flats to the rims of North Salt Wash, BLM should not allow motorized use to enter into

North Salt Wash and should not allow motorized travel to continue into the Wood Hollow wash. Designating a portion of this route would allow access to the area while still protecting sensitive resources.

### SS3394

SS3394 is in a badlands-type landscape in the Eagle Canyon region. The route is currently designated as OHV-Closed. The route largely does not exist on the ground. As a result, opening this route to motorized use would lead to new surface disturbance, which BLM did not analyze as part of its environmental assessment. Opening this route would also damage soils, vegetation, habitat and wilderness character.

**BLM should maintain the OHV-Closed designation for SS3394.**

### SS3434

SS3434 proceeds through John McDonald Canyon. John McDonald Canyon is located in an important cultural landscape, and encompasses a number of cultural sites. Under the current travel plan, SS3434 ends before entering the canyon itself. BLM should retain that designation but should *not* allow motorized use into the canyon itself. Instead, the agency should establish a nonmotorized trailhead prior to the canyon. Opening this route into the canyon would lead to substantial damage to resources, including to cultural sites.

**BLM should maintain the OHV-Closed designation for SS3434 as it proceeds into and through John McDonald Canyon.**

### SS3426

SS3426 extends off of SS3419 towards John McDonald Canyon through the open and scenic badlands landscape. It then turns southwest into the canyon itself before connecting with SS3434. This route is currently designated as OHV-Closed. As a result of BLM's failure to manage OHV use and enforce its existing travel plan, there has been some unauthorized use which has led to damage to soils, vegetation and habitat. This route is also in a culturally-rich landscape with significant cultural sites that are vulnerable to damage from motorized use. Rather than inviting even more motorized use into this canyon, BLM should create nonmotorized trailheads at either end of the canyon. Motorized use of this route already creates conflicts with nonmotorized visitors exploring the cultural landscape. Opening this route would only exacerbate those conflicts.

**BLM should maintain the OHV-Closed designation for most of SS3426 and establish a nonmotorized trailhead before the route enters John McDonald Canyon.**